FR: SCHOPPE-RICO
C.D.C. # V-11328
PELICAN BAY STATE PRISON
P.O. BOX # 7500
CRESCENT CITY. CA. 95532.

IN PRO-PER.

FILED

08 JUN 25 PM 2: 13

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6-19-08

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA.

JOHN M. SCHOPPE-RICO.
                    PLAINTIFF

          VS.

ROBERT A. HOREL. WARDEN

JSW
CASE NO. C-07-5416 - ~~JSJ~~-PR.

CERTIFICATE OF MAILING. OF EXHIBITZ.
INJUNCTION WITH FIRST AMENDED
PETITION.

TO THE COURT: RESPONDENTS PLEASE TAKE NOTICE THAT PETITIONE IN PRO-PER.
MR. SCHOPPE-RICO. HEREBY IS FILING EXHIBITS WITH INJUCTION WITH. THE
FIRST AMENDED PETITION. THAT WAS FILED MAILED OUT ON 6-12-08 TO THE
COURT OF NORTHERN DISTRICT. AND TO THE ATTORNEY GENERALS OFFICE
THESE EXHIBITS ARE INSUPPORT OF FIRST AMENDED PETITION AND ARE TO BE
FILED AND /OR CONSIDERED WITH PETITION AMENDED. THE DELAY IS DUE
TO (C.D.C) PELICAN STATE PRISON STAFF. REFUSING AND NOT WANTING TO
PHOTO COPY SAID EXHIBITS. HOWEVER. I GOT THEM PHOTO COPIED TWICE
FOR THE COURT. AND ONE COPY FOR ATTORNEY GENERALS OFFICE, WITH
THIS SAID. THIS WILL CONCLUDE AND EXHIBITZ WILL BE MAILED IN NOW
IN SUPPORT OF PETITION. I SWEAR UNDER PENALTY OF PERJURY THE FORE-
GOING IS TRUE AND CORRECT IN ITS TOTALLITY IN TWO ENVELOPES
EXHIBITS WERE MAILED TO COURTS.

                    SINCERELY

                    MR. SCHOPPE-RICO
                              PETITIONER

          6-19-08

# EXHIBIT: A

( 22 pg) HAND INJURIES. AND MEDICAL REPORTS.
    WITH DIAGRAHMS OF PHYSICAL IMPAIRMENT
    A PROOF OF DISABILITY

ATTACHED TO EXHIB.
22 PAGES



2 OCTOBER. HE U[...] RIFLE. [RT 1846-1848] HOWEVER ALLOWING D[...]ID TO [...] FORM INT SHARON CONWAY. MS. SMITH WAS BOASTING BRAGGING HOW HE SHOT THE AP[...]ELLANT, INCLUDING THE DA, WITHHOLDING THE 911 TAPE RECORDING PERTAINING TO IT, AS WELL [...] [...] IN LATE SEPTEMBER OR OCTOBER, THIS LEAVING HIM PHYSICALLY LEGALLY DISABLED ON OBER. 17. 2000, BY DECLARE HIM UNABLE TO DO, WHAT HE D[...]TIES ALLEGED TO OCCURRED ON OCT. 17. 2000.

ULNA   RADIUS

NOTE: NO WAY AT TIME COULD CARRY GRIP, PULL OR HIT ANYTHING ON OCT. 17. 00.

TYPE OF INJURY SHATTERED BONE PLATE AN WRIST BONE FIX[...] REPLACED BY FIXATION SCREW INSTALLED IN BONE BY A SURGEON LEAVING FOR LONGER THAN 3 MONTHS NOV. 30. SCAPHOID STILL FRACTURED BONE, STILL FRACTURED TO DATE 2003 OF NOV. 30.

DIGITAL ARTERY

SUPERFICIAL TRANSVERSE LIGAMENT

PALMAR FASCIA

THIS AREA HURTS ITS STIFF STILL TO TH[...] DAY.

SCARS ARE THE DOCTORS ENTERY OF SURGERY REPAIR INJURY AN GUNSHOT WOUND TO THE SHATTERED WRIST BONES WITH FIXATION SCREW

SCAR INDICATES WERE SURGEON DOCTOR OPERATED LEAVING ENTIRE HAND DISABLED PARALYZED AN BRUISED AN SWOLLEN, PURPLE WHEN FIXING GUNSHOT WOUND

**FIG. 177** - VERTICAL SECTION THROUGH THE ARTICULATIONS AT THE WRIST. SHOWING THE FIVE SYNOVIAL MEMBRANES

**FIG. 241** - PALMAR FASCIA - FROM A PREPARATION IN THE MUSEUM OF THE ROYAL COLLEGE OF SURGEONS OF ENGLAND.

FIG. 251 FRACTURE OF THE LOWER RADIUS WITH FIXATION SCREW REPLACING SHATTERED BONE AN JOINT.

SEE NOTES ABOVE NEXT TO FIGURES.
APPELLANT MOVES TO PROVE THAT ON OCT 17.00 WITH THIS TYPE OF INJURY HE WAS LEGALLY DISABLED. AN WITH A NEWER DIAGNOSTIC IMAGING REPORT HE CAN PROVE THIS.

ORDER MD: RAEL, JAMES, M.D.
ORDER DATE: 04/14/03
CONTRA COSTA HEALTH SERVICE
CONTRA COSTA REGINAL MEDICAL CENTER
CONTRA COSTA HEALTH CENTER
DIAGNOSTIC IMAGING DEPARTMENT
= REPORT =

RIGHT HAND : 3 VIEWS.

MR#: MU05011G444
NAME: SCHOPPE-RICO
PH #: (925) 646-4775
D.O.B: 08/21/81  SEX: M.
LOC: MDF.
ACCT#: MO58601667
PCS: MART.
SERVICES DATE: 04/14/2003
SERVICE TIME: 1500. —

COMPARE: RIGHT HAND AN WRIST 1/30/01.

HISTORY: PREVIOUS GUNSHOT WOUND: PAIN.

FINDINGS: MULTIPLE METALLIC GUNSHOT FRAGMENTS REMAIN AT RADIAL ASPECT OF WRIST, OLD HEALED RADIAL STYLOID PROCESS FRACTURE. MID, SCAPHOID FRACTURE REMAINS IN STABLE POSITION WITH NON-UNION, AND SINGLE FIXATION SCREW, SCLEROSIS OF PROXIMAL AND DISTAL POLES OF SCAPHOID, HAS INCREASED.

CONCLUSION: OLD GUNSHOT WOUND WITH SCAPHOID FRACTURE NONUNION AND DEVELOPING SCAPHOID AVASCULAR NECROSIS.

MICHAEL A. PRICE, M.D.

PRIM: [...]CA
DICTATED: 04/14/08
TRANCRIBED: 04/15/03 0912.
CONTRA COSTA REGIONAL MEDICAL CENTER (PCI OF DATABASE CCS)

DIAGNOSTIC IMAGING REPORT.

DRAFT COPY

RUN: 04/21/03 — 8:20 by pizzo, ANTHONY FNP

PAGE 1 OF 1.



3. DISSECTION OF SHOULDER AND ARM

2. BEND OF ELBOW

1. DISSECTION OF PECTORAL REGION AN AXILLA

4. FOREARM

5. PALM OF HAND

ON RIGHT HAND HAND AN[...] DISABLED BY OCT. 17. 2000 C[...] COURSEL WAS INFORM[...]

FIG. 228 - DISSECTION OF UPPER EXTREMITY

PG 1.

CONTRA COSTA
HEALTH SERVICES

**CONSENT TO SERVICES AND CONDITIONS
OF SERVICES AND OF ADMISSION**

SCHOPPE          RICO
M   8/31/1981 925 645-4775

00501694-4        JO
                  MART

Patient ID

**MEDICAL/SURGICAL TREATMENT CONSENT:** The undersigned consents to any medical treatment, including but not limited to x-ray examinations, laboratory procedures, medical/surgical procedures, injections, and blood transfusions, considered advisable or necessary by the attending physician or by other of the hospital's medical staff, including physician residents and independent contract physicians; and further agrees to the provisions expressed on the reverse side of this form.

**TEACHING PROGRAM:** The undersigned understands that Contra Costa Health Services, Contra Costa Regional Medical Center and Contra Costa Health Centers are teaching institutions and that residents, interns, and health care students, under the supervision of professional staff, may be involved in providing medical and/or health care.

**CONSENT TO RELEASE MEDI-CAL LABELS:** The undersigned authorizes the Contra Costa County Department of Social Services to release information concerning the status of the patient's Medi-Cal application, and to send the patient's Medi-Cal labels to the Contra Costa Health Services Department. I also authorize the above Agency to send Contra Costa Health Services a Letter of Authorization, to allow the Medi-Cal program to be billed for any medical services I have received at a county facility that may be covered by the Medi-Cal program.

**FINANCIAL AGREEMENT:** The undersigned promises to reimburse the County of Contra Costa for any hospital care and/or medical services provided to the patient at any time within 365 days of the date indicated below, which services are not covered by Medicare, Medi-Cal, insurance or any other health care compensation carrier, at the rates established by the Contra Costa County Board of Supervisors. The undersigned further agrees to use any damages or indemnity paid to or on behalf of the patient as a result of the injury or illness which necessitated this care to reimburse the county up to the amount billed, but not to exceed the rates set by the Board of Supervisors.

The undersigned waives the statute of limitations on this matter for a period of 10 years. This agreement and waiver is binding on the undersigned, his or her heirs, assigns, administrators, and executors.

The undersigned authorizes the Social Security Administration to release to Contra Costa County Health Services Department information concerning the status of the patient's Social Security benefits, including the type of benefit, amount receiving, and the effective date. I also authorize the above agency to release information about the patient's Medicare benefit, including the effective date.

**ASSIGNMENT OF BENEFITS:** The undersigned authorizes, whether he/she signs as agent or as patient, direct payment to Contra Costa County of any insurance benefits otherwise payable to or on behalf of the patient for this hospitalization and/or these outpatient services, including emergency services if rendered, in an amount not to exceed the County's regular charges. A photocopy of this authorization shall be considered as effective and valid as the original.

The undersigned authorizes and directs the attorney, claims adjustor, insurance company and any person(s), company or corporation who may effect a settlement or payment of any claim for damages or indemnity that the patient may have arising from the injury or illness which necessitated this hospital care and/or outpatient services, to deduct the amount of the charges of these services from any sum due the patient and to pay that amount directly to Contra Costa County and the undersigned hereby assigns that amount to Contra Costa County.

**RELEASE OF INFORMATION FOR REIMBURSEMENT:** The undersigned agrees that, to the extent necessary to determine liability for payment and to obtain reimbursement, Contra Costa County may disclose portions of the patient's record, including his/her medical and psychiatric records, to any person or corporation which is or may be liable for all or any portion of the charges, including but not limited to insurance companies, health care service plans, workers' compensation carriers, Social Security Administration, and peer review organizations.

**The undersigned certifies that he/she has *read both sides of this document,* received a copy thereof, and is the patient, the patient's legal representative, or is duly authorized by the patient as the patient's general agent to execute this document and accept its terms.**

7-17-03

_____
DATE

_____
SIGNATURE OF PATIENT OR PATIENT'S REPRESENTATIVE

_____
WITNESS TO SIGNATURE

_____
IF PATIENT'S REPRESENTATIVE, RELATIONSHIP TO PATIENT

If patient unable to sign, STATE REASON:

2

DATE          BY

CONTRA COSTA HEALTH SERVICES
CONTRA COSTA REGIONAL MEDICAL CENTER
CONTRA COSTA HEALTH CENTERS

**DIAGNOSTIC IMAGING DEPARTMENT**

**REPORT**

Ordering MD:   Rael,James,M.D.
Order  Date:   04/14/03
Order  Time:

MR#:      M005016944
Name:     SCHOPPE,RICO
Ph #:     (925)646-4775
DOB:      08/21/81    Sex   M
Loc:      MDF
Acct# : M058601667
PCP:
PCS:      MART

SERVICE DATE:  04/14/2003
SERVICE TIME:  1500

**RIGHT HAND:  3 VIEWS**

COMPARE:                    Right hand and wrist 1/30/01.

HISTORY:                    Previous gunshot wound.  Pain.

FINDINGS:
Multiple metallic gunshot fragments remain at radial aspect of wrist.  Old healed
radial styloid process fracture.  Mid scaphoid fracture remains in stable position,
with nonunion, and single fixation screw.  Sclerosis of proximal and distal poles of
scaphoid, has increased.

CONCLUSION:                 Old gunshot wound with scaphoid fracture nonunion and
                            developing scaphoid avascular necrosis.


                                     MICHAEL A. PRICE, M.D.


PRIM        : LCA
Dictated    : 04/14/03
Transcribed : 04/15/03 0912                    **DIAGNOSTIC IMAGING REPORT**

Contra Costa Regional Medical Center (PCI: OE Database CCS)            DRAFT COPY



AT THE WRIST

COPY

EXCLUSION OF THIS TYPE OF EVIDENCE DEMONSTRATING PHYSICAL IMPAIRMENT IS ERROR WHERE PROSECUTION VERSIONS OF EVENTS RELIED ON DEFENDANTS PHYSICAL ABILITY TO PERFORM CERTAIN ACTS

ALTERED JOINT BONE FIXATION SCREW IN SCAPHOID FRACTURE TILL HEALING FOR THE LAST SEVEN YEARS

RADIUS      ULNA

SUPERFICIAL TRANSVERSE LIGAMENT      DIGITAL ARTERY

DIGITAL ARTERY
DIGITAL ARTERY

PALMAR FASCIA

PALM

THIS IS WHERE THE CALIBER ENTERED THE FLESH

AFTER THE OPERATION AND AFTER 36 STITCHES TO CLOSE THE WOUND ET LEFT APPROXIMATELY A 4½ INCH SCAR.

DURING THE OPERATION SURGEN CUT THE WRIST AREA TO REMOVE ALL REMAIN NO FRAGMENTS WI THEN INSTALLED A SCREW TO KEE THE WRIST IN PLACE

DESSECTION SHOULDER AN ARM

3

RIGHT ARM SHOULDER ARM FORARM AND HAND 1804 ON OCTOBER 17, 2000, WAS PHYSICAL IMPAIRMENTED DUE TO GUN SHOT WOUND AND URGED FIXATION SCREW DESTABILIZE WRIST IN ALT.

DISABILITY

4. FORARM

1

1. DESSECTION PECTORA REGION AN AXILLA.

4  4

INJURY

INJURY SCARS

5. PAIN OF HAND

| LEFT ANTERIOR HAND | RIGHT ANTERIOR PALM | LEFT POSTERIOR HAND | RIGHT POSTERIOR HAND |

(EXHIBIT-II)

DATE: _____    TIME: _____

SIGNATURE

1  RIGHT HAND: 3- VIEWS ___ COMPARE: RIGHT HAND AND "WRIST 1/30/01" ORTHO

2  HISTORY: PREVIOUS GUNSHOT WOUND - PHYSICAL IMPAIRMENT - PAIN

3  FINDINGS: MULTIPLE METALLIC GUNSHOT FRAGMENTS REMAIN AT RADIAL ASPECT OF WRIST

4  HEALING RADIAL SCILOID PROCESS FRACTURE "MID SCAPHOID FRACTURE" REMAINS IN STABLE

5  POSITION WITH NONUNION, AND SINGLE FIXATION SCREW SCLEROSIS OF PROXIMAL AND

6  DISTAL POLES OF SCAPHOID. HAS INCREASED.

7  CONCLUSION OF 04/14/2003 OF SEP. 23 2000 INJURY: OLD GUNSHOT WOUND

8  WITH SCAPHOID "FRACTURE" NONUNION AND DEVELOPING SCAPHOID

CDC NUMBER NAME (LAST FIRST M.I.)
MR#  X005011-444.
NAME:  SCHOPPE-RICO  #  V-1132X.
PH#:  (925) 646-4775.
DOB:  OXXIIXI.  SEX:  M.
LOC:  MIDIT.
ACC#:  XXSXSXDIX.
SEX:  M.
POS:  HART.

ORDERING MD:  ARIEL JAMES MIN.
SERICK DATE:  04 X4 X 03.
DIAGNOSTIC IMAGING DEPARTMENT RADIOLOGY
CONTRA COSTA HEALTH SERVICES
CONTRA COSTA REGIONAL MEDICAL CENTER.

4





# X-RAY REPORT

## DEPARTMENT OF CORRECTIONS
## PELICAN BAY STATE PRISON
## HEALTH CARE SERVICES

NAME:  SCHAPPE-RICO, JOHN   NO. V11328  CLINIC: B7-228   DOB: 08/28/81  DATE: 04/15/04

EXAM REQUESTED:               RIGHT WRIST

REQUESTING M.D.:              M. MCLEAN, F.N.P.

CLINICAL DATA:                HISTORY OF PAIN

RADIOGRAPHIC REPORT:          RIGHT WRIST

FINDINGS:                     No comparisons.

There are multiple small metallic fragments in the region of the radial styloid process both within the bone and in the soft tissues.

There is loss of normal contour of the carponavicular bone with fixation screw within the substance of the navicular.

There is early narrowing and irregularity of the radiocarpal joint.

**IMPRESSION:**               **STATUS POST GUNSHOT WOUND RIGHT WRIST WITH EVIDENCE OF AVASCULAR NECROSIS OF THE CARPONAVICULAR AND EARLY DEGENERATIVE ARTHRITIC CHANGE INVOLVING THE RADIOCARPAL JOINT.**

7-16-04

04/20/2003          CURTIS COULAM, M.D.          BGR

## ORTHOPEDIC CONSULTATION
### MARK M. LAU, M.D.
### GREGORY J. DUNCAN, M.D.

The patient is here for re-evaluation of a right wrist problem. He had sustained a gunshot wound to the wrist in the past and underwent a fixation procedure for the scaphoid. When he was previously seen the scaphoid screw was noted to be quite prominent, by x-ray, but the patient declined surgery or any other type of invasive treatment but requested a follow-up in 3 months. At that time he also refused a brace but is now requesting a brace to be used, at least part time, for stressful activities.

On physical examination the patient has a healed volar scar over the scaphoid which is non-tender. Tinel's sign is negative. There is surprisingly good range of motion of the wrist, about 80-90% of normal and no crepitus in the CMC joint or the STT area is palpable even with circumduction of the wrist joint.

The previous x-rays of the wrist show the gunshot injury to the scaphoid with a single fixation screw, the head of which appears to be well outside of the boundaries of the cortex of the scaphoid.

**IMPRESSION:**          **RIGHT WRIST PAIN, INTERMITTENT, WITH HISTORY OF GUNSHOT WOUND AND SCAPHOID FRACTURE.**

The patient was advised as to the surgical possibilities but is against any type of invasive treatment at this time. He is taking Ibuprofen on a p.r.n. basis with short-term relief of pain and states that he is functioning well enough and is not interested in surgery under any circumstance. He was given a chrono for a wrist brace to be provided through the orthotist and he will return Here in 3 months at his request and a repeat x-ray of the wrist will be performed prior to that visit.


GREGORY DUNCAN, M.D.

d: 12/22/2004
t: 12/23/2004 bgr   job # 1106

Clinic: B5

**12/22/2004    SCHOPPE-RICO, JOHN   V11328        PBSP        GD/bgr**
**ORTHOPEDICS CONSULTATION**



RIGHT ARM

FIG. 340: THE SUPERFICIAL LYMPHATICS AND GLANDS OF THE UPPER EXTREMITY

RIGHT ARM

MEDIAN CEPHALIC

INTERNAL CUTANEOUS NERVE

EXTERNAL CUTANEOUS NERVE

MEDIAN BASILIC

RIGHT ARM INJURY PHYSICALLY IMPAIRED.

FIG. 330: THE SUPERFICIAL VIEWS OF THE UPPER EXTREMITY

DATE: _____    TIME: _____

SIGN: _____

CDL NUMBER   NAME (LAST. FIRST. MID)

SCHOPPE — RICO S

FLEXOR CARPI RADIALIS

PALMARIS LONGUS

TO HOLD THE SCREW

THE SCREW TO HOLD THE BONES TO-GETHER.

ANNULAR LIGAMENT

OPPONENS POLLICUS

FLEXOR BREVIS POLLICE OUTER HEAD

ABDUCTOR POLLICIS

LUMBRICALI

TENDON OF FLEXOR PROFUNDUS

FLEXOR LONG. POLLICE

TENDON OF FLEXOR SUBLIMIS

SHEATH WITH PERFORATING TENDON IN SITU.

FIG. 343  7



HAND AND
THE OS ARCA WAS
PHYSICALLY IMPAIRED
FROM SURGERY
INJURY

LIGAMENTS

ANASTOMOTICA
MAGNA

DESCENDING
FROM SUPERIOR PROFUND

POSTERIOR
ULNA +
RECURRENT

POSTERIOR
INTEROSSEOUS

TERMINATION OF
ANTERIOR INTEROSSEOUS

POSTERIOR CARPAL
(RADIAL)

RADIAL

POSTER.
CARPAL
(ULNAR)

DORSALIS
POLICIS
DORSALIS
INDICIS

FIG. 306. ARTERIES OF THE BACK OF THE
FOREARM AN HAND.

FLEXOR SUBDIGITAL
FLEXOR LONG POLL
FLEXOR PROF MEDIAL
EXTENSOR
RADIUS
INTEROSSEOUS MEMBRANE
EXTENSOR PROF ANTERIOR

EXTENSOR
LONG POLL

ANT ANNULAR LIG
SEMI-LURNAR
US. MAGNUM
ABDUCTOR
THUMB-METACARPAL
SECOND
PHALANX
FIRST PHALANX
RIGHT HAND

FIG. 176. LONGITUDINAL SECTION OF THE RIGHT
FOREARM HAND AN THIRD FINGER VIEWED
FROM THE ULNAR ASPECT

GUNSHOT WOUND ENTURY

A SMALL CALIBER
PENATRATED AND SHATTERED SCAPHOID
WICH THE SERGEANTS PLACED THE SCREW TO
HOLD THE WRIST IN PLACE.

DATE _____ TIME _____

SIGN _____

CDC NUMBER NAME LAST, FIRST MED)

SCHOPPE - RICO S

1  PRO - CONSUL TECHNICAL
2  & MEDICAL EXPERTS.
3  WEBSITE: WWW.EXPERT.INFO.COM.
4  1945. PALO VERDE. AVE. STR. 200
5  LONG BEACH. CA. 90815
6  1 - (800) 392 - 1119
7
8
9
10  BODY SHEET - MALE

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS

**REASONABLE MODIFICATION OR**
**ACCOMMODATION REQUEST**
CDC 1824 (1/95)

| INSTITUTION/PAROLE REGION: | LOG NUMBER: | CATEGORY: |
|---|---|---|
| PBSP | S-04-01939 | 18. ADA |

*NOTE:* THIS FORM IS TO BE USED ONLY BY INMATES/PAROLEES WITH DISABILITIES

*In processing this request, it will be verified that the inmate/parolee has a disability which is covered under the Americans With Disabilities Act.*

| INMATE/PAROLEE'S NAME (PRINT) | CDC NUMBER | ASSIGNMENT | HOURS/WATCH | HOUSING |
|---|---|---|---|---|
| Schoppe-Rico, John M. | V11328 | AD-SEG | A1-128 | |

In accordance with the provisions of the Americans With Disabilities Act (ADA), no qualified individuals with a disability shall, on the basis of disability, be excluded from participation in, or be denied the benefits of the services, activities, or programs of a public entity, or be subjected to discrimination.

You may use this form to request specific reasonable modification or accommodation which, if granted, would enable you to participate in a service, activity or program offered by the Department/institution/facility, for which you are otherwise qualified/eligible to participate.

Submit this completed form to the institution or facility's Appeals Coordinator's Office. A decision will be rendered within 15 working days of receipt at the Appeals Coordinator's Office and the completed form will be returned to you.

If you do not agree with the decision on this form, you may pursue further review. The decision rendered on this form constitutes a decision at the FIRST LEVEL of review.

To proceed to SECOND LEVEL, attach this form to an Inmate/Parolee Appeal Form (CDC 602) and complete section "F" of the appeal form.

Submit the appeal with attachment to the Appeals Coordinator's Office within 15 days of your receipt of the decision rendered on this request form.

If you are not satisfied with the SECOND LEVEL review decision, you may request THIRD LEVEL review as instructed on the CDC 602.

## MODIFICATION OR ACCOMMODATION REQUESTED

DESCRIPTION OF DISABILITY:

RIGHT HAND INJURY, OL 'GUN SHOT WOUND, FRACTURE WRIST JOINTS WITH FIXATION Screw modified in WRIST N' HAND.

WHAT VERIFICATION DO YOU HAVE OF YOUR DISABILITY?

MEDICAL RECORDS OF INJURY AN OPERATION done ON HAND AND AN UPDATED Follow up ON HAND disability, X-RAY's, ECT ECT. MEDICAL RECORDS VERIFy's. DISABILITY AN SO ON OF PROOF

DESCRIBE THE PROBLEM:

HAVE LIMITED RIGHTHAND CAPPABILITYs, I'M WRITEHANDED AS WELL, HURTS WHEN GRIP SOMETHING, WRITE. ECT. real FRAGILE, CANT LEFT Things.

WHAT SPECIFIC MODIFICATION OR ACCOMMODATION IS REQUESTED?

IN ACCORDANCE WITH (A.D.A) TO GIVE ME AII AN EVERYTHING I'M ENTITLED TO, including ALL INFORMATION OF SERVICES, activity or programs OFFERED by THE INSTITUTION AN TO CONTRAST AN ORTHOPEDIC SPLINT right HAND brace IS NEEDED

| John M. Schoppe-Rico | 7-8-04 |
|---|---|
| INMATE/PAROLEE'S SIGNATURE | DATE SIGNED |

7/10/04                                      4

REASONABLE MODIFICATION OR ACCOMMODATION REQUEST
CDC 1824 (1/95)

## REVIEWER'S ACTION

**TYPE OF ADA ISSUE**

DATE ASSIGNED TO REVIEWER: 3-3-05

DATE DUE: 3-24-05

[X] PROGRAM, SERVICE, OR ACTIVITY ACCESS (Not requiring structural modification)

    [X] Auxiliary Aid or Device Requested

    [ ] Other_____

[ ] PHYSICAL ACCESS (requiring structural modification)

**DISCUSSION OF FINDINGS:** YOU CLAIM TO HAVE AN INJURED RIGHT HAND AND WRIST STEMMING FROM A GUNSHOT WOUND. YOU REQUESTED AN ORTHOPEDIC SPLINT RIGHT HAND BRACE. YOU APPEAL WAS SUSPENDED ON 07-28-04 PENDING AN ORTHOPEDIC CONSULTATION. YOU WERE SEEN BY DR. DUNCAN ON 12-22-04. YOU WERE ADVISED AS TO THE SURGICAL POSSIBILITIES, BUT STATED THAT YOU WERE AGAINST ANY TYPE OF INVASIVE TREATMENT. YOU WERE GIVEN A CHRONO FOR A WRIST BRACE TO BE PROVIDED THROUGH THE ORTHOTIST.

_____
_____
_____
_____

12-22-2004
DATE INMATE/PAROLEE WAS INTERVIEWED

GREGORY J. DUNCAN, MD
PERSON WHO CONDUCTED INTERVIEW

**DISPOSITION**

[ ] GRANTED     [X] DENIED     [ ] PARTIALLY GRANTED

**BASIS OF DECISION:** ALTHOUGH YOU REQUESTED A BRACE FOR YOUR RIGHT HAND/WRIST, AND A CHRONO WAS GENERATED FOR YOU TO RECEIVE THAT BRACE, YOU REFUSED THE BRACE INITIALLY ON 01-05-05 AND AGAIN ON 01-20-05. IT WAS DOCUMENTED THAT YOU STATED "NOT WANTING TO SPEND ANY MONEY" AS YOUR REASON FOR REFUSING THE BRACE.

**NOTE:** *If disposition is based upon information provided by other staff or other resources, specify the resource and the information provided. If the request is granted, specify the process by which the modification or accommodation will be provided, with time frames if appropriate.*

DISPOSITION RENDERED BY: (NAME)
FREDERICK W. SPENCER, DDS

TITLE
Chief Dental Officer

INSTITUTION/FACILITY
PBSP

## APPROVAL

ASSOCIATE WARDEN'S SIGNATURE
Carl K. Thacker               10

DATE SIGNED
3/8/05

DATE RETURNED TO INMATE/PAROLEE

## ORTHOPEDIC CONSULTATION
## GREGORY J. DUNCAN, M.D.

Mr. Schoppe-Rico is here to discuss treatment options for his right wrist. He had a gunshot wound and an ORIF of the scaphoid in approximately the year 2000 performed at an outside hospital not related to the CDC system.

He is unsure of the doctor's name or even the hospital's name and we do not have the old records of that trauma.

He is doing quite a few push-ups but with activities he develops predictable wrist pain on the radial aspect of the right wrist.

He has had previous x-rays which were again reviewed with the patient which do show significant post traumatic changes in the wrist with a retained fixation screw in the scaphoid significant retained metallic fragment and injury at the radioscaphoid joint and a large defect in the region of the scaphoid fossa of the distal radius.

**IMPRESSION:**               **POST TRAUMATIC DEGENERATIVE ARTHRITIS WITH RETAINED BONE SCREW.**

Clinically I cannot palpate the screw so I am not convinced that removing the screw would be of much benefit in terms of the overall symptoms. By the far the more likely source of the pain is the trauma to the radiocarpal joint involving the scaphoid fossa of the distal radius. However, I would like to obtain repeat x-rays and re-examine the screw as there could be some evidence of progressive loosening at which case screw removal is an option. The patient previously has refused any surgery including screw removal but now he would like to obtain at least x-rays so we will order these at Pelican Bay and see the patient thereafter.


_____
GREGORY DUNCAN, M.D.

d:    05/11/2005
t:    05/11/2005
bgr  job # 1922
Clinic:    ASU A-1

## ORTHOPEDIC CONSULTATION
## MARK M. LAU, M.D.
## GREGORY J. DUNCAN, M.D.

**CHIEF COMPLAINT:** Pain right wrist with history of gunshot wound and prior scaphoid surgery.

**HISTORY OF PRESENT ILLNESS:** The patient is a 33-year-old male who was shot by a low velocity gunshot wound in the year 2000, while he was not incarcerated.

He sustained a fracture to the scaphoid that was treated with an open reduction, internal fixation shortly after the original injury. He was then incarcerated and has actually done reasonably well for the last few months after about a 3 year period of wrist pain. He does have chronic stiffness in the wrist.

**PAST MEDICAL HISTORY:** Significant for asthma which is controlled with inhalers.

**CURRENT MEDICATIONS:** Triamcinolone inhaler, Tetracycline, Ibuprofen p.r.n., albuterol inhaler.

**EXAMINATION:**    The patient has about 50% of normal range of motion in the wrist with some tenderness and crepitus in the radiocarpal joint near the scapholunate interval.

There is minimal tenderness near the screw head on the volar aspect of the wrist. The previous surgical incision is well healed and is non-tender.

The patient has minimal pain with range of motion testing.

An x-ray of the right wrist taken at Pelican Bay shows post traumatic changes from the previous gunshot wound with prior scaphoid fracture which now appears healed but has resulted in marked irregularity of the scaphoid as well as some destruction of the radiocarpal joint. Multiple retained lead fragments are noted. The screw is quite prominent with the screw head extending several millimeters out from the cortical edge of the scaphoid.

**IMPRESSION:**                    RIGHT WRIST PAIN WITH HISTORY OF
                                   GUNSHOT WOUND AND SCAPHOID
                                   FRACTURE TREATED WITH OPEN
                                   REDUCTION INTERNAL FIXATION.

09/29/2004        SCHOPPE-RICO, JOHN      PBSP       GD/bgr
                  ORTHOPEDICS CONSULTATION

12                          V11328

( 18 )

**PLAN:**           I am not certain the patient has avascular necrosis of the scaphoid as opposed to post traumatic change from the gunshot wound. At any rate, the screw is quite prominent and I would recommend this be removed as it is starting to erode into the trapezium. This has likely been the case for at least several months or even years so the patient elected not to have the screw removed. He states his wrist is actually doing somewhat better over the last few months for unclear reason so he declines any surgical treatment. He also did not wish to use a wrist brace. He has anti-inflammatory medicines available as needed. He is aware that even if the screw were removed it would not restore normal function or result in complete pain relief because the majority of the symptoms are likely from the post traumatic change to the wrist itself as opposed to the presence of the screw. The patient requested a re-check in about 3 months so this was ordered and he will return at that time.


GREGORY DUNCAN, M.D.

d:    09/29/2004
t:    09/29/2004
bgr  job # 0653

Clinic: B4


09/29/2004     **SCHOPPE-RICO, JOHN     PBSP         GD/bgr**
               **ORTHOPEDICS CONSULTATION**

2




# X-RAY REPORT

## DEPARTMENT OF CORRECTIONS
## PELICAN BAY STATE PRISON
## HEALTH CARE SERVICES

C12

NAME: SCHOPPE-RICO, JOHN   NO. V11328   RM:  ASU-A1  DOB: 08/28/81  DATE: 05/13/05

EXAM REQUESTED:               RIGHT WRIST

REQUESTING M.D.:              G. DUNCAN, M.D.

CLINICAL DATA:                HISTORY OF PAIN.

RADIOGRAPHIC REPORT:          RIGHT WRIST

FINDINGS:                     Comparison is made to a previous study dated 04/15/2004.

Again, multiple metallic fragments secondary to a previous gunshot wound at the level of the radiocarpal joint are noted. These appear essentially unchanged. Additionally there is sclerosis and deformity of the carponavicular with a fixation screw in place. These findings are all essentially unchanged. The current examination again shows erosive changes at the radiocarpal joint, which are stable in appearance.

IMPRESSION:           1.   COMPARED TO THE PREVIOUS STUDY, THERE HAS BEEN NO SIGNIFICANT INTERVAL CHANGE. AGAIN CHANGES OF AVASCULAR NECROSIS OF THE CARPONAVICULAR AND POSTTRAUMATIC ARTHRITIC CHANGE OF THE RADIOCARPAL JOINT ARE NOTED.
                      2.   SIDE BY SIDE COMPARISON OF THE PREVIOUS STUDY SHOWS NO INTERVAL CHANGE.

6-17-05

ORIGINAL

05/20/05                      CURTIS COULAM, M.D.                              DLK
DATE READ                     RADIOLOGIST                              TRANSCRIBER

14

## ORTHOPEDIC CONSULTATION
## GREGORY J. DUNCAN, M.D.

Mr. Schoppe-Rico returns for re-evaluation of his right wrist where he sustained a previous gunshot wound, status post ORIF with post traumatic arthritis of the wrist joint.

Patient states he has had no change in symptoms since his last exam. He was asking about treatment options but based on the clinical and the radiographic findings I am not certain that there is any treatment that would render good pain relief and still retain the wrist motion.

On exam there is mild tenderness and no swelling visible in the wrist. The previous surgical scars are evident with no sign of any infection or chronic inflammation.

The recent x-rays are reviewed with films a year ago and they show no change in the position of the bone screw with rather severe radioscaphoid arthritis and multiple retained lead fragments from the previous gunshot wound.

**IMPRESSION:**                    **POST TRAUMATIC ARTHRITIS, RIGHT**
                                   **WRIST WITH RETAINED BONE SCREW.**

I recommend a wrist splint but the patient declined. He may be a candidate for surgical treatment in the future, possibly a wrist fusion but currently his level of symptoms does not justify that much of a surgical procedure. I do not believe removing the bone screw would provide pain relief as it does not appear to be a source of pain either on physical exam or by x-ray with no sign of loosening of recent films. The patient was given the treatment options and was satisfied with the non-surgical treatment as recommended and he will obtain the wrist brace in the future if he so desires.

DICTATED BUT
NOT READ
_____
GREGORY DUNCAN, M.D.

d:    06/08/2005
t:    06/08/2005
bgr  job # 2091
Clinic:    C-12



| DATE | TIME | |
|---|---|---|
| 2-27-04 | 10⁰⁰ | S ' I have cysts on my face, my wrist got broke & didn't heal right, I get sick to my stomach & take a dump up to 3 times a day, especially when I drink milk, I get to wheezing & need my inhaler' |
| | | O @ Facial cheek area has 4-1/4" round cystic circumscribed lesions, infact non- 2 draining though one closest to 1/m mouth has a red crust. S/A GSW @ wrist, x-ray describes scars/ bullet frags gsw from 2000 acc to 1/m. there is pain on movement & & rom. 1/m is wearing a wrist support. @ present abd discomfort/distention/ guarding/organomegaly. @ tenderness, masses or guarding. Bowel sounds wnl. V.S. 117/64 98² 72-16. Equal chest expansion, lips/nailbeds pink, adequate PO₂ 98, peak flow 500. Lungs clear to auscult throughout exc sl sibilant rhonchi/wheezing LLQ dorsally. Reports he normally uses albuterol inh &/day. |
| | | A 1 - alteration in skin integrity R/T lesions - alteration in musculoskeletal function R/T S/A GSW @wrist - Alteration in GI function R/T w/loose stools on occasion - alteration in Resp function R/T sibilant Rhonchi |
| | | P - education R/T GI health V.S. R/O lactose intolerance - Refer to PCP |
| | | [signature] |

---

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| PVSP | B7-228L | SCHAPPE-RICO V11328 |

## INTERDISCIPLINARY PROGRESS NOTES

(44)

PELICAN BAY STATE PRISON
HEALTH CARE SERVICES UNIT
CHRONO

NAME: Schoppe-Rico, John   CDC#: V11328   HOUSE: A21-A1   DATE: 4-8-05

The above-named inmate has a medical condition which requires the below-listed medically-indicated chrono(s).

- ☐ COTTON BLANKETS
- ☐ EXTRA MATTRESS
- ☐ EGG CRATE MATTRESS
- ☐ EXTRA PILLOWS/WEDGE
- ☐ SHORT BEARD
- ☐ TINTED GLASSES–FADE GRAY (Please Circle One: #1  #2  #3)    (By Optometrist Recommendation Only)
- ☐ ORTHOTICS: Type: _____
- ☒ MEDICAL EQUIPMENT: Please check appropriate medical equipment below:

- ☐ LOW BUNK
- ☐ LOW BUNK/LOW TIER
- ☐ INSOLES/ARCH SUPPORTS   Size: _____
- ☐ WAIST CHAINS AND DOUBLE CUFFS

☐ Cane  ☐ Walker  ☐ Wheelchair  ☐ Crutches  ☐ C-PAP/BIPAP  ☐ Oxygen  ☐ Ice Pack  ☒ Ace Wraps

☐ Shower Chair

Wrist

(When appropriate, please name body part affected and size, e.g., right arm): _____   size: _____

Due to a refusal of (please circle one) **MEDICAL APPOINTMENT/EXAMINATION/TEST/FOLLOW-UP** appointment/(please circle one) FIRST/SECOND/THIRD chronic care appointment, the patient is advised that refusal may result in worsening of condition permanent disability, grave disability, and/or death. You are advised to keep your future medical appointments. If you miss three Chronic Care appointments, you will be removed from the Chronic Care Program, and you must make an appointment with your Primary Care Provider.

EFFECTIVE DATE: 4-8-05       EXPIRATION DATE: 4-8-06

<u>EFFECTIVE DATE AND EXPIRATION DATE MUST BE PROVIDED FOR CHRONO TO TAKE EFFECT</u>

_____                _____
Please Print Name                      Signature/Title

DISTRIBUTION:  WHITE–Health Record       GREEN–Housing Unit       YELLOW–CCR       PINK–C-File       GOLDENROD–Inmate
***When appropriate, a copy shall be forwarded to Specialty Clinic.

HEALTH RECORDS STAFF SHALL LIST OTHER APPROPRIATE COPIES BELOW AND SHALL DISTRIBUTE ACCORDINGLY: (e.g., Clothing:  SHU/GP/L-1):

DATE: 4-8-05   NAME: Schoppe-Rico, John   CDC#: V11328       PBSP/MEDICAL

17

# DEPARTMENT OF CORRECTIONS
## SAN QUENTIN STATE PRISON
## X-RAY REQUEST

DATE REQUEST RECEIVED: _____

(For X-Ray Department Only)

NAME: _SCIFOPPE RICO_ DCH#: _V11328_   HOUSE: _27329_   DATE OF BIRTH: _8-28-81_
LAST        FIRST        M1

DATE ORDERED: _27 Oct 03_   X-RAY TECHNICIAN: _D. Tunstall_   DATE TAKEN: _10/27/03_
SIGNATURE

CHECK APPROPRIATE BOX: [X] ROUTINE    [ ] STAT

**EXAMINATION REQUESTED:** 1) _APL LKT Rt wrist_

2) _____

CLINICAL DATA: _ORIF 33yro c80. Wt~~~~
Wears a Splint_

_signature_
SIGNATURE OF REQUESTING PHYSICIAN

---

## RADIOGRAPHIC REPORT

**RIGHT WRIST:** There is a short orthopedic screw fixing an old navicular fracture. In addition, there are multiple varied size bullet fragments proximal to this area in the region of the lateral side of the distal end of the radius. A few of the varied size bullet fragments are in the soft tissues adjacent to the lateral side of the distal radius. The other areas of the right wrist are unremarkable.

_(W)_

[ ] NO SIGNIFICANT ABNORMALITIES

18

_signature_  M.D.   DATE READ: _10/28/03_     _10/28/03 DTC_
RADIOLOGIST SIGNATURE                              DATE/TRANSCRIBER

"ANATOMY BREAK DOWN"

2:
AG. 232.

3.   INFERIOR RADIO-ULNAR ARTICULATIONS.

THIS IS A PIVOT-JOINT FORMED BY THE HEAD OF THE ULNA RECEIVED INTO THE SIGMOID CAVITY AT THE INNER SIDE OF THE LOWER END OF THE RADIUS. THE ARTICULAR SURFACE ARE COVERED BY A THIN LAYER OF CARTILAGE and connected TOGETHER BY TH FOLLOWING LIGAMENTS. ___ 1.) ANTERIOR RADIO-ULNAR ___ 2.) POSTERIOR RADIO-ULNAR. ___ 3.) INTERARTICULAR FIBRO-CARTILAGE.

THE ANTERIOR RADIO-ULNAR LIGAMENT (FIG.174) IS A NARROW band OF FIBRES EXTENDING FROM THE ANTERIOR MARGIN OF THE SIGMOID CAVITY OF THE RADIUS, TO THE ANTERIOR SURFACE OF THE HEAD OF THE ULNA. ___ THE "POSTERIOR RADIO-ULNAR LIGAMENT (FIG 175), EXTENDS BETWEEN SIMILAR POINTS ON THE POSTERIOR SURFACE OF THE ARTICULATION ___→

THE "INTERARTICULAR FIBRO-CARTILAGE (FIG 177) IS TRIANGULAR IN SHAPE, AND IS PLACED TRANSVERSELY BENEATH THE HEAD OF THE ULNA. BINDING THE LOWER END OF THIS BONE AND THE RADIUS FIRMLY TOGETHER, ITS PERIPHERY IS THICKER THAN ITS CENTRE, WHICH IS THIN AND OCCASIONALLY PERFORATED. IT IS attached BY ITS APEX TO A DEPRESSION WHICH SEPARATES THE STYLOID PROCESS OF THE ULNA FROM THE HEAD OF THAT BONE: AND BY ITS BASE, WHICH IS THIN TO THE PROMINENT EDGE OF THE RADIUS, WHICH SEPERATES THE SIGMOID CAVITY FROM THE CARPAL ARTICULATING SURFACE. ITS MARGINS ARE UNITED TO THE LIGAMENTS OF THE WRIST JOINT. ITS UPPER SURFACE, SMOOTH AND CONCAVE, ARTICULATES WITH THE HEAD OF THE ULNA; FORMING AN ARTHRODIAL JOINT. ITS UNDER SURFACE, ALSO CONCAVE AND SMOOTH, FORMS PART OF THE WRIST-JOINT AND ARTICULATES WITH THE CUNEIFORM AND INNER PART OF THE SEMILUNAR BONES. BOTH SURFACE ARE LINED BY A SYNOVIAL MEMBRANE: THE UPPER SURFACE, BY ONE PECULIAR TO THE RADIO-ULNAR ARTICULATION: UNDER THE under UNDER SURFACE, BY THE SYNOVIAL MEMBRANE OF THE WRIST. ___ THE "SYNOVIAL MEMBRANE (FIG.177. OF THIS ARTICULATION HAS been called FROM ITS EXTREME LOOSENESS. THE membrane SACCIFORMIS). IT EXTENDS HORIZONTALLY INWARDS BETWEEN THE head OF THE ULNA AND THE INTERARTICULAR FIBRO-CARTILAGE, AND UP WARDS BETWEEN THE RADIUS AND THE ULNA, FORMING HERE A VERY LOOSE CUL-DE-SAC, THE QUANTITY OF SYNOVIA WHICH IT OBTAINS IS USUALLY CONSIDERABLE. ___ "ACTIONS:" THE MOVEMENT IN THE INFERIOR RADIO-ULNAR ARTICULAR IS IS JUST THE REVERSE OF THAT IN THE SUPERIOR. RADIO-ULNAR JOINT. IT CONSIST OF A MOVEMENT OF ROTATION OF THE LOWER END OF THE RADIUS ROUND AN AXIS WHICH CORRESPONDS TO THE CENTRE OF THE HEAD OF THE ULNA. WHEN THE RADIUS ROTATES FORWARDS, PRONATION OF THE FOREARM AND HAND IS THE RESULT; and WHEN BACKWARDS, SUPINATION. IT WILL THUS BE SEEN THAT IN PRONATION AND SUPINATION OF THE FOREARM AND HAND THE RADIUS DESCRIBES A SEGMENT OF A CONE, THE AXIS OF WHICH EXTENDS FROM THE CENTRE OF THE HEAD OF THE RADIUS TO THE MIDDLE OF THE HEAD OF THE ULNA IN THIS MOVEMENT. HOWEVER, THE ULNA IS NOT QUITE STATIONARY, BUT ROTATES A LITTLE IN THE OPPOSITE DIRECTION. : THAT IT ALSO DESCRIBES THE SEGMENTS OF A CONE, THOUGH OF SMALLER SIZE THAN THAT DESCRIBED BY THE RADIUS. THE MOVEMENT WHICH CAUSES THIS ARTICULATION IN THE POSITION OF THE HEAD OF THE ULNA TAKES PLACE PRINCIPALLY ? THE SHOULDER-JOINT BY A ROTATION OF THE HUMERUS, BUT POSSIBLY ALSO TO A SLIGHT EXTENT AT THE ELBOW JOINT. ✳

SURFACE FORM. THE POSITION OF THE INFERIOR RADIO-ULNAR JOINT MAY BE ASCERTAINED BY FEELING, FOR SLIGHT GROOVE AT THE BACK OF THE WRIST, BETWEEN THE PROMINENT HEAD OF THE ULNA AN THE LOWER END OF THE RADIUS, WHEN THE FOREARM IS IN A STATE OF ALMOST COMPLETE PRONATION.

VII. RADIO-CARPAL OR WRIST JOINT.

THE WRIST IS A CONDYLOID ARTICULATION. THE PARTS ENTERING INTO ITS FORMATION ARE THE LOWER END OF THE RADIUS and UNDER SURFACE OF THE INTERARTICULAR FIBRO-CARTILAGE, WHICH FORM TOGETHER THE RECEIVING CAVITY: AND THE SCAPHOID, SEMILUNAR, and CUNEIFORM BONES, WHICH FORM THE CONDYLE, THE ARTICULAR SURFACE OF THE RADIUS and THE UNDER SURFACE OF THE INTERARTICULAR FIBRO-CARTILAGE, THE RECEIVING CAVITY, FORM TOGETHER A TRANSVERSELY ELLIPTICAL CONCAVE SURFACE, THE ARTICULAR SURFACES OF THE SCAPHOID, SEMILUNAR, AND CUNEIFORM BONES FORM TOGETHER A SMOOTH, CONVEX SURFACE, THE CONDYLE, WHICH IS RECEIVED INTO THE CONCAVITY ABOVE MENTIONED. ALL THE BONY SURFACES OF THE ARTICULATION ARE COVERED WITH CARTILAGE ___

( SEE — JOURN. OF ANAT. AND PHYS. VOL. XIX, PARTS i', ii', iii' and iv.)

AND CONNECTED TOGETHER BY A CAPSULE, WHICH IS DIVIDED INTO THE FOLLOWING LIGAMENTES.

1.) EXTERNAL LATERAL ___ 2.) INTERNAL LATERAL ___ 3.) ANTERIOR ___ 4.) POSTERIOR ___

THE EXTERNAL LATERAL LIGAMENT (RADIO-CARPAL) (FIG.174), EXTENDS FROM THE SUMMIT OF THE STYLOID PROCESS OF THE RADIUS TO THE OUTER SIDE OF THE SCAPHOID SOME OF ITS FIBRES BEING PROLONGED TO THE TRAPEZIUM and ANNULAR LIGAMENT. ___ THE INTERNAL LATERAL LIGAMENT "(ULNO-CARPAL) IS A ROUNDED CORD, ATTACHED ABOVE TO THE EXTREMITY OF THE STYLOID PROCESS OF THE ULNA; AND DIVIDING BELOW INTO TWO FASCICULI, WHICH ARE ATTACHED, ONE TO THE INNER SIDE OF THE CUNEIFORM BONE, THE OTHER TO THE PISIFORM BONE AND ANNULAR LIGAMENT.

THE "ANTERIOR LIGAMENT" IS A BROAD MEMBRANOUS BAND, ATTACHED ABOVE TO THE ANTERIOR MARGIN OF THE LOWER END OF THE RADIUS, ITS STYLOID PROCESS AND THE ULNA. ITS FIBRES PASS DOWNWARDS AND INWARDS TO BE INSERTED INTO THE PALMER SURFACE OF THE SCAPHOID, SEMILUNAR, AND CUNEIFORM BONES, SOME OF THE STYLOID PROCESS OF THE ULNA TO THE SEMILUNAR AND CUNEIFORM BONES. THIS LIGAMENT IS PERFORATED BY NUMEROUS APERTURES FOR THE PASSAGE OF VESSELS; AND THE IS IN RELATION: IN FRONT WITH TENDONS OF THE FLEXOR PROFUNDUS DIGITORUM and FLEXOR LONGUS POLLICIS; BEHIND, WITH THE SYNOVIAL MEMBRANE OF THE WRIST JOINT.

THE "POSTERIOR LIGAMENT" (FIG. 175) LESS THICK AND STRONG THAN THE ANTERIOR, IS attached above, TO THE ~~~~ AND POSTERIOR BORDER OF THE LOWER END OF THE RADIUS, ITS FIBRES PASS OBLIQUELY DOWNWARDS and INWARDS TO BE ATTACH TO THE DORSAL SURFACE OF THE SCAPHOID, SEMILUNAR and CUNEIFORM BONES BEING CONTINUOUS WITH THOSE OF THE DORSAL LIGAMENTS. THIS LIGAMENT IS IN RELATION, BEHIND, WITH THE EXTENSOR TENDONS OF THE FINGERS IN FRONT, WITH THE SYNOVIAL membrane OF THE WRIST.

19

THE SYNOVIAL MEMBRANE (FIG 177) LINES THE INNER SURFACE OF THE LIGAMENTS ABOVE DESCRIBED. EXTENDING FROM THE LOWER END OF THE RADIUS AND INTERARTICULAR FIBRO-CARTILAGE ABOVE TO THE ARTICULAR SURFACES OF THE CARPAL BONES below IT IS LOOSE AND LAX AND PRESENTS NUMEROUS FOLDS, ESPECIALLY BEHIND. —— "RELATIONS" — THE WRIST JOINT IS COVERED IN FRONT BY THE FLEXOR, and BEHIND BY THE EXTENSOR TENDONS; IT IS ALSO IN RELATION WITH THE RADIAL and ULNAR ARTERIES.
THE ARTERIES SUPPLYING THE JOINTS ARE THE ANTERIOR AND POSTERIOR CARPAL BRANCHES OF THE RADIAL and ULNAR. THE ANTERIOR AND POSTERIOR INTEROSSEOUS and SOME ASCENDING BRANCHES FROM THE DEEP PALMER ARCH.
THE NERVES ARE DERIVED FROM THE ULNAR AND POSTERIOR INTEROSSEOUS. —— "ACTION" — THE MOVEMENTS PERMITTED I THIS JOINT ARE FLEXION, EXTENSION, ABDUCTION, ADDUCTION and CIRCUMDUCTION. ITS ACTION WILL BE FURTHER STUDIED WITH THOSE OF THE CARPUS, WITH WHICH THEY ARE COMBINED. —— "SURFACE FORM" — THE LINE OF THE RADIO-CARPAL JOINT IS ON LEVEL WITH THE APEX OF THE STYLOID PROCESS OF ULNA. —— "SURGICAL ANATOMY" — THE WRIST JOINT IS RARELY DISLOCATED, ITS STRENGTH DEPENDING MAINLY UPON THE NUMEROUS STRONG TENDONS WHICH SURROUND THE ARTICULATION. ITS SECURITY IS FURTHER PROVIDED FOR BY THE NUMBER OF SMALL BONES OF WHICH THE CARPUS IS MADE UP, and WHICH ARE UNITED BY VERY STRONG LIGAMENTS THE SLIGHT MOVEMENTS WHICH TAKE PLACE BETWEEN THE SEVERAL BONES SERVES TO BREAK THE JARS THAT RESULT FROM FAL OR BLOWS ON THE HAND DISLOCATION BACKWARDS; WHICH IS THE MORE COMMON, SIMULATES TO A CONSIDERABLE EXTENT COLLES FRAC TURE OF THE RADIUS, AND IS LIABLE TO BE MISTAKEN FOR IT; THE DIAGNOSIS CAN BE EASILY MADE OUT BY OBSERVING THE RELATIVE POSITIC OF THE STYLOID PROCESS OF THE RADIUS AN THE ULNA . . . . IN THE NATURAL CONDITION THE STYLOID PROCESS OF THE RADIUS IS ON A LOWER LEVEL. (I.E) NEARER THE GROUND, WHEN THE ARM HANG BY THE SIDE, THAN THAT OF THE ULNA, AND THE SAME WOULD BE THE CASE IN DISLOCATION. IN COLLE'S FRACTURE ION THE OTHER HAND, THE STYLOID PROCESS OF THE RADIUS IS ON THE SAME, OR EVEN A HIGHER LEVEL THAN THAT OF THE ULNA —— THE WRIST JOINT IS OCCASIONALLY THE SEAT OF ACUTE SYNOVITIS, THE RESULT OF TRAUMATISM, OR THE existing ARISING IN THE RHEUMATIC OR PYAEMIC STATE, WHEN THE SYNOVIA IS. THE RESULT SAC IS DISTENDED WITH FLUID THE SWELLING IS GREATEST ON THE DORSAL ASPECT OF THE WRIST, SHOWING A GENERAL FULNESS, WITH SOME BULGING BETWEEN TENDONS THE INFLAMMATION IS PRONE TO EXTEND TO THE INTERCARPAL JOINTS and TO ATTACK ALSO THE SHEATHS OF THE TENDONS IN THE NEIGHBOURHOOD, CHRONIC INFLAMMATION OF THE WRIST IS GENERALLY TUBERCULOUS, and OFTEN LEADS TO SIMILAR DISEASE IN THE SYNOVIAL SHEATHS OF ADJACENT TENDONS AND OF THE INTERCARPAL JOINTS; THE DISEASE, THEREFORE WHEN PROGRESSIVE, FREQUENTLY LEADS TO NECROSIS OF THE CARPAL BONES, AND THE RESULTS IS OFTEN UNSATISFACTORY.

## VIII. ARTICULATIONS OF THE CARPUS.

THESE ARTICULATIONS MAY BE SUBDIVIDED INTO THREE SETS : 1) THE ARTICULATIONS OF THE FIRST ROW OF CARPAL BONES.
2) THE ARTICULATIONS OF THE SECOND ROW OF CARPAL BONES. —— 3) THE ARTICULATIONS OF THE TWO ROWS WITH EACH OTHER.

### 1. ARTICULATIONS OF THE FIRST ROW OF CARPAL BONES. —— THESE ARE ARTHRODIAL JOINTS. THE LIGAMENTS
CONNECTING THE SCAPHOID, SEMILUNAR AND CUNEIFORM BONES ARE —— . "DORSAL" — "PALMER" —— TWO INTEROSSEOUS.
THE "DORSAL LIGAMENTS" ARE PLACED TRANSVERSELY BEHIND THE BONES OF THE FIRST ROW. THEY CONNECT THE SCAPHOID AND SEMILUNAR. and THE SEMILUNAR AND CONEIFORM —— THE "PALMER LIGAMENTS" ARE ALSO PLACED TRANSVERSELY CONNECTED THE SCAPHOID AND SEMILUNAR. and THE SEMILUNAR and CUNEIFORM BONES. THEY ARE LESS STRONG THAN THE DORSAL AND PLACED VERY DEEPLY BELOW THE ANTERIOR LIGAMENT OF THE WRIST. —— THE "INTEROSSEOUS LIGAMENTS" come set (FIG 177) ARE TWO NARROW BUNDLES OF FIBROUS TISSUE CONNECTING THE SEMILUNAR BONE, ON ONE SIDE WITH THE SCAPHOID AND ON THE OTHER WITH THE CUNEIFORM, THEY ARE ON A LEVEL WITH THE SUPERIOR SURFACES OF THESE BONES and CLOSE THE UPPE PART OF THE SPACES BETWEEN THEM. THEIR UPPER SURFACE ARE SMOOTH, and FORM WITH THE BONES THE CONVEX ARTICULAR, SURFACE OF THE WRIST JOINT. —— THE LIGAMENTS CONNECTING THE PISIFORM BONE ARE ——
1.) CAPSULAR _____     2.) TWO PALMAR LIGAMENTS.
THE "CAPSULAR LIGAMENT" IS A THIN MEMBRANE WHICH CONNECTS THE PISIFORM BONE OF TO THE CUNEIFORM. IT IS LINED WITH SEPARATE SYNOVIAL MEMBRANE _____ THE "TWO PALMER LIGAMENTS" ARE TWO STRONG FIBROUS BANDS WHICH CONNECT THE PISIFORM TO THE UNCIFORM. and TO THE BASE OF THE FIFTH METACARPAL BONE. THE PISO-UNCINATE & THE PISO-META CARPAL LIGAMENT (FIG 174)

### 2) ARTICULATIONS OF THE SECOND ROW OF CARPAL BONES.

THESE ARE ALSO ARTHRODIAL JOINTS. THE ARTICULAR SURFACES ARE COVERED WITH CARTILAGE, AND CONNECTED BY THE FOLLOWING LIGAMEN
1.) DORSAL          2.) PALMAR          —— THREE INTEROSSEOUS
THE DORSAL LIGAMENTS EXTEND TRANSVERSELY. FROM ONE BONE TO ANOTHER ON THE DORSAL SURFACE, CONNECTING THE TRAPEZIUM WITH TH TRAPEZOID. THE TRAPEZOID WITH THE OS MAGNUM. and THE OS MAGNUM WITH THE UNCIFORM. . . . . . —— "THE PALMER LIGAMENTS" HAVE A SIMILAR ARRANGEMENT ON THE PALMER SURFACE. —— "THE THREE INTEROSSEOUS LIGAMENTS" MUCH THICKER THAN THOSE OF THE FIRST ROW, ARE PLACED BETWEEN THE OS MAGNUM and THE UNCIFORM, A SECOND BETWEEN THE OS MAGNUM and THE MAGNUM and THE TRAPEZOID. and a THIRD BETWEEN THE TRAPEZIUM and TRAPEZOID THE FIRST OF THESE IS MUCH THE STRONGEST, AND THE THIRD IS SOMETHING SOMETIMES WANTING ——

### 3.) ARTICULATIONS OF THE TWO ROW OF CARPAL BONES WITH EACH OTHER.

THE JOINT BETWEEN THE SCAPHOID, SEMILUNAR, and CUNEIFORM, and THE SECOND ROW OF THE CARPUS OR THE MID-CARPAL JOINT. I MADE UP OF THREE DISTINCT PORTIONS, IN THE CENTRE THE HEAD OF THE OS-MAGNUM and THE SUPERIOR SURFACE OF THE UNCIFORM. ARTICULATE WITH THE DEEP-CUP SHAPED CAVITY FORMED BY THE SCAPHOID and SEMILUNAR BONES and CONSTITUTE, a SORT OF BALL AND SOCKET JOINT; ON THE OUTER SIDE THE TRAPEZIUM and TRAPEZOID ARTICULATE WITH THE SCAPHOID, and ON THE INNER SIDE THE UNCIFORM ARTICULATES WITH THE CUNEIFORM, FORMING GLIDING JOINTS.
THE LIGAMENTS ARE —

ANTERIOR OR PALMAR.          EXTERNAL LATERAL
POSTERIOR OR DORSAL.          INTERNAL LATERAL.

THE ANTERIOR OR PALMER LIGAMENTS CONSIST OF SHORT FIBRES, WHICH PASS, FOR THE MOST PART, FROM THE PALMAR SURFACE OF THE BONES OF THE FIRST ROW TO THE FRONT OF THE OS MAGNUM . . . . . . .

THE POSTERIOR OR DORSAL LIGAMENTS CONSIST OF SHORT. IRREGULAR bundles of fibres passing between the bones of THE FIRST AND SECOND ROW ON THE DORSAL SURFACE OF THE CARPUS . . . . . . .

THE LATERAL LIGAMENTS. ARE VERY SHORT, THEY ARE PLACED, ONE ON THE RADIAL THE OTHER ON THE ULNAR SIDE OF THE CARPUS, THE FORMER, THE STRONGER AND MORE DISTINCT CONNECTING THE SCAPHOID AND TRAPEZIUM BONES, THE LATTER THE CUNEIFORM and UNCIFORM; THEY ARE CONTINUOUS WITH THE LATERAL LIGAMENTS OF THE WRIST. JOINT, IN ADDITION TO THESE LIGAMENTS, A SLENDER INTEROSSEOUS BAND SOMETIMES CONNECTS THE OS MAGNUM AN THE SCAPHOID.

THE SYNOVIAL MEMBRANE OF THE CARPUS IS VERY EXTENSIVE, IT PASSES FROM THE UNDER SURFACE OF THE SCAPHOID SEMILUNAR AN CUNEIFORM BONES TO THE UPPER SURFACE OF THE BONES OF THE SECOND ROW, SENDING UPWARD TWO PROLONGATIONS — BETWEEN THE SCAPHOID AN SEMILUNAR AND THE SEMILUNAR AND CUNEIFORM, SENDING DOWN WARD THREE PROLONGATIONS BETWEEN THE FOUR BONES OF THE SECOND ROW; WHICH ARE FURTHER CONTINUED ON — WARD INTO THE CARPO-METACARPAL JOINTS OF THE FOUR INNER METACARPAL BONES. AND ALSO FOR A SHORT DISTAN BETWEEN THE METACARPAL BONES THERE IS A SEPERATE SYNOVIAL MEMBRANE BETWEEN THE PISIFORM AND CUNEIFORM BONES.

ACTIONS — THE ARTICULATIONS OF THE HAND AN WRIST, CONSIDERED AS A WHOLE, IS DIVIDED INTO THREE PARTS
1) THE RADIUS AN THE INTERARTICULAR FIBRO-CARTILAGE; 2) THE MENISCUS, FORMED BY THE SCAPHOID, SEMILUNAR, AND CUNEIFORM. THE PISIFORM BONE HAVING NO ESSENTIAL PART IN THE MOVEMENT OF THE HAND 3.) THE HAND PROPER THE METACARPAL BONES WITH THE FOUR CARPAL BONES ON WHICH THEY ARE SUPPORTED — VIZ THE TRAPEZIUM, TRAPEZOID, OS MAGNUM, AND UNCIFORM. THESE THREE ELEMENTS FORM TWO JOINTS.
(1) THE SUPERIOR (WRIST JOINT PROPER); BETWEEN THE MENISCUS AND BONES OF THE FOREARM. (2) THE INFERIOR, BETWEEN THE HAND AND MENISCUS (TRANSVERSE OR MID CARPAL JOINT.

1). THE ARTICULATION between the forearm and CARPUS IS A TRUE condyloid articulation, and therefore all movements but rotation are permitted, FLEXION AND EXTENSION are the most free and of these, a greater AMOUNT OF EXTENSION than flexion is permitted on account of the articulating surfaces extending farth ON THE DORSAL than on the palmar aspect of the CARPAL BONES, IN THIS MOVEMENT THE CARPUS BONES ROTATE UN a TRANSVERSE AXIS drawn between the TIPS OF THE STYLOID PROCESS of the RADIUS an ULNA, A CERTAIN AMOUNT OF Adduction (OR ULNAR FLEXION) and abduction (OR RADIAL FLEXION) is also permitted of these the FORMER IS considerably greater IN EXTENT THAN THE latter, IN THIS MOVEMENT THE CARPUS REVOLVES upon an ANTERO-posterior, AXIS drawn THROUGH THE CENTRE OF THE WRIST. FINALLY CIRCUMDUCTION, is permitted by the consecutive movements OF adduction, extension abduction an Flexion with intermediate movements between them; THERE IS NO ROTATION BUT THIS IS provided FOR BY THE SUPINATION and pronation of the RADIUS ON THE ULNA, THE MOVEMENT OF FLEXION IS performed BY THE FLEXOR CARPI Radialis, the Flexor carpi ulnaris, and the palmaris longus, extension, by the EXTENSOR CARPI Radialis longior et brevior and the EXTENSOR carpi ulnaris. and THE palmaris longus; extension By the FLEXOR EXTENSOR; abduction ulnar flexion by the flexor carpi ulnaris and the extensor carpi ulnaris, and adduction (Radial Flexion) by the extensors of the THUMB and the extensor carpi radialis longior et brevior And the Flexor carpi radialis.

2) The chief movements permitted IN THE TRANSVERSE OR MID-CARPAL JOINT ARE FLEXION and extension and a slight AMOUNT OF ROTATION, IN Flexion and Extension and which is the movement most freely enjoyed THE TRAPEZIUM an TRAPEZOID on the Radial SIDE AND THE UNCIFORM ON THE ULNAR SIDE glide FORWARD AND BACK WARDS ON THE scaphoid, and cuneiform Respectively, while THE head of the OS, MAGNUM and SUPERIOR SURFACE OF THE UNCIFORM ROTATE IN THE CUP-SHAPED CAVITY OF THE SCAPHOID and semilunar, Flexion AT THIS JOINT IS FREER THAN EXTENSION A VERY TRIFLING amount of ROTATION is also permitted, THE head OF OS, MAGNUM ROTATING round a VERTICAL AXIS drawn THROUGH ITS OWN CENTRE, while AT THE same TIME a slight gliding MOVEMENT TAKES PLACE IN THE LATERAL PORTIONS OF THE JOINT,

IX. CORPO-METACARPAL ARTICULATIONS.

1. ARTICULATIONS OF THE METACARPAL BONE OF THE THUMB WITH THE TRAPEZIUM.
THIS IS A JOINT OF RECIPROCAL RECEPTION, and enjoys great FREEDOM OF MOVEMENT, on account of the configurati OF ITS ARTICULAR SURFACES WHICH ARE Saddle/SHAPED, so that on section each bone appears to be recieved into CAVITY IN THE OTHER ACCORDING TO THE DIRECTION IN WHICH THEY ARE CUT, THE JOINT IS SURROUNDED BY a capsular ligame THE CAPSULAR LIGAMENT IS THICK BUT LOOSE, and passes from the circumference of the upper extremity of THE METACARPAL BONE TO THE ROUGH EDGE BOUNDING THE ARTICULAR SURFACE OF THE TRAPEZIUM; IT IS THICKEST externally AND BEHIND, AND LINED BY Separate synovial membrane.
MOVEMENTS — IN THE ARTICULATION OF THE METACARPAL BONE OF THE THUMB WITH THE TRAPEZIUM THE MOVEMENTS permit ed are FLEXION EXTENSION, adduction, abduction and CIRCUMDUCTION. WHEN THE JOINT IS FLEXED THE METACARPAL BONE IS BROUGHT IN FRONT OF THE palm and the THUMB is gradually TURNED to the FINGERS; IT IS BY THIS peculiar MOVEMENT THAT THE TIP of the THUMB is opposed to the other DIGITS ; FOR By SLIGHTLY FLEXING THE FINGERS THE PALMAR SURFA OF THE THUMB CAN BE BROUGHT IN CONTACT WITH THE PALMAR SURFACE ON AFTER ANOTHER,

2.) ARTICULATIONS OF THE METACARPAL BONES OF THE FOUR INNER FINGERS WITH THE CARPUS,
THE JOINTS FORMED BETWEEN THE CARPUS and FOUR INNER METACARPAL BONES ARE ARTHRODIAL JOINTS. THE LIGAMENTS ARE —
    DORSAL —     PALMER —     INTEROSSEOUS.

THE DORSAL LIGAMENTS, THE STRONGEST AN MOST DISTINCT, CONNECT THE CARPAL AND METACARPAL BONES ON THEIR DORSAL SURFACE. THE SECOND METACARPAL BONE RECEIVES TWO FASCICULI — ONE FROM THE TRAPEZIUM, THE OTHER FROM THE TRAPEZOID, THE THIRD METACARPAL RECEIVES TWO — ONE FROM THE TRAPEZOID AND ONE FROM THE OS-MAGNUM, THE DURTH TWO — ONE FROM THE OS MAGNUM AND ONE FROM THE UNCIFORM. THE FIFTH RECEIVES A SINGLE FASCICULUS FROM TI NCIFORM BONE WHICH IS CONTINUOUS WITH A SIMILAR LIGAMENT ON THE PALMER SURFACE, FORMING AN INCOMPLETE CAPSU THE PALMER LIGAMENTS HAVE A SOMEWHAT SIMILAR ARRANGEMENT ON THE PALMER SURFACE, WITH THE EXCEPTION OF THE THIR METACARPAL. WHICH HAS THREE LIGAMENTS. — AN EXTERNAL ONE FROM THE TRAPEZIUM, SITUATED ABOVE THE SHEATH OF THE TENDO OF THE FLEXOR CARPI RADIALIS; A MIDDLE ONE, FROM THE OS MAGNUM AND INTERNAL ONE, FROM THE UNCIFORM THE INTEROSSEOUS LIGAMENTS CONSIST OF SHORT THICK FIBRES, WHICH ARE LIMITED TO ONE PART OF THE CARPO-METACARPAL ARTICULATION; THEY CONNECT THE CONTIGUOUS INFERIOR ANGLES OF THE OS MAGNUM; AND ~~~~~~~~~~~~~~~ UNCIFORM WITH THE ADJACENT SURFACES OF THE THIRD AND FOURTH METACARPAL BONES.

THE SYNOVIAL MEMBRANE IS A CONTINUATION OF THAT BETWEEN THE TWO ROWS OF CARPAL BONES. OCCASIONALLY, THE ARTICULATION OF THE UNCIFORM WITH THE FOURTH AND FIFTH METACARPAL BONES HAS A SEPARATE SYNOVIAL MEMBRANE. THE SYNOVIAL MEMBRANES OF THE WRIST AND CARPUS (FIG. 177) ARE THUS SEEN TO BE FIVE IN NUMBER. THE FIRST, THE MEMBRANA SACCIFORMIS, PASSES FROM THE LOWER END OF THE ULNA TO THE SIGMOID CAVITY OF THE RADIUS, AND LINES THE UPPER SURFACE OF THE INTERARTICULAR FIBRO-CARTILAGE — THE SECOND PASSES FROM THE LOWER END OF THE RADIUS AND INTERARTICULAR FIBRO-CARTILAGE ABOVE TO THE BONES OF THE FIRST ROW BELOW THE THIRD THE MOST EXTENSIVE PASSES BETWEEN THE CONTIGUOUS MARGINS OF THE TWO ROWS OF CARPAL BONES — BETWEEN THE BONES OF THE SECOND ROW TO THE CARPAL EXTREMITIES OF THE FOUR INNER METACARPAL BONES, THE FOURTH FORM THE MARGIN OF THE TRAPEZIUM TO THE METACARPAL BONE OF THE THUMB, THE FIFTH BETWEEN THE ADJACENT MARGINS OF THE CUNEIFORM AND PISIFORM BONES.

ACTIONS — THE MOVEMENT PERMITTED IN THE CARPAL-METACARPAL ARTICULATIONS OF THE FOUR INNER FINGERS IS LIMITE TO A SLIGHT GLIDING OF THE ARTICULAR SURFACE UPON EACH OTHER, THE EXTENT OF WHICH VARIES IN THE DIFFERENT JOINTS. THUS THE ARTICULATION OF THE METACARPAL BONE OF THE LITTLE FINGER IS MOST MOVABLE THAN THAT OF THE RING FINGER. THE METACARPAL BONES OF THE INDEX AND MIDDLE FINGERS ARE ALMOST IMMOVABLE

22

# EXHIBIT: B

1.) PAGES ONE THROUGH NINE. PAUL LANCASTERS TESTIMONY VIA FIRST INTERVIEW - - - DEFENDANTS EXHIBIT. 7. A. O11510-S  ⟶  3/14

2.) PAGES ELEVEN TWELVE THIRTEEN, MISTAKEN IDENTITIEFICATIONS AND EYEWITNESS PSYCHOLOGY AUTHORITIES, . . -

3.) PAGES FOURTEEN THROUGH THIRTY, ALBERT MELTONS FIRST INTERVIEW AND MISTAKEN ERRONOUS IDENTIFICATION - - . DEFENDANTS EXHIBIT 6A . O11510-S. 3/14.

ATTACHED TO EXHIB.
( 29 - PAGES )

pg.27

EX-7A. BC (

(43)

INTERVIEW WITH PAUL LANCASTER

DEFENDANT'S
EXHIBIT D·3
7A
011505

DET. COSTA: Okay. Let's do what we got to do.

MR. LANCASTER: Now I can tell you --

DET. COSTA: I know you were talked to out there.

MR. LANCASTER: The best that I can do for you is to draw you a little diagram --

DET. COSTA: Uh-huh.

MR. LANCASTER: -- of the area over there, and go over it, and then you can question me about anything else.

DET. COSTA: Well, we're pretty familiar with the area.

MR. LANCASTER: What I got in my hand

DET. COSTA: Where were you at when all this started?

MR. LANCASTER: This is what I wanted to see if we could come up with something. Okay. This is Pacifica.

DET. COYNE: Okay.

MR. LANCASTER: This is Kevin.

DET. COYNE: Okay.

MR. LANCASTER: This is Port Chicago. This is south, this is north. I'm on my walk. I'm coming down Kevin. Let's see here, we got coming down here, and then it comes over into a left-hand turn lane --

DET. COYNE: Right

MR. LANCASTER: -- and goes there. Okay.

DET. COSTA: So just for reference, here's the hotdog stand.

MR. LANCASTER: This is the hotdog stand

DET. COSTA: Yeah.

MR. LANCASTER: And over here's the filling station

DET. COSTA: Right

MR. LANCASTER: And this is a big empty lot.

DET. COSTA: Right.

MR. LANCASTER: Okay. And this is all bushes. All bushes up in here. When I'm down here on Kevin, I see this black guy pulling two carts. And he's coming from this way.

DET. COSTA: On this side of the street?

MR. LANCASTER: Yes.

DET. COSTA: Okay.

MR. LANCASTER: And he's out in the middle of the street in this lane, and he's waiting to go over the traffic and go into this lane and come down the bicycle path. All right? So he's passed me when I come around the corner. So I stay on this side of the street, I've just done my walk and I'm hot so I stay on the shady side. So I come down, and I'm getting ready to cross over before the light, right in here. And this guy that got shot, him and this guy are about right here.

DET. COSTA: The guy with the cart, you mean?

MR. LANCASTER: The guy with the cart and the guy that got shot, they were together.

DET. COSTA: Okay.

MR. LANCASTER: And I'm just a little bit below, right here. Now this guy that shot him, I didn't see him coming down this way. He had to come from here. So he come out from here, and right to where the hedges are, he started shooting. And I figure I'm within 25 or 30 feet of being in the line of fire.

DET. COSTA: Uh-huh

MR. LANCASTER: And he squeezed off, I don't know how many shots.

DET. COSTA: If you had to guess, how many?

MR. LANCASTER: I just told them down there at least three and it could have been more.

DET. COSTA: Okay.

2

MR. LANCASTER:  And what I saw was a short rifle, just a barrel, not butt.  And it seemed like to me it was bolt action because he was squeezing off shots, and you couldn't hold it like you would hold a gun and cock it, you know.

DET. COSTA:  Was it like this or like this?

MR. LANCASTER:  No, no, he had it (unintelligible).

DET. COSTA:  On the outside.

MR. LANCASTER:  He was pulling the bolt back.

DET. COSTA:  Okay.

MR. LANCASTER:  And I could hear the bullets that didn't hit him striking the sidewalk and coming down here. And there's all kinds of cars and stuff parked in this garage here, and I could hear them hitting metal.

DET. COSTA:  Okay

MR. LANCASTER:  Okay. So the guy that got shot, he staggers down and he falls down here.

DET. COSTA:  and you're still right here at this point.

MR. LANCASTER:  Oh, yeah, you're damn right.

DET. COSTA:  Stopped.

MR. LANCASTER:  Yeah. Oh, boy, I hope to tell you.

DET. COSTA:      Okay.

MR. LANCASTER:  So the shooter goes down here, crosses over here on the sidewalk over here.

DET. COSTA:      Uh-huh.

MR. LANCASTER:  And somewhere about in here, not that high up, there's a light standard and it's got a triangular metal sign on it. And that is the last time that I saw him. So this guy falls here. The other guy that's pulling the carts is hollering, 911. People are there in their cars, but I don't think anybody had a cell phone, anyway. So I proceed to run over here to the filling station. Well, the guy that's operating the shop there is already on the phone. So I took the phone from him and talked to the dispatcher and let her know what happened and where this guy was and the last time --- where he was heading, towards Kevin, and I didn't see him turn on Kevin. And I heard somebody say that he jumped the fence but I didn't see that.

3

DET. COSTA: You didn't see him go over a fence

MR. LANCASTER: And there's another street up here. I don't know if he went up that way.

DET. COSTA: So the last time you saw the suspect, he had crossed Port Chicago, around this pole?

MR. LANCASTER: That's the last time I seen him, heading up that way. Now, he wasn't running like a jackrabbit. He was walking.

DET. COSTA: Walking. Fast walking?

MR. LANCASTER: Well, more or less, because he did get to that point before I ran to the phone.

DET. COSTA: Okay

MR. LANCASTER: But he wasn't moving like a jackrabbit.

DET. COSTA: Do me a favor, right up in here, write down the clothing that you remember the suspect wearing.

MR. LANCASTER: I don't remember the clothing, other than it was dark clothing and not the clothing that they took me to view, the guy that they did have.

DET. COSTA: Uh-huh

MR. LANCASTER: And the guy that they did have was down here on Kevin.

DET. COSTA: Right.

MR. LANCASTER: And he was a much larger person in stature than this guy was.

DET. COSTA: How tall do you think the shooter was?

MR. LANCASTER: Somewhat taller than I am and a lot thinner. A young fellow. He was in his twenties, give or take.

DET. COSTA: How tall are you?

MR. LANCASTER: Five-ten.

DET. COSTA: So about as tall as you or shorter than you?

MR. LANCASTER: Well, about right in the area, there.

4

(47)

DET. COSTA: But skinnier than you?

MR. LANCASTER: Oh yeah

DET. COYNE: Hispanic?

MR. LANCASTER: Pardon

DET. COYNE: Hispanic?

MR. LANCASTER: Yes.

DET. COYNE: Okay. And you were in the middle of the street when this happened, you were already trying to cross?

MR. LANCASTER: Yeah

DET. COYNE: Okay. You see this guy comes out of the ---

MR. LANCASTER: .I would say I was within 25 or 30 feet or whatever it is, that distance across there, of being in the line of fire.

DET. COYNE: Okay. The guy with the cart is coming down this side. Where did he met the victim. Where did he meet the guy that got shot at?

MR. LANCASTER: Right there.

DET. COYNE: (unintelligible)

MR. LANCASTER: Meeting right there, yeah.

DET. COYNE: Okay. Did they look like they knew each other?

MR. LANCASTER: In fact, this guy just come out of there. And when I looked up and heard everything ---

DET. COYNE: You didn't hear him say anything?

MR. LANCASTER: There was no language. There was no foul language or anything like that. The only guy that I heard was the guy that was pulling the carts.

DET. COYNE: And he was yelling, call 911.

MR. LANCASTER: He was shouting and crouching. And the guy that got hit ran up there and collapsed.

DET. COSTA: But prior to the shots, you didn't hear any yelling back and forth?

MR. LANCASTER: No sir.

DET. COSTA:          Okay

MR. LANCASTER: No, sir. Like they knew each other or you dirty so and so, nothing.

DET. COSTA: It looked like the guy with the carts and the guy that got shot, it looked like they knew each other?

MR. LANCASTER: Yes

DET. COSTA: Okay

MR. LANCASTER: This was what makes me think --- and this my own thoughts --- that this was either a random shooting or they knew each other and this guy, the shooter stalked him and come up on him and blew him away. I don't know what else it could be. Because he saw me but he didn't do nothing. He turned, went up and went across, wherever he went.

DET. COSTA: When he walked away this way, was he still holding the rifle?

MR. LANCASTER: I didn't see that. He was walking away from me. And by that time, I'm over here. This guy's collapsed and I'm over there looking at him. And this other guy pulling the carts, he's down there yelling 911. And I didn't see anything else open so I ran over here. I knew this guy was open. I know this guy. I've had my car smogged there.

DET. COSTA: Uh-huh

MR. LANCASTER: So I took the phone away from him and gave him this information, where these guys was.

DET. COSTA: Did the shooter bring anything else besides the rifle?

MR. LANCASTER: Not that I know of.

DET. COSTA: You didn't see anything else on him or with him?

MR. LANCASTER: He had his hands full. And there was no stock on the gun.

DET. COSTA: No stock?

MR. LANCASTER: Saw just the barrel.

DET. COSTA: But it was definitely a rifle.

6

(44)

MR. LANCASTER: It was a rifle.

DET. COSTA: You know handguns and weapons pretty good?

MR. LANCASTER: No, not that I saw.

DET. COSTA: You know guns pretty well?

MR. LANCASTER: Well, sure, yeah.

DET. COSTA:        Okay.

MR. LANCASTER:  But I know he had one hand here and one hand there.  He didn't have
      nothing ---

DET. COSTA: Did it look like the barrel might have been cut?

MR. LANCASTER: I don't know about the barrel.  I just know that there was no stock on it.

DET. COSTA: Okay. But definitely a rifle?

MR. LANCASTER: Yeah.

DET. COSTA: Okay

MR. LANCASTER: In fact ---

DET. COSTA: Was it blue or stainless?

MR. LANCASTER: I couldn't tell.  In fact, I walked up later and looked at the area.  And there
      was a cartridge laying there, and it looked like a .22 cartridge.  So I told the girl that was
      there, the Sheriff's girl, that he was standing up here.  And if I know anything about guns, the
      way they eject it, he could have ejected them off into these bushes.  They looked a little bit
      more, and I saw them put another thing down there, but I (unintelligible).

DET. COSTA: So when you saw the suspect going across here and walking up. You can't --
      you did not see the rifle at that time.

MR. LANCASTER: No. No.

DET. COSTA: (unintelligible).

MR. LANCASTER: Go ahead. Yeah. I imagine when he come wherever he come from, it was
      concealed, and when he went up and went across it was concealed.  Either that or he threw it
      away, I don't know.

7

( 50 )

DET. COSTA:          Uh-huh.

MR. LANCASTER:  The best thing I could do was get down to 911 and tell them where he was headed. And then it was out of my hands, I did all I could.

DET. COSTA: Now at some point out here, they, they showed you a person who was being detained?

MR. LANCASTER: Yes, they had him around on Kevin. They had him stopped.

DET. COSTA: In a car, outside a car?

MR. LANCASTER: And they got him out and I looked at him. He had on shorts and a white t-shirt. I did not see that down there. And this fellow was larger in stature than the fellow that I saw.

DET. COSTA: Okay. So the fellow that you saw was smaller than you remember the shooter being, being tinier? Okay.

MR. LANCASTER: Wasn't heavyset or anything. And that's about it.

DET. COYNE: The guy they showed you over here being detained, on a scale of 1 to 10, 10 being positive, 1 being no way it's him, where, where would you say ---

MR. LANCASTER: As of right now I'm saying there's no way.

DET. COYNE: There's no way it's him. Okay.

MR. LANCASTER: And by saying that, I don't know whether he had anything on him when he was caught, whether he had a weapon on him or got rid of it.

DET. COSTA: Sure.

MR. LANCASTER: Or was just a guy going down the street.

DET. COSTA: Try to concentrate on the facial features, cause clothing can change. You know, I can take off my clothes once I disappear from sight.

MR. LANCASTER: He was too far away from me to say anything except that he was a Hispanic.

DET. COSTA: So if --

MR. LANCASTER: And when you're, when you're shooting, you don't stand there and see if he's got all 38 - 32 teeth and what have you, you know.

8

(51)

DET. COSTA:  I agree.

MR. LANCASTER: And I was - I could have been in the line of fire so I could have been hit (unintelligible) other guy.

DET. COYNE:  So other than clothing description, you'd probably not be able to identify him, the shooter by facial alone.

MR. LANCASTER: No

DET. COYNE:  Okay.  You mainly remember his clothing and, he was wearing dark clothes.

MR. LANCASTER:  Right.

DET. COYNE:      Did you say long sleeve shirt?

MR. LANCASTER:  I didn't say and I don't know.

DET. COYNE:  Alright.  But dark clothes, top and bottom.

MR. LANCASTER:  I was surprised to see the guy that they showed me in shorts and white shirt.



Ellen Reasonover was a Good Samaritan who called the police to report she saw two men in a car at the scene of a murder. She was prosecuted for the murder, and came within one vote of a death sentence. Discovery revealed that concealed exculpatory audio tapes and purchased perjured testimony to frame her was key to her release in August 1999 after 16 years of false imprisonment. In 2004 Ms. Reasonover was awarded damages of $7.5 million.

# *Justice:Denied* relentlessly sheds light on the conviction and punishment of the innocent.

...is an independent non-profit publication that is not beholden to editorially pleasing any private group or public agency. *Justice:Denied* fearlessly prints stories of wrongful conviction and how and why they occur. No one is spared exposure for their role in causing an injustice. Prosecutors, detectives, lab technicians, judges, witnesses, politicians, jurors and defense lawyers are all fair game.

Since its funding in 1998, *Justice:Denied* has provided a public voice for the innocent people - estimated to be as many as one and a half million - buried in the depths of this country's federal and state law enforcement systems.

As the only magazine published in this country devoted to wrongful convictions, *Justice:Denied* sends out invaluable SOS messages to the free world about the plight of people as innocent of the crime they were convicted of committing as the person reading this. Everyday hundreds of people learn it can't happen to me/was wishful thinking. A person's innocence is irrelevant if the illusion is created they are guilty - and prosecutors are masters at doing just that.

Overturning a wrongful conviction is a monumental task. An innocent person's conviction after a several day trial can, and often times does take years of effort by dedicated people to overturn. To do so requires convincing skeptical people that a person has been wronged by the legal system. The difficulty in doing that is why *Justice:Denied* shines its light on cases of people who can make a credible argument that they got the ultimate raw deal - being convicted of a crime they didn't commit.



Ray Krone walked out of an Arizona prison on April 8, 2002 after DNA proved his innocence. However, four of those years were spent on death row. Erroneous expert bite mark testimony led to Mr. Krone being wrongfully convicted twice for a murder he didn't commit.

> "As the only magazine devoted solely to wrongful convictions, *Justice:Denied* fulfills an important role by publicizing wrongful convictions. *Justice-Denied* writers also provide an important public service by covering developments that promote the ends of true justice rather than indiscriminate revenge"
>
> Martin Yant, author, journalist and private investigator

## How Are People Wrongly Convicted?

A number of factors contribute to the remarkable ease that vast numbers of men, women and increasingly children are victimized by a wrongful conviction. One or more of the following factors are typically present in a case of wrongful conviction:

- ✓ Overzealous prosecutors solely concerned with winning
- ✓ Inadequate police investigation
- ✓ Fabrication of evidence or doctored reports by the police and/or crime lab technicians
- ✓ Erroneous identification by the victim or other eyewitnesses
- ✓ False confession physically or psychologically coerced
- ✓ Inexperienced or incompetent defense lawyer
- ✓ Perjury by the police and/or other prosecution witnesses
- ✓ Inaccurate analysis of evidence by crime lab technicians
- ✓ Uncritical jurors who blithely accept the prosecutor's case
- ✓ Tunnel vision by police and prosecutors who presume the defendant's guilt to the exclusion of other suspects
- ✓ Slanting of a judge's rulings to favor the prosecution
- ✓ Lack of resources prevents the defendant from hiring investigators and/or experts to find exculpatory evidence
- ✓ Pressuring of witnesses to give pro-prosecution testimony
- ✓ Smearing of the defendant's character in the courtroom and the media for alleged or actual actions that have no relationship to the charges
- ✓ Critical evidence disappears, is destroyed, or the prosecution resists providing it for defense testing
- ✓ Prejudice against a defendant's ethnicity, religion, or political or personal ideas by the prosecutor, judge and/or jurors
- ✓ Coercion of an innocent defendant to accept a plea bargain by the prosecutor's piling on of charges that will result in a much longer sentence if the defendant goes to trial and loses
- ✓ Purchase of perjurious testimony by the prosecutor
- ✓ Wording of an indictment to paint an innocent person in the worst light possible in the eyes of the judge and jury

The playing field is heavily tilted in favor of the prosecution when a defendant isn't wealthy enough to hire the highest quality lawyers, investigators and expert witnesses to counter the prosecution's virtually unlimited resources. So the likelihood of a wrongful conviction becomes a near certainty when an innocent person who doesn't have hundreds of thousands of dollars to spend on a defense, encounters a deck stacked by such things as police perjury, falsification or destruction of evidence by the police, crime lab technicians or prosecutors; perjured testimony purchased by an un-scrupulous prosecutor; a pro-prosecution judge; or prejudiced jurors. Under those conditions the wonder isn't that the innocent are convicted, but that they are ever acquitted.

JD's website is at: **http://justicedenied.org**



Anthony Brogdon spent 10 years imprisoned for a rape he didn't commit. In March 2003 his conviction based on falsification of evidence by the FBI crime lab was thrown out.

## The Wrongly Convicted Are Becoming Visible

*Justice:Denied* and its website that gets over a million hits a year, have been a leader in increasing public awareness about the prevalence of wrongful convictions. When *Justice:Denied* was founded it was one of a very few voices crying in the wilderness about the nation-wide scandal of innocent people being falsely branded as criminals. That concern is now openly shared by the professors, students, lawyers and journalists involved in more than three dozen innocence projects across the country. There are also now several websites that expose different aspects of wrongful convictions, and newspapers regularly report on exonerated people.

Governor George Ryan's pardoning on January 10, 2003 of four innocent men on Illinois' death row who had been tortured into falsely confessing would have been unthinkable just a few years ago. There was extensive news coverage of those pardons and of Gov. Ryan's commutations the next day of everyone on Illinois' death row, because of the possibility there were undetected innocent people among them. Afterwards an Illinois prosecutor admitted what also would have been unthinkable a few years ago: innocent people confess to crimes they didn't commit and some of them end up on death row.

Jeffrey Scott Hornoff was convicted of murdering a woman acquaintance without any physical evidence of his guilt. After 6-1/2 years imprisonment, he was released on November 6, 2000 when the actual killer confessed.

"In November of 2000 *Justice:Denied* published an article I had written about my son Derek's case and a publisher from Medstar Television read that article which led to the production of an hour long episode of Medical Detectives which airs on The Learning Channel. That program has been seen around the world, we have received numerous messages of concern and support from people who watched it. ... the February 2003 issue of Playboy and a book was currently in the process of being written. All of the recognition and support would not have happened were it not for *Justice:Denied*. I have been asked, 'How can I ever repay you?'"

Larry A. Trice, father of Derek Trice, one of the 'Navy's Forgotten Four'

*Justice:Denied's* mission can be summed up as a crusade to make 'Innocent Until Proven Guilty' more than a hollow phrase used by judges, prosecutors and the police to cover-up that in reality the reverse is usually true: an accused person is considered to be 'Guilty Until Proven Innocent.'

## Public exposure is a powerful antidote to injustice.

**Keep up-to-date by subscribing to *Justice:Denied*, or help expose the injustice of wrongful convictions by donating today!** (see other side)



# *Justice:Denied's* Bookshop

Pay with check, money order, or stamps (pre-stamped envelopes OK)

**Note:** There is a $5 service charge per *book* order less than $35, except for the books listed at the bottom of the order form.

| Book Title or Number (write in or circle your selections) | Price |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| **Sub-Total** |  |
| If Sub-Total is less than $35, ADD $5 Service Charge |  |
| Freeing The Innocent  (No service charge) | $15 |
| KBL's Unreasonable Conviction (No service charge) | $10 |
| Prisoner 6-issue *Justice:Denied* subscription | $10 |
| Non-Prisoner 6-issue *JD* subscription | $20 |
| Sample issue of *Justice:Denied* magazine | $ 3 |
| **Total** |  |

## Order Mailing Information

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst.: _____

Address: _____

City/State/Zip: _____

Extra Line: _____

**Mail Payment To:**
Justice Denied
PO Box 68911
Seattle, WA 98168

Or order with your credit card from *Justice:Denied's* website:
**http://justicedenied.org**
Questions? Email: info@justicedenied.org

---

**Victims of Justice Revisited** by Thomas Frisbie and Randy Garrett - $19.95 - 468 pgs. Tells the story of Rolando Cruz and his two co-defendants accusation of kidnapping and murdering Jeanine Nicarico in 1983 from the day the crime occurred to their exoneration in 1995 after three trials, to the trial of seven law officers accused of conspiring to deny Cruz a fair trial and falsely have him executed. #23

**Innocent: Inside Wrongful Conviction Cases** by Scott Christianson - $18.95 - 208 pgs. The 42 cases collected and graphically documented in *Innocent* reveal the mistakes, abuses and underlying factors that led to miscarriages of justice, including the presumption of guilt, mistaken identification, eyewitness perjury, ineffective assistance of counsel, police misconduct, prosecutorial misconduct, and forensics, while also describing how determined prisoners, post-conviction attorneys, advocates and journalists struggled against tremendous odds to win their exonerations. #76

**Tulia: Race, Cocaine, and Corruption in a Small Texas Town** by Nate Blakeslee - $14.95 - 464 pgs. Definitive account of the five year travesty of justice in Tulia that resulted in the wrongful conviction of 38 people on trumped up drug charges. Blakeslee is the award-winning reporter for the *Texas Observer* who broke the Tulia story in 2000. #25

**Exit to Freedom** by Calvin C. Johnson Jr. with Greg Hampikian - $18.95 - 286 pgs. After his 1983 conviction for rape and related crimes, Calvin C. Johnson Jr. told the judge, "With God as my witness, I have been falsely accused of these crimes. I did not commit this crime. I'm an innocent man." Sentenced to life in prison, *Exit to Freedom* is Johnson's story of how he spent the next sixteen years working to free himself before DNA testing ruled out the possibility he was guilty, and he was released in 1999. #26

**The Death of Innocents: An Eyewitness Account of Wrongful Executions** by Helen Prejean - $14 - 336 pgs. The book's first part focuses on the execution of two men who were likely innocent: Dobie Williams, a black man with an IQ of 65 from rural Louisiana represented by incompetent counsel and found guilty by an all-white jury based mostly on conjecture and speculation; and, Joseph O'Dell, convicted of murder based on a jailhouse informant who later admitted to testifying falsely for his own benefit. The book's second part details the inequities in capital prosecutions and the arbitrary imposition of the death sentence. #27

**Win Your Case: How to Present, Persuade, and Prevail – Every Place, Every Time** by Gerry Spence - $14.95 - 304 pgs. Written for defense lawyers or lay people. In his 50+ year career Spence has never lost a criminal case. He considers every case a "war," and he focuses on what is necessary to win. The book deals with waging the war: improving one's storytelling skills, conducting effective opening and closing statements and using witnesses. #72

**Last Man Standing: The Tragedy and Triumph of Geronimo Pratt** by Jack Olsen - $15.95 - 512 pgs. The story of Geronimo Pratt's 1970 conviction and life sentence for an LA murder committed when he was 350 miles away from the crime scene and under FBI surveillance in Oakland, CA. Pratt was exonerated in 1997 and awarded $2.75 million in 2000. This is a textbook case of abuse of the American legal system for political ends. #63

**Last Words From Death Row** by Norma Herrera - $19.95 - 264 pgs. Lionel Herrera was executed in 1993 after the U.S. Supreme Court ruled evidence of his factual innocence was irrelevant to issuing of habeas corpus. Lionel's last request by his sister was to tell his true story. His experiences involving not one of the U.S. legal system is more concerned with procedure than finding the truth of a person's guilt or innocence. #88

**Freeing The Innocent: A Handbook For The Wrongly Convicted** by Michael and Becky Pardue - $15 - Self-help manual jam packed with hands-on - "You Too Can Do It" - advice explaining how Michael Pardue was freed in 2001 after 28 years of wrongful imprisonment. #01 (No Service Charge)

**Kirstin Blaise Lobato's Unreasonable Conviction** by Hans Sherrer - $10 - Kirstin Blaise Lobato has twice been convicted in Las Vegas of murdering a homeless man and sexually assaulting his corpse in 2001. Yet, there is no forensic, physical, eyewitness or confession evidence linking her to the murder or the crime scene, and there is no evidence he was sexually assaulted by the perpetrator. This is the full story reported in *Justice:Denied* Issues 26 & 34. #100 (No Service Charge)

**Improper Submissions: Records of a wrongful conviction** by Erma Armstrong - $10 - 370 pgs. The true story of how Karlyn Eklof was delivered into the hands of a psychotic liar by traffickers in porn and mind control. After she witnessed a murder she was prosecuted and convicted for that crime, and is currently serving two life sentences in Oregon. *Improper Submissions* documents that exculpatory and impeaching evidence was hidden by the prosecution, and bragging by the killer (later convicted and sentenced to death) was used by the prosecution against Karlyn. #28 (No Service Charge)

**Who Killed Sarah?** by Sheila and Doug Martin - $16.95 - 202 pgs. Although there was no physical evidence, no witness to the crime and no murder weapon, Penny Brummer was convicted of first-degree murder in the death of Sarah Gonstead by a Madison, Wisconsin jury in October 1994. But did Brummer do it? Or was she herself a victim of overzealous prosecutors, tunnel-vision investigators, contradictory forensic scientists, and a prejudiced judge? It's a twilight zone, but it's real. #29

**The Wrong Men: America's Epidemic of Wrongful Death Row Convictions** by Stanley Cohen - $15 - 256 pgs. Sociologist Cohen examines some 100 instances where people sentenced to death were later exonerated. Cohen also analyzes the chief reasons why wrongful convictions occur so frequently, and he presents a convincing argument to suspect the reliability of capital convictions. #32

**Arbitrary Justice: The Power of the American Prosecutor** by Angela J. Davis - $29.95 - 264 pgs. Hardcover. Intense and long-overdue serious examination of the expanding power of prosecutors and their increasing politicization. Law Professor Davis explains how the day-to-day practices and decisions of prosecutors produce unfair and unequal treatment of defendants. Davis argues that the mechanisms purportedly holding prosecutors accountable are ineffectual and foster a climate of tolerance for misconduct. (Pub. April 2007) #84

**Police Interrogation and American Justice** by Richard A. Leo - $40 - 328 pgs. Hardcover. Professor Leo is one of the world's leading authorities on false confessions. Leo shows the police have developed sophisticated interrogation methods that rely on persuasion, manipulation, deception and psychological coercion to induce an admission of guilt from a suspect. Leo argues that standard interrogation techniques produce confessions that are inherently suspect, and that false confessions are relied on to wrongly convict a person. Leo also explains that the *Miranda* warning ineffectively protects a suspect's right against self-incrimination. (Pub. March 2008) #102

defendant was entitled to summary judgment. Anderson v. Liberty Lobby INC. 47 TU.S. 242. 25651.52. 106 S.C. 2505, 25 10.11.91  Led. 2d 202 (1986) The Test for directed verdict in Turn, is whether a rational jury could have brought in a verdict for the nonmovant the defendant in this case  Kozlowski v. John E Smith's Son Co. 87 Wisd 882. 888. LTS  N.W. 2d  915. 922 (1979)

A party does not vouch for the truth of every statement of the witnesses he calls. even of the friendly witnesses Fed. R. Evid. 608  and note of advisory committee on proposed rule.  Guenther v. Armstrong Rubber Co. 406 F.2d 1315. 1317 + 18. (3d Cir. 1969), but with exception that the defendant counsel might have tried to fit this case within - but did not try - California's law requires the defendant in this case to prove that the plaintiffs (did wh explain) How is the defendant to carry Paul Lancasters burden of proof if the jury disbelieves his only witnesses. In theory the jury might disbelieve the witness testimony about the color and coating of the suspect but believe her bias testimony about their attributes, but what sense would that make ? The deposition indicates no greater uncertainty about identity of a person. Than about other features of the person.   On the contrary the features of discriptions is the feature most stressed in their testimony How could the jury rationally conclude that she had gotten the color and coating wrong but the size. shape an other features connecting the pill to Lilly right. ? There may be answers to these questions, but answers that come out of scholarly literature of which the plaintiffs /defendants counsel appears to be unaware and which he in any event made no attempt to present through the affidavit of an expert who might later testify at the Trial. as in such cases as. " United States  V. Smith, 736. F.2d  1103.  (6th Cir 1984). (Per curium). and United States  V. Moore. 786. F.2d - 1308 - 1311-13 ( 8th Cir. 1986). An important body of psychological research undermines the lay intuition that confident memories of salient experiences (such as taking a defendant an wrongly accusing him.) are accurate and do not fade with time unless a persons memory has some pathological impairment. Much of this evidence can be found in Credibility assessment ( Yuille ed. 1989). Eye Witness Testimony: Psychological perspectives ( Wells & Loftus eds. 1984 ); evaluating witness evidence ( Lloyd - Bostock & Clifford eds. 1983 ) A leading scholar in this field is Elizabeth F. Loftus author of papers in each of the three volumes we have cited as co-author of one of the volumes.

The basic problem about testimony from memory is that most of our recollections are not verifiable. The only war= rant for them is our certitude. and certitude is not a reliable test of certainty. many people are certain that God exists many are certain that he does not exist. The believer and the nonbeliever are equally certain, but The  cannot bo= be correct. Similarly the mere fact that we remember something with great confidence is not a powerful warrant for thinking it true. It therefore becomes an empirical question whether and in what circumstances memory is accurate. Cognitive psychologists such as Loftus have tried to answer this question. the answers are controversi= Zaragoza & McCloskey, misleading. Post-event information and the memory impairment hypothesis. comme= on Bell and Reply to Tversky and Tuchin. 118 J. Experimental Psych. 92 (1989). they are based for the most part. experimental results generalize to real "world" situations. But although the answers certainly are not definit= they are suggestive. The basic findings are accuracy of recollection decreases at a geometric rather than arithmetic rate ( so passage of time has a highly distorting effect on re-collection) accuracy of recollection is not high= correlated) with the recollectors confidence: and memory is highly suggestible - people are easily, "reminded "of events. That never happened, and having been " reminded " may therefore hold the false re-collection as tenaciously as they would a true one.

All three of these findings could have been used in this case - how effectively we need not decide. The defendants counsel wanted the jury to pick and choose among the three witnesses recollections of the features of. identity. - To believe some and disbelieve others. it is difficult to see how the psychological research to which we have referred would have assisted counsel in this dilicate operation, but it might be have been used in anoth= way, with the aid of an affidavit by an expert witness. The plaintiff defendants counsel might have a change the case from one in which the defendant can. L and is therefore required to allege and prove what type of proo= dog scent discrimination an "disability" of the use of his hand and other factors. in which the defendant cannot allege or prove this. an evidence he has. That counsel failed to acknowledge. in which the defendant cannot allege or prove this= allows the opposition to get by with alleging and proving merely that the opposition produced the misapplied law an evidence in use of in preventing miscarriage of justice during the period in which the defendant didnt do nothing.  Collins  veri lilly co.  supra 116. Wisd 2d at 143-44 342 N.W. 2d at 50.  than add more cites, He is an honest person, he refuses to change his testimony from what he actually though quite possibly false believed. - - The defendant counsel did not follow this route. She did not plan to present (presumably through an expert witness) grounds for disbelieving the testimony of the plaintiffs. girlfriend, which exonerates the defendant. he planned to make the defendants only witness, she intended to present the case not as one

## INTERVIEW WITH ALBERT MELTON

MR. MELTON: Anyway, I was kind of upset 'cause she had to go to work she had to catch the 10:53 bus where I live, so I left the house about 9, I made it to the spot about 9:43 cause I wanted to, you know, make it you know back so I can, you know, so she can catch the next bus.

DET. COSTA: Uh-huh

MR. MELTON: And then as I was proceeding to the --- what is it, the bike lane, the bike lane to my right.

DET. COSTA: The far side of the street there.

MR. MELTON: Yeah, the bike lanes.

DET. COSTA: Where it's happening

MR. MELTON: Uh-huh, I was pushing the baskets, two of them. I had two of them. The glass is real heavy, I had two, you know.

DET. COSTA: Uh-huh. You call them your baskets.

MR. MELTON: It must have been over 300 lbs. of glass. Okay. Then Nick proceeded to come where I was at and help me. He said, "These baskets, they're gonna pull you out in the street." I said, "No, I usually do them by myself, anyway." But as I was pulling it, coming up, pull it to those things and go up the street, you know, the ramp right there there was a sign right there and them bushes with all that. And I'd seen this Spanish guy, you know. He looked at me as Nick was pushing. He looked at me and I gave him eye contact, and Nick gave him eye contact. And as we was pushing, standing up, next thing I know, the guy, he pulled out a gun I think it was a rifle, a rifle like a .22 or something. And next thing I know, he just started shooting.

DET. COSTA: How far were you from this guy with the rifle at that time?

MR. MELTON: It was real close. At least as far from . . . . A little farther from here to there.

DET. COSTA: To the wall there?

MR. MELTON: Yeah, then we had to start running.

DET. COSTA: Uh-huh

MR. MELTON: We started running. We were running out of the street and stuff. Nick told me to get out of the way.

74

DET. COSTA: Did this guy say anything to you while he was pulling the gun?

MR. MELTON: No, he didn't saying nothing. I didn't even know the guy.

DET. COSTA: He never said anything.

MR. MELTON: I don't even know the guy. I don't think Nick knew him.

DET. COSTA: He never said give me your money or --

MR. MELTON: No, he didn't say nothing. I never seen the guy in my life.

DET. COSTA: Okay. Alright. Okay. So you and Nick start running?

MR. MELTON: We ran out in the street 'cause Nick said he was hit. So I start screaming out, somebody call an ambulance, call 911. Then the guy proceeded to cross the street. He was walking and he started walking real fast. And then he went, he jumped over a retaining wall where there is a big – big -- I was watching, there was a big old wooden telephone between it –

DET. COSTA: Uh-huh.

MR. MELTON:       -- and what's his name. He jumped right over there, over that retaining wall and went that way.

DET. COSTA: So you're about seven feet away when you see this guy going like this with a gun, right?

MR. MELTON: It could have been about from here to - - hey, 'cause we was right there. He was right there about five, six feet away

DET. COSTA: Okay, that wall there?

MR. MELTON: Yeah. Yeah.

DET. COSTA:       Okay.

MR. MELTON:       He was close.

DET. COSTA: So you and Nick turn, start to walk away or run away?

MR. MELTON: When he pulled out the gun?

DET. COSTA: Right. How far do you think you got before the shots started coming out?

MR. MELTON: We didn't get that far.

DET. COSTA: Didn't get that far?

MR. MELTON: We made a couple of steps to try to get away, and he told me to get out of the way. The bullets started hitting him.

DET. COSTA: How many shots did you hear?

MR. MELTON: I heard about pom, pom, pom, pom, pom. About probably four or five.

DET. COSTA: Okay, were they that fast?

MR. MELTON: The only way I could say it was fast. It must have been a semiautomatic. That's the only thing, you know, you can continually fire.

DET. COSTA: Ah hum.

DET. COYNE:        You never seen this guy before, huh?

MR. MELTON: Never seen him in my life.

DET. COYNE: What did he look like?

MR. MELTON: He looked Hispanic.

DET. COYNE: Wait a minute. Start with his head. Did he have a hat on?

MR. MELTON: He had a thick dark, it was a dark color, it was a wool like hat and his hair was kind of long.

DET. COYNE: Wool like yours?

MR. MELTON: Something like mine, yeah.

DET COSTA: No bill?

MR. MELTON: Yeah. But he didn't have no symbols or nothing on it.

DET. COYNE: No bill?

MR. MELTON: Yeah, his was more like wool. And his hair was kind of long. He had a mustache and his face was shaved.

DET. COYNE: Clean?

MR. MELTON: Yeah, his face was shaven. And he had a blue like, blue long like flannel, you know. And his pants, I think his pants was kind of thin.

DET. COSTA: Slow down a little bit now. Blue flannel what, shirt?

MR. MELTON: It was like a sweatshirt.

DET. COSTA: Was it button down, like a shirt?

MR. MELTON: No, I think it could have been a pullover.

DET. COSTA: Blue pullover.

MR. MELTON: Yeah

DET. COSTA: Long sleeve, short sleeve?

MR. MELTON: No, long sleeve. 'cause (unintelligible) pull it up (unintelligible).

DET. COSTA: Uh-huh

MR. MELTON: And he started shooting.

DET. COSTA: Did it have any logos on it, any printing on it?

MR. MELTON: No, no, no, no, it didn't have no symbols on it.

DET. COSTA: Okay. And the pants?

MR. MELTON: I think they were beige or tan.

DET. COSTA: Light color pants?

MR. MELTON: Yeah.

DET. COSTA: Darker than this table or --

MR. MELTON: Close to that color, yeah.

DET. COSTA: Did he have anything else with him, a backpack or --

MR. MELTON: No, not that I know of.

DET. COSTA: Nothing like that.

MR. MELTON:  It happened so quick, you know, that I did, you know – 'cause I did have contact with him after I pushed my basket up and Nick pushed his basket up. Then the next thing you know,  he looked at us and he pulled out the rifle and started shooting at us.

DET. COSTA:  So where did you first hook up with Nick?

MR. MELTON:  I didn't hookup. He was sitting at the bus stop

DET. COSTA:       Right.

MR. MELTON:       He was waiting for his wife.

DET. COSTA:  But he came out to help you with your cart.

MR. MELTON:  Yeah, I had two of them.

DET. COSTA:  Yeah. Did he come across the street to help you?

MR. MELTON:  No, I was on this -- I was on this side.

DET. COSTA:  You already made the cross?

MR. MELTON:  Yeah, I already made the cross here where the bus stop was at.

DET. COSTA:  Right.

MR. MELTON:  On that side. And he got off the bench and came,  proceeded to help me with that basket (unintelligible).

DET. COSTA:  And that was right around where that sign was, you said?

MR. MELTON:  Yeah, the man was leaning against the sign.

DET. COSTA:  The bad guy?

MR. MELTON:  The murderer. He was like that. Then when we got the baskets up, we got the baskets up then we both -- I made eye contact first 'cause I didn't know nobody was there.

DET COYNE:  You were walking past him?

MR. MELTON:  Yeah. Then when I looked, I seen him. Then Nick looked. The next thing you know, he pulled out the thing and started shooting.

DET. COSTA:  And he didn't say anything?

MR. MELTON:  He didn't say nothing.

DET. COSTA:  He didn't say fuck you guys or --

MR. MELTON:  Didn't say nothing.

DET. COSTA:  Nothing.

MR. MELTON:  Didn't say nothing.

DET COYNE:  About how old was he?

MR. MELTON:  Look like he could have been about 25.

DET COYNE:  Mid twenties?

MR. MELTON:  Something like that, yeah.

DET. COSTA:  And you say long hair.  Longer than yours?

MR. MELTON:  Yeah, yeah, yeah.

DET. COSTA:  Longer than yours?

MR. MELTON:  Longer than mine.

DET. COSTA:  How much longer?  Cause yours almost –

DET COYNE: Going down his back?

MR. MELTON:  Yeah, 'cause his was longer.  Longer, about couple, three, maybe three more inches longer than mine

DET COYNE:  You actually saw him go over the retaining wall?            57 6

MR. MELTON:  Yeah, he went over the retaining wall.  He didn't - he didn't go straight down.

DET COYNE:  Did he have the gun with him?

MR. MELTON:  I mean – he left the stuff – he had the gun with him, 'cause the gun would have been found, it would have been right – if he threw it in the thing.

DET. COSTA:  When he -- After he shot and started back across the street, was he running, full out running?

MR. MELTON:  No wasn't running.

DET. COSTA:        Walking?

MR. MELTON:        He was walking fast.

DET. COSTA:  Walking fast.

MR. MELTON:  Yeah, he was walking fast.

DET. COSTA:  Faster than a normal walk?

MR. MELTON:  Well, he was walking -- he was walking faster than when he walked across that street.

DET COYNE:  So he  walked across the street normal.

MR. MELTON:  He walked, was walking faster.  Then he got closer to the what's the name, then he hopped over the retaining wall.

DET. COSTA:  Where were you headed, Jeff?

MR. MELTON:  I was going to the can place.

DET. COSTA:  Oh, there at the shopping center?

MR. MELTON:  Yeah, right there.

DET. COSTA:  And where were you coming from?

MR. MELTON:  I was coming from Ambrose street where I live at, 172 Ambrose.

DET. COSTA:  That's quite a haul, taking those two carts, huh?

MR. MELTON:  Yeah, but, see, I wanted to wait till Saturday.  And that was the better time I could have did it but, you know, I didn't know – you know, Saturday.

DET. COYNE:  How long have you known Nick?

MR. MELTON:  Basically all my life.

DET. COYNE:  Both of you born and raised there in West Pittsburg?

MR. MELTON:  Downtown Pittsburg.  You know, I been knowing his brother from school, some of his brothers and stuff.  Even though he was a few years older than me but, you know, I know his brother.  His brother worked with my old lady at the school.

DET. COYNE:  Uh-huh.

MR. MELTON: My lady went to school with (unintelligible).

DET COSTA: The hard part about this, Jeff, is we don't know why this guy picked you two out to do this thing to you. Was there any name calling prior to this going on or ---

MR. MELTON: Nobody didn't say nothing.

DET. COYNE: I mean like the day before.

MR. MELTON:    Oh. Hey, this is the first time I'm going out in a week, I never met the man. Never met the man. I was just going to recycle my stuff. I don't think Nick knew the man

DET. COYNE: So he's crazy, just started shooting.

MR. MELTON: Just started shooting. Just started shooting. Killed my friend.

DET. COYNE: If you saw this guy again, do you think you'd recognize him?

MR. MELTON: Probably. 'Cause it happened so fast, you know, I got a glimpse of him, you know.

DET. COYNE:    Uh-huh.

DET. COYNE: Prior -- prior to leaving out there when they brought you here, did they show you anybody that was being detained?

MR. MELTON: Yeah, they showed me one.

DET COSTA: They showed you a guy?

MR. MELTON: Uh-huh. And the guy they showed, it looked like the guy, but see, this guy, I don't know if he took off or changed clothes or whatever, but he didn't have what he had on.

DET. COYNE: Sure. So try to focus on the facial features of this guy. Try to focus on his face. Because clothes can be removed.

MR. MELTON: Yeah, yeah. That - that's - that's what hit me when I was sitting down. I remembered the mustache and his face was smooth.

DET. COYNE: Uh huh

MR. MELTON: And his hair was long, longer than mine.

DET. COYNE:    Uh-huh.

21
8

MR. MELTON:     And he had that hat on and that that blue what's the name.

DET. COYNE:  Now, the hat was like yours except --

MR. MELTON:  No.  There was no – this is a red.  He had like wool.  It was a pull, you know.

DET. COYNE:  Same design.

MR. MELTON:  Not the same design, no.  It was a hat that cover your forehead, and it was like wool

DET. COSTA:  Did it have a bill on it, like a ball cap bill.

MR. MELTON:  Huh-uh.  No, it didn't have no like symbols on it.  It was just plain, it was just a plain hat.  It was just a plain hat.

DET. COSTA:  Right

MR. MELTON:  You know, what they call a skull hat, one of those kinds of hats.  You know, it didn't have no symbols or nothing.

DET. COSTA:  Right.  But I'm talking about like a bill like a baseball bill, the thing that sticks out on a baseball hat.  You know what I'm talking about, to protect the sun?

MR. MELTON:  Oh, no, no.

DET. COSTA:  Didn't have that.

MR. MELTON:     Huh-uh.

DET. COSTA:     Okay.  So this guy they showed you out there,  you're saying that that looks like him, or how positive are you?  Or it's not him?  What did you tell the Deputy?

MR. MELTON:  I told him it looked like the guy.

DET. COSTA:  It looks like the guy.

MR. MELTON:     It looks like the guy.

DET. COSTA:  As far as you though are concerned, they showed you where the guy was, right?

MR. MELTON:     Uh-huh.

DET. COSTA:     And he showed you the guy.

MR. MELTON:        Yeah, right.

DET. COSTA: On a scale of one to ten, ten being very positive that's him and one being no way that's him, where are you in that scale?

MR. MELTON: It's over – it's half, probably six.

DET. COSTA: Probably six?

MR. MELTON: Uh-huh.

DET. COSTA: So you're about about midway in there, huh?

MR. MELTON: Yeah.

MR. MELTON: I'm very upset. That was uncalled for.

DET. COSTA: Well, that's what's throwing us off. Usually behind these things there's some name calling.

MR. MELTON: See, 'cause I know I never seen the man. But if he'd have knew Nick, he would have said something to Nick.

DET. COSTA: Uh huh

MR. MELTON: But hey, he didn't say nothing to Nick, you know, act like he knew him. 'Cause Nick came up, he seen me pushing my cart and came up and helped me, you know.

DET. COSTA: Uh huh

MR. MELTON: You know, he said, "These carts about ready to drag you down." I said, "I know. Usually I push two of them like that all the time when I'm coming here." And so he came, like I said, he proceeded, one up, the other cart and I pushed the other one up. And I got eye contact, I looked and I was shocked, you know, somebody right there, you know. I looked, Nick looked, we had them up on the street. Next thing you know, the guy pulled out the – what's the name.

DET. COSTA: This guy was leaning against the pole there that has that sign on it?

MR. MELTON: Yes.

DET. COSTA: That homemade sign?

MR. MELTON: Yeah, right against that.

DET. COSTA: What does that sign say, garage sale or something?

MR. MELTON: It was something like that.

DET. COSTA: Okay. He was leaning against that pole.

MR. MELTON: Yeah.

DET. COSTA: He wasn't like hiding.

MR. MELTON: No. I don't know if he was waiting for the bus or what.

DET. COSTA: Uh huh

MR. MELTON: But he was there. He was there.

DET. COSTA: Now, you said you made eye contact with him at one point, this guy.

MR. MELTON: Yeah, 'cause, you know, as I was pulling up, you know.

DET. COSTA: Uh huh.

MR. MELTON: I was getting on the street, you know, there's a guy there --

DET. COSTA: Sure.

MR. MELTON: -- you know.

DET. COSTA: Is it possible maybe he thought you guys were giving the evil look or something, the evil eye with him or something?

MR. MELTON: I don't know how he think, if – if he (unintelligible) we're pushing baskets, you know.

DET. COSTA: Yeah. You said you made eye contact with him.

MR. MELTON: Yeah, you know, 'cause I didn't know who was there.

DET. COSTA:        Right.

MR. MELTON:        Someone there.

DET. COSTA: Uh huh. I'm just trying to understand why that guy did this.

MR. MELTON: You know, it's strange to me, too.

DET. COSTA: Uh huh

MR. MELTON: You know, that's stupid. You know, it don't make no sense at all, you know.

DET. COSTA: Sure

MR. MELTON: It don't make no sense. It really don't, you know. You know, it's life, you know. 'Cause you know, every time we see each other, you know, we either hug each other, you know, or speak to each other, you know.

DET. COSTA: Uh-huh

MR. MELTON:    We been knowing each other, you know, we always got along. Wasn't never no problems.

DET. COSTA:    Sure.

DET. COSTA: Sure. Just so I got an idea here, this is Port Chicago, this is that field.

MR. MELTON: Uh huh.

DET. COSTA: Here's the park bench, the bus stop bench.

MR. MELTON: Uh-huh

DET. COSTA: Here's that sign –

MR. MELTON:    Uh-huh.

DET. COSTA:    -- that said garage sale or whatever. Here's the hot dog place. You know where that's at, right.

MR. MELTON: Uh-huh.

DET. COSTA: Okay. Where were you when you first noticed the guy leaning against the pole?

MR. MELTON: Soon as I hit the sidewalk.

DET. COSTA: Put an X where you were.

MR. MELTON: Okay. What is this right here?

DET. COSTA: That's the sign that says garage sale or whatever.

MR. MELTON: Okay.

DET. COSTA: That field area.

MR. MELTON:  Okay.

DET. COSTA:  Here's the bench.

MR. MELTON:  Here's the little thing up on the ramp, about right there.

DET. COSTA:  Okay.  That's when you first noticed this guy.

MR. MELTON:  Yeah.

DET. COSTA:  Was this guy facing this way?

MR. MELTON:  He was facing -- he was facing, as I was looking at him, he was facing that way.

DET. COSTA:  Facing which way?

MR. MELTON:  He was facing -- okay.  He was like this, and as I got up, that's how -- that's how I seen him.

DET. COSTA:  Okay.  So he was facing the hot dog stand?

MR. MELTON:  Yes, like he was waiting, you know, like the bus come, he would see the bus.

DET. COSTA:  So he was more on this side or this side? This is where the fence comes in.

MR. MELTON:  He was leaning up against the fence under that sign.

DET. COSTA:  Right.

MR. MELTON:  Okay.  He was looking --

DET. COSTA:  Looking towards the hotdog stand.

MR. MELTON:  Yes.  Yes.

DET. COSTA:  So he was facing this way.

MR. MELTON:  Uh-huh

DET. COSTA:  So I'll draw an arrow facing that way, right?

MR. MELTON:        Uh-huh.

DET. COSTA:        Okay.  You were right about here --

MR. MELTON: Uh-huh

DET. COSTA: -- where you put that little X.

MR. MELTON: And Nick was helping me push the other basket then.

DET. COSTA: And Nick was right next to you?

MR. MELTON: Yeah

DET. COSTA: Okay. Where did Nick meet up with you?

MR. MELTON: He seen me pushing the baskets. He seen me push the baskets before I got to the (unintelligible) what's the name that go up on the street.

DET. COSTA: Uh-huh

MR. MELTON: He came - he came towards me.

DET. COSTA: Okay.

MR. MELTON: He came towards me and he grabbed one.

DET. COSTA: So he's going down this way, from the bus stop?

MR. MELTON: Yeah, (unintelligible).

DET. COSTA: All right. Can I just have you put your name right here for me.

DET COYNE: Okay, Jeff, I'm gonna read this to you 'cause it'll make it little bit quicker for you, okay? All it says is you will be asked to look at several photographs. You will be alone with me and Mike while you look at these photographs. The fact the photographs are shown to you should not influence your judgment. In other words, just because I got these pictures doesn't mean the guy's in here, okay? Things are going change, hair --- these are black and white photos, so eye color, that kind of stuff isn't gonna come out. Could have cut his hair, hair could have grown long, could have had a baseball cap on, could not have a cap, you know what I mean. Those kinds of things are gonna change. So focus mainly on the features of the face. You're not obligated to identify anybody. If you don't see anybody in here that - - - if you see someone that looks like him, you can say well this kind of looks like him. But don't think that you have to.

MR. MELTON: Yeah, yeah, right.

DET COYNE: Right.

MR. MELTON:        Right. I understand.

DET COYNE: Okay. Go ahead and take a look and see if you see anybody that looks like the fellow. We make it difficult because we try to make them look alike, see.

MR. MELTON: Six.

DET. COYNE: Number 6 looks most like him. Okay. Is that just on his age or what do you - -

MR. MELTON: The look

DET. COYNE: Pardon?

MR. MELTON: The eye contact.

DET. COYNE: Okay. So you're saying the guy, but you're not positively saying this is him, it just looks kind of like him.

MR. MELTON: No, I'm just saying it could, you know.

DET. COYNE: Looks kind of like him?

MR. MELTON: Yeah.

DET. COYNE: Okay. Nobody else in there resembles?

MR. MELTON: No.

DET COYNE: Okay. All right. I'm about done. You done?

DET COSTA: I can't think of anything else. You have anything else for us you'd like to add or -

DET COYNE: You want to ask some questions?

MR. MELTON: No, like I just told you, it was like I was timing myself, you know, 'cause (unintelligible), that's about it.

DET. COSTA:        Uh-huh.

MR. MELTON:        'Cause I made it to – Nick helped me at 9:43. At 9:43, 'cause I was gonna get - - that's what time I made it right there and he helped me, it was 9:43. 'Cause I keep track 'cause I knew my lady had to go to work.

DET. COSTA:        Uh-huh.

DET. COSTA: What's this about a hole in your hat?

MR. MELTON: It wasn't there. I never had a hole in this hat before.

DET. COSTA: Don't put your finger through. So you're saying those two holes were not there before?

MR. MELTON: No.

DET. COSTA: These two holes here?

MR. MELTON: Yeah.

DET. COSTA: Really?

MR. MELTON: They weren't.

DET COYNE: Are those bullet holes?

MR. MELTON:        I don't know what they are. They wasn't in the hat when I got it.

DET. COSTA: Well, how long have you had it?

MR. MELTON: I had it for a while, but I never had no holes in it.

DET. COSTA: You never noticed those holes before?

MR. MELTON: No.

DET. COSTA: When the shots started going off, did you feel something hit your head?

MR. MELTON: I couldn't tell you, 'cause he just told me, what's his name told me to get out of the way.

DET. COSTA: But can't – you don't remember --

MR. MELTON: And then when (unintelligible) I think he told me to take – told him (unintelligible).

DET. COSTA: Put this back on the way you normally wear it, the way you had it this morning.

MR. MELTON: Like that.

DET. COSTA: That's the way you normally wear it?

MR. MELTON: Yeah.

DET. COSTA: Okay, turn that way. I don't know. (unintelligible) those are bullet holes, 'cause
it looks like it would have hit you 'cause it's not up here anywhere, this part that's pushed up.

MR. MELTON: Uh-huh

DET. COSTA: Yeah. Okay.
I had him put it on the way he normally wears it (unintelligible).

# EXHIBIT : C

1.) PAGE : ONE  MAP OF BAYPOINT STREET LOCATIONS OF WHERE,
INCIDENT AND  INVESTIGATORY STOP AND ARREST TOOK PLACE.

ATTACHED TO EXHI,
( 3  PAGE . ) ,

( pg . 78 )















C.    Persons Present at the Time of the Shooting.

1.    The Decedent's Wife, Who Did Not See the Shooter.

At approximately 9:00 a.m. on October 17, 2000, Rita Taylor and her husband Nick Taylor were at the bus stop at Port Chicago Highway and Pacifica Avenue.  RT 1265-1266, 1269.  Mr. Taylor crossed Port Chicago Highway to help Albert Melton with his shopping carts.  RT 1269.  Ms. Taylor then heard "pellets" and saw Mr. Taylor on the ground, but she did not see who had shot him.  RT 1270-1272.

2.    Albert Melton, Who Had Been Pushing the Shopping Carts.

Mr. Melton had been using the two shopping carts for recycling, and Mr. Taylor had come over to help.  RT 1329-1331.  Mr. Melton saw a young Hispanic man leaning against a fence, and the man pulled a sawed-off rifle from under his shirt.  RT 1332-1333, 1335-1337.  The man had a mustache, a dark, knitted wool hat, and a long black shirt or sweater.  RT 1342.  His hair may have been shoulder length.  RT 1365-1366.

The man pointed the gun at Mr. Taylor and fired five or six shots.  RT 1337.  The man then crossed the street and went over a wall.  RT 1339-1340.

In a statement to Detective Costa later on the day of the shooting (RT 2316-2318), Mr. Melton said that the man's hat had been a "skull hat."  EX. 6A, at 9.[3]  Mr. Melton also told police that the man had worn a blue flannel sweatshirt (EX. 6A, at 4) and beige or tan pants.  *Ibid.*

---

[3]/  Exhibit 6-A, the transcript of Mr. Melton's police interview with Detective Costa.  The videotape of that interrogation was played for the jury at trial.  RT 2317-2318.

132

# EXHIBIT: D

1.) 59 PAGE ~ THE HASTING LAW JOURNAL. VOLUME 42. NO. NOV. 1990, SCIENCE.
ON ANDREW. E. TASLITZ. ON DOGS. OLFACTORY.

ATTACHED TO EXHIB,
( 59 PAGES. )

# *The*
# HASTINGS LAW JOURNAL

VOLUME 42, NUMBER 1                                    NOVEMBER 1990

## Table of Contents

### ESSAY

BEYOND THE WASTE LAND:
LAW PRACTICE IN THE 1990s
*By David Schuman* .......................................    1

Law practice has begun to resemble the world in T.S. Eliot's enigmatic poem, "The Waste Land." Professor Schuman suggests that the problem is confrontation: our basic misconception is that justice requires victors and vanquished, exclusion of the opponent rather than inclusion. Lawyers increasingly are unable to contain the aggressive and combative nature of the system and too often treat insensitivity, ruthlessness, and paranoia as professional virtues; virtues which then infect their personal lives. In stark contrast, observers throughout history would have treated this isolation and defensive living as absurd or dangerous.

This essay suggests that rather than fantasize about a utopian alternative social context, lawyers heed the comands of The Waste Land's thunder: to give, sympathize, control. By incorporating these directives into their professional lives, the author argues that lawyers may become more connected and whole within their existing world.

### · ARTICLES

DOES THE COLD NOSE KNOW?
THE UNSCIENTIFIC MYTH OF THE DOG SCENT LINEUP
*By Andrew E. Taslitz* ...................................    15

Thousands of "dog scent lineups" have been conducted in both the United States and Europe. In a "dog scent lineup," a dog scents an object found at the scene of a crime and then sniffs a line of suspects (or objects touched by suspects). If the dog "alerts" to a particular suspect, that alert is used as substantive evidence that the person identified committed the crime. Such lineups have resulted in the conviction of persons for robbery, rape and murder, and have lead to sentences of life imprisonment or even death.

Most American courts have rejected legal challenges to dog scent lineup evidence, concluding that such evidence is not "scientific" and is, therefore, not subject to the strict reliability tests often applied to scientific evidence. The author takes

# *Articles*

# Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup

*by*
ANDREW E. TASLITZ

## Table of Contents

| | | | |
|---|---|---|---|
| I. | The Mythic Infallibility of the Dog | | 20 |
| | A. | Why Myth Matters | 20 |
| | B. | The Myth of the Dog | 23 |
| | C. | How Judges Apply the Myth | 28 |
| | | (1) The Narcotics Cases | 28 |
| | | (2) Tracking the Truth | 33 |
| | |     a. The Dog as Sui Generis | 33 |
| | |     b. Debunking the Dog | 38 |
| II. | The Science of Scenting | | 42 |
| | A. | The Dog's Nose | 43 |
| | B. | Scent Groups | 44 |
| | C. | Ground, Air, and Track Scents | 45 |
| | D. | Time and Psychology: Two Factors Affecting Scenting Accuracy | 47 |
| | E. | The Types of Scenting Dogs | 48 |
| | F. | Recognizing the Science Behind Scent Lineups: A Tool for Crafting Fair Lineup Procedures | 50 |
| III. | Evidentiary Objections to Dog Scent Lineups | | 52 |
| | A. | The *Frye* Rule | 53 |
| | | (1) Are Scent Lineups "Scientific" Evidence? | 53 |
| | |     a. The Tracking Analogy | 54 |
| | |     b. The Lineup Cases | 57 |
| | |     c. Juror Inability to Evaluate Lineup Evidence Fairly | 59 |
| | |     d. The Novelty Question | 61 |
| | | (2) Is the *Frye* Test Met? | 62 |
| | B. | Relevancy | 73 |
| | | (1) Validity and Reliability: An Exploration of the Scientific Data | 74 |

|  |  |  |  |
|---|---|---|---|
|  |  | a. | Where Time is Not a Factor.............. 74 |
|  |  | b. | Where Time is a Factor .................. 78 |
|  |  | (2) | Relevancy and Indeterminacy ................. 79 |
|  |  | (3) | Subjectivity: Cues and Miscues .............. 82 |
|  |  | (4) | Is the Relevancy Test Met? .................. 84 |
|  | C. | Calibrating the Dog............................... 89 |
|  | D. | Who Is Qualified as an Expert on Dog Scent Lineups?......................................... 91 |
|  | E. | Suggestiveness and the Role of Counsel........... 93 |
|  |  | (1) | General Principles ........................... 93 |
|  |  | (2) | Science Enlightens the Inquiry ................ 102 |
|  |  | (3) | Designing a Fair Scent Lineup............... 104 |
|  |  | (4) | The Role of Counsel ........................ 107 |
|  | F. | Hearsay-Related Objections....................... 110 |
|  |  | (1) | Hearsay ...................................... 110 |
|  |  | (2) | The Confrontation Clause ................... 112 |
|  | G. | The Traditional Foundational Requirements for Tracking Evidence ............................... 120 |
|  | H. | The Corroboration Requirement.................. 122 |
|  | I. | The Standard of Proof and Harmless Error ........ 123 |
| IV. | The Full Disclosure Alternative ........................ 125 |
|  | A. | Discovery......................................... 126 |
|  | B. | Adversary Attack ................................. 128 |
|  | C. | Demonstrations and Independent Testing .......... 129 |
|  | D. | Jury Instructions................................. 131 |
|  | E. | A Multi-Pronged Attack .......................... 132 |
| Conclusion ................................................. 133 |

Vol. 42

.   74
.   78
.   79
.   82
. .   84
. .   89

. .   91
. .   93
. .   93
. .  102
. .  104
. .  107
. .  110
. .  110
. .  112
ɔr
. .  120
.   122

. .  123

. .  125
. .  126
. .  128
. .  129
. .  131
. .  132

. . .  133

# Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup

*by*

Andrew E. Taslitz*

Murderers and robbers have been, ere now, convicted,
and suffered death under such evidence, and men have
said that the finger of God was in it.

—Sir Walter Scott[1]

Is the "finger of God" really behind a dog's identification of
a criminal suspect? A deep human faith in the purity and accuracy
of the dog has long said so. This faith in the "inerrant inspiration"
of the dog's nose[2] has led to the dog's rapidly expanding use in lo-
cating avalanche victims, finding lost children, detecting bombs, lo-
cating drugs, and tracking escapees.[3] But the most controversial use
of the canine olfactory sense remains the dog scent lineup.

In a "dog scent lineup" a dog sniffs an object imbued with a
scent known to be from a wrongdoer and then sniffs a line of either
objects or people.[4] If the dog "alerts"—that is, barks at, sniffs and
paws at, sits near, or mouths a suspect, or an object touched by a
suspect—the "alert," in the form of an alleged match of the object's
scent with that of the suspect, is admitted as substantive evidence
that the person identified committed the crime.[5]

---

   *   Assistant Professor, Howard University School of Law; former Assistant District
Attorney, Philadelphia, Pa.; B.A. 1978, Queens College; J.D. 1981, University of Pennsyl-
vania Law School.

   The author thanks his wife, Patricia V. Sun, Esq., for her numerous helpful comments
on earlier drafts of this Article and Drs. I. Lehr Brisbin and L.J. Meyers for their comments
on many of the scientific issues addressed herein. Appreciation also goes to the author's
research assistant, Alfred English, for his help in completing this Article, and the Howard
University School of Law for its financial support of this project.

   1.  W. Scott, The Talisman 256 (1973).

   2.  State v. Streeper, 113 Idaho 662, 666, 747 P.2d 71, 75 (1987) (quoting 1A J.
Wigmore, Evidence § 177, at 1852 (Tillers rev. ed. 1983)).

   3.  S. Bryson, Search Dog Training 4-6, 18 (1988); M. Pearsall & H. Verbruggen,
M.D., Scent: Training to Track, Search, and Rescue 161-62, 179-86 (1982); Stein, *Dogs
Dig In to Sniff Out Victims at Crash Site,* L.A. Times, May 13, 1989, at 32, col. 1.

   4.  Annotation, *Dog Scent Discrimination Lineups,* 63 A.L.R.4th 143 (1988 & Supp.
1989). This annotation distinguishes between a "people lineup," in which the dog identifies
the person in a line whose scent the dog determines matches that of an object, and an
"inanimate object" lineup, in which a dog uses its scent to identify one object in a line of
many objects and determines that it matches that of a particular person. *Id.* at 144.

   5.  *See, e.g.,* S. Bryson, *supra* note 3, at 302 (defining "alert"); United States v.
McNiece, 558 F. Supp. 612, 613 (E.D.N.Y. 1983) (lineup "alert" admitted as substantive
evidence of identity).

Case 3:07-cv-05416-JSW    Document 10    Filed 06/25/2008    Page 65 of 65

For example, a witness sees a murder committed, and although the murderer's face is hidden by shadow, his hat falls off as he escapes. The police have a witness who can identify the murderer's hat but not the murderer himself. An extensive investigation is conducted and, based purely on circumstantial evidence, a group of suspects is assembled into a line. A trained dog sniffs the hat, sniffs each person in the line, and then barks at suspect number three. Literally upon the "nod of [the] dog's head,"[6] the suspect is convicted and sentenced to death.[7]

This illustrative scenario is based on reality. Since the first such reported dog scent lineup took place during the 1920s,[8] thousands have been conducted in the United States.[9] Individuals have been convicted of robbery,[10] rape,[11] and even murder[12] when the primary evidence identifying them as the culprit was a dog scent lineup identification.[13] Indeed, lineups conducted as many as twenty-one months after the crime[14] and in which there was significant evidence that the lineups were not reliable have resulted in convictions.[15] Some of those convicted were sentenced to life imprisonment or even death.[16]

6. United States v. Young, 745 F.2d 733, 756 (2d Cir. 1984) (quoting the defendant's characterization of narcotics detector dog evidence), *cert. denied,* 470 U.S. 1084 (1985).

7. *See* State v. Roscoe, 145 Ariz. 212, 700 P.2d 1312 (1984) (death penalty), *cert. denied,* 471 U.S. 1094 (1985). Roscoe still waits on death row. Although he has exhausted his rights on direct appeal, a collateral attack on his conviction still is pending, thus delaying his execution. *See infra* note 153 (discussing Roscoe's fate in greater detail). *Cf.* Roberts v. State, 298 Md. 261, 469 A.2d 442 (1983) (defendant convicted of rape and sentenced to 50 years imprisonment based on a dog's selection of the defendant in a lineup in which the animal scented a cap worn by the rapist; the victim was unable to confirm this identification).

8. State v. Grba, 196 Iowa 241, 194 N.W. 250 (1923).

9. In United States v. McNiece, 558 F. Supp. at 612-13 (E.D.N.Y. 1983), one lineup expert testified that he alone had conducted over 1000 scent lineups. *Cf.* Letter from Brigadier Jan de Bruin of the Rotterdam Municipal Police to Andrew Taslitz (undated but received Oct. 1989) [hereinafter Letter I] (on file at the *Hastings Law Journal* office) (noting that about 300 scent lineups are conducted each year in Rotterdam, Holland).

10. United States v. Gates, 680 F.2d 1117 (6th Cir. 1982).

11. Roberts v. State, 298 Md. 261, 469 A.2d 442 (1983).

12. State v. Roscoe, 145 Ariz. 212, 700 P.2d 1312 (1984), *cert. denied,* 471 U.S. 1094 (1985); Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982), *habeas corpus proceeding sub nom.* Epperly v. Booker, 235 Va. 35, 366 S.E.2d 62 (1988) (denying the habeas writ).

13. *See Roscoe,* 145 Ariz. 212, 700 P.2d 1312; *Roberts,* 298 Md. 261, 469 A.2d 442; *Epperly,* 224 Va. 214, 294 S.E.2d 882.

14. United States v. McNiece, 558 F. Supp. 612, 617 n.6 (E.D.N.Y. 1983); *see also Gates,* 680 F.2d at 1119 (more than eight months' delay); *Epperly,* 224 Va. at 220-22, 226-27, 233, 294 S.E.2d at 884-86, 889-90, 893 (13 to 14 days' delay, incorrectly described by the court as an 11-day delay).

15. *See infra* text accompanying notes 289-295, 417-420, 477-487.

16. *Roscoe,* 145 Ariz. 212, 700 P.2d 1312 (death sentence); *Epperly,* 224 Va. 214, 294 S.E.2d 882 (life imprisonment).