Scent lineups have proven surprisingly resistant to legal challenges, surviving attacks on the dog's accuracy[17] and the suggestiveness of the procedure,[18] as well as allegations that the lineup violated the accused's constitutional right to confront the witnesses against him.[19] This resilience is the result of the courts' persistent use of standards that are used to determine the admissibility of more traditional forms of dog identification evidence such as tracking and narcotics detection. In borrowing these standards the courts not only are relying on standards that are themselves ill-reasoned but also are drawing inappropriate analogies between dog scent lineups and other forms of dog identification evidence. The courts' irrational handling of scent lineups also reflects the judiciary's fundamental failure to recognize the mythic qualities of the supposedly infallible dog's power and to understand the role science plays in the law of evidence.

This Article seeks to address these judicial failures. The Article begins in Part I with a discussion of the role of myth in the law of evidence, with emphasis on the mythic dog. The biology and psychology of scenting are explored in Part II, which introduces the scientific nature of dog scent evidence and describes the differences between scent lineups and other types of dog scent evidence. Part III examines the possible evidentiary objections to scent lineups. Part IV considers "full disclosure" to the jury of the relevant scientific data as an alternative to the exclusion of potentially prejudicial and unreliable lineup evidence. Finally, the Article concludes that scientific research is in too early a stage to justify admitting scent lineups as identification evidence in criminal trials, and even if scientific research eventually supports the use of scent lineups, there are numerous alternative approaches to the screening and presentation of such evidence that must be followed to ensure that defendants receive fair trials.

---

17. *See, e.g., McNiece*, 558 F. Supp. 612; *Roscoe*, 145 Ariz. 212, 700 P.2d 1312; *Epperly*, 224 Va. 214, 294 S.E.2d 882. *But see* Ramos v. State, 496 So. 2d 121 (Fla. 1986) (first degree murder conviction reversed because there was insufficient evidence that scent lineups are an accurate method for proving identity and because the particular lineup involved was conducted in an unfair manner).

18. Roberts v. State, 298 Md. 261, 268-75, 469 A.2d 442, 445-48 (1983).

19. *Cf.* Commonwealth v. Michaux, 360 Pa. Super. 452, 454, 461-62, 520 A.2d 1177, 1177-78, 1181-82 (1987) (tracking and informal, on-the-scene lineup).

## I.  The Mythic Infallibility of the Dog

### A.  Why Myth Matters

Historians understand "myth" to be a unifying concept and recognize that human behavior often is shaped more by perceptions than by objective reality.[20] The concept of myth also is useful in the law of evidence precisely because myth focuses on the perceptions of people. Classifying an idea as a "myth" is not necessarily pejorative. A myth is a "large, controlling image that gives philosophical meaning to the facts of ordinary life; that is, which has organizing value for experience."[21] A myth makes abstract ideas concrete and organizes reality by means of generalizations; generalizations that often are charged with emotion.[22] Myths need not necessarily be grand or fit a "scholarly typology,"[23] and consequently images of cowboys and movie stars are as much a part of American mythology as the beliefs in manifest destiny or the classless society.[24]

While myths are often an important part of the social fabric and a way of tying people together by common values and beliefs,[25] "there is, of course, always a danger of illusion, a danger that in ordering one's vision of reality, the myth may predetermine the categories of perception, rendering one blind to things that do not fit the mental image."[26] This danger of blindness is precisely why myths must be

---

20. This "mythic" view of history is discussed in depth in, among other sources, MYTH AND SOUTHERN HISTORY: THE OLD SOUTH (P. Gerster & N. Cords 2d ed. 1989) [hereinafter MYTH AND SOUTHERN HISTORY]; J. ROBERTSON, AMERICAN MYTH, AMERICAN REALITY (1980).

21. Tindall, *Mythology: A New Frontier in Southern History*, in MYTH AND SOUTHERN HISTORY, *supra* note 20, at 2 (quoting Schorer, *The Necessity for Myth* in MYTH AND MYTHMAKING 355 (H. Murray ed. 1960)). Professor Robertson has similarly, if more simply, defined "myths" as:

> the patterns—of behavior, of belief, and of perception—which people have in common. . . . [M]yths are often couched in good stories, very often told of heroes and heroines.
>
>   . . . .
>
>   But the "truth" about a people, the "truth" about America and Americans, resides *both* in American myths *and* in American realities. The myths are part of the world we live in; so were they part of our grandfathers' world. If we would understand our world, or anyone else's, we must understand its myths as well as—indeed as part of—its realities.

J. ROBERTSON, *supra* note 20, at xv-xvi.

22. *See* Tindall, *supra* note 21, at 2.

23. *See* J. ROBERTSON, *supra* note 20, at 6.

24. *See id.* at 6, 72, 74-75, 258-59. *See generally* J. CAMPBELL, THE POWER OF MYTH (1988) (addressing the importance and scope of myth).

25. *See* J. ROBERTSON, *supra* note 20, at xv-xvii, 9-18.

26. Tindall, *supra* note 21, at 2.

identified when they become a part of a judicial proceeding in a courtroom. In this setting there are two particular dangers: first, a jury may reach a decision that is based substantially on the unexamined assumptions, images, and feelings that constitute the myth; second, a judge, who after all is a member of our myth-laden society, may be so influenced by the myth that he makes critical evidentiary rulings based more on those views than on any reasoned, probing, analytical effort at divining reality.[27]

Although neither legal scholars nor the courts expressly have recognized "myth" as a general concept, the importance of exposing specific, individual myths has been the implicit or explicit subject of recent litigation and scholarly commentary. For example, some courts now admit evidence of child sexual abuse accommodation syndrome as a way of rebutting certain myths about sexually abused children, notably that "true" victims immediately report the crime to an adult.[28] Similarly, some courts permit psychologists to testify about the weaknesses of eyewitness identifications to challenge the myth that witnesses expressing certainty about identifications are highly reliable.[29]

When employed in the evidentiary context, a myth as an idea is a particularly powerful analytical tool because of the absence of a more concrete, "scientific" way to approach many evidentiary issues. Controlled research on the psychology of juries and judges is in its infancy.[30] Moreover, given the infinite variety of types of evidence and the expense of psychological research, it is improbable that empirical data soon will be amassed regarding the likely effects of each possible piece of evidence on jury members. Myths therefore provide an alternative, or at least a supplement, to psychological research, for evidence identified as imbued with mythic qualities probably will be overvalued, misunderstood, and misused by jurors. Such

27. *Cf.* Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome and Its Implications for Expert Psychological Testimony,* 69 MINN. L. REV. 395, 402-10 (1985) (discussing the mythology of rape and the impact of that mythology on evidentiary matters within judicial decision-making).

28. Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses,* 68 B.U.L. REV. 155, 156-63 (1988) (authored by Veronica Serrato); *cf.* Massaro, *supra* note 27 (discussing the potential use of expert testimony in debunking the mythology of adult rape).

29. *See, e.g.,* United States v. Downing, 753 F.2d 1224 (3d Cir. 1985) (discussing the problem of preconceptions regarding eyewitness testimony without explicitly describing the problem as one of "myth"); People v. McDonald, 37 Cal. 3d 351, 690 P.2d 709, 208 Cal. Rptr. 236 (1984) (same).

30. *E.g.,* McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions,* 26 B.C.L. REV. 1143, 1205 (1985) (bemoaning the dearth of empirical research on whether jurors overvalue expert testimony).

evidence must be excluded, or special efforts must be made to control the wayward jury.

How can myths be identified? Myths by their nature permeate literature, history, television, movies, and many other forms of popular culture.[31] Moreover, because law deals with human perceptions and misperceptions as well as struggles and compromise, case law often reflects the substance, or is the result, of myths.[32] Identifying myths, therefore, requires only a sensitivity to the concept and a willingness to search in the daily life of our society.[33]

Such a search through the work and literature of artists, historians, writers, police, dog trainers, movie buffs, and judges leaves little doubt of the existence of a belief in the "mythic infallibility" of the dog's nose.

31. See J. CAMPBELL, supra note 24; MYTH AND SOUTHERN HISTORY, supra note 20; J. ROBERTSON, supra note 20.

32. See Massaro, supra note 27, at 398, 404, 413 (trial judge's remarks illustrated judicial acceptance of rape myths).

33. "All of us are aware of our myths. They are part of the world we live in." J. ROBERTSON, supra note 20, at xv. Being aware of our myths does not necessarily mean consciously aware. Thus part of the work of historians specializing in the mythic perspective is to identify myths explicitly by finding them in literature, history, and art. Historians then confront us with what we subconsciously knew all along. See id. at xv-xvii, 351.

The United States Supreme Court, while not speaking in terms of a "mythic perspective" on the law, also has inquired into the teachings of history, literature, and philosophy in an attempt to divine fundamental Western values and preconceptions. See Coy v. Iowa, 487 U.S. 1012 (1988). In Coy, the Court cited Roman history, Shakespeare, and other "quotations from antiquity," as well as the words of former President Eisenhower and modern colloquialisms, to demonstrate the existence of the basic "human feeling" that face-to-face confrontation with accusers is necessary for fairness. Id. at 1015-19; cf. Gregg v. Georgia, 428 U.S. 153, 173, 176-82 (1976) (Court survey of history, jury verdicts, and legislation in a search for "objective indicia that reflect the public attitude" toward the death penalty). Interestingly, the Court in Coy and Gregg did not require the taking of expert testimony on history and philosophy. Similarly, the process of identifying a myth that is suggested by this Article assumes that the courts will not look to expert testimony, for courts are well-equipped to find "social" or "legislative" facts (facts involved in deciding questions of law or policy) without the taking of testimony. See Davis, An Approach to Problems of Evidence in the Administrative Process, 55 HARV. L. REV. 364, 402 (1942) (defining "legislative" facts). The parties may seek to inform the courts' judgment by filing "Brandeis"-type briefs, but the taking of expert testimony on the question of myth generally would be time-consuming and unnecessary, particularly because a myth, even more so than other legislative facts, involves the courts in a very traditional role: using history and philosophy to craft and apply legal rules. Cf. Monahan & Walker, Social Authority: Obtaining, Evaluating, and Establishing Social Science in Law, 134 U. PA. L. REV. 477, 510-12 (1986) (recommending that courts rely solely upon briefs and independent judicial investigation when using social science research as authority on questions of law or policy). Of course, exceptions might be made to this general rule when a court finds the relevant research on the myth complex, the assistance of the lawyers incomplete, and the time for making a decision brief. See id.

Case 3:07-cv-05416-JSW     Document 10-2     Filed 06/25/2008     Page 5 of 55

## B.  The Myth of the Dog

The "loyalty and utter fidelity" of the dog has been an article of faith in Western culture.[34] Homer's *Odyssey* tells of Odysseus' dog, Argus, an aged canine who, though parted from his master some twenty years, struggled to rise and greet the returning Odysseus. The animal died making the effort.[35] In the Congress of the United States, a Senator publicly praised the "one absolutely unselfish friend that man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, his dog."[36] And Mark Twain, some ten years after this senate speech, wrote in *Pudd'nhead Wilson*: "If you pick up a starving dog and make him prosperous, he will not bite you. That is the principal difference between a dog and a man."[37]

The myth of the dog as it now exists in our legal proceedings was developed out of a combination of the ancient human love of the canine and the centuries of tales of dogs' great scenting feats.[38]

---

34.  Asimov, *Preface* to HOUND DUNNIT at viii (I. Asimov, M. Greenberg & C. Waugh ed. 1987). Professor Asimov provides an excellent summary of several of the tales of canine affection noted below. *See also infra* notes 35-65 and accompanying text.

35.  HOMER, THE ODYSSEY 319-21 (R. Fitzgerald trans. 1963).

36.  Asimov, *supra* note 34, at viii. The Senator continued:

A man's dog stands by him in prosperity and in poverty, in health and in sickness. He will sleep on the cold ground where the wintry winds blow and the snow drives fiercely, if only he may be near his master's side. He will kiss the hand that has no food to offer, he will lick the sores and wounds that come in encounter with the roughness of the world. He guards the sleep of his pauper master as if he were a prince.

When all other friends desert, he remains. When riches take wings and reputation falls to pieces, he is as constant in his love as the sun in its journey through the heavens.

If misfortune drives the master forth an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying him to guard against danger, to fight against his enemies.

And when the last of all comes, and death takes the master in its embrace, and his body is laid away in the cold ground, no matter if all other friends pursue their way, there by the graveside will the noble dog be found, his head between his paws, his eyes sad, but open in alert watchfulness, faithful and true, even in death.

M. LORING, YOUR DOG AND THE LAW vii (1983) (quoting an 1870 tribute by Senator George Graham Vest of Missouri).

37.  M. TWAIN, PUDD'NHEAD WILSON 99 (1984); *see also* People v. Malgren, 139 Cal. App. 3d 234, 243, 188 Cal. Rptr. 569, 575 (1983) (Feinberg, J., dissenting) (emphasizing the danger that jurors will, because of the natural human affection for dogs, overvalue dog scent evidence).

38.  *See infra* text accompanying notes 39-65. This Article centers on the development of the myth in Western, English-speaking societies, but the myth has force in other cultures

Many of the tales of canine scenting prowess are true; some simply are legend. Yet by the modern age, dogs have acquired a mythic image of an infallibly sensitive nose that will unerringly lead to evildoers.

The earliest known report of the canine as detective dates from 300-272 B.C. Two men had murdered a slave and fled, leaving the slave's dog, the sole eyewitness, by the body. The King, passing by on a royal progress, ordered the body buried and took the dog in as his own. After some time passed, the dog accompanied his new master on a review of his troops. As two of the soldiers marched past, the animal flew at them in a rage. " 'No further evidence was needed, for, in order to escape from the dog, the criminals confessed their guilt.' "[39]

Another well known tale of the dog's prowess in sniffing out the guilty comes from Sir Walter Scott, writing in the nineteenth century about the twelfth century crusades. In *Blair v. Commonwealth,*[40] the court summarized Scott's tale:

> In "The Talisman" it is related that in the joint crusade of Richard I of England and Phillip II of France, Roswell, the hound, pulled from the saddle Conrade, Marquis of Montserrat, thus mutely accusing him of the theft of the banner of England. Phillip defended the Marquis with the remark, "Surely the word of a knight and a prince should bear him out against the barking of a cur." To which Richard replied, "Royal brother, recollect that the Almighty who gave the dog to be companion of our pleasures and our toils, both invested him a nature noble and incapable of deceit. He forgets neither friend nor foe; remembers, and with accuracy, both benefit and injury. He hath a share of man's intelligence, but no share of man's falsehood. You may bribe a soldier to slay a man with his sword, or a witness to take his life by false accusation; but you cannot make a hound tear his benefactor; he is the friend of man save when man justly incurs his enmity. Dress yonder Marquis in what peacock robes you will, disguise his appearance, alter his com-

---

as well. The Winnebago Indians, for example, date the dogs' keen scent from the first feast made on this earth by the first four sons of Earthmaker, the Creator:

> The first thing the four brothers did when they arrived on the earth was to start their fire. Earthmaker sent them a deer right away, and the youngest brother shot it with an arrow and began to prepare the deer meat for food. Something alighted on the deer meat. "What is that?" they said. "It is a wasp," said the oldest brother. "And when I get a dog, if it is black, I shall name it Wasp, like this one. And because the wasp has the keen scent to find the deer meat, so shall the dog have the keen scent to discover other animals."

M. LEACH, GOD HAD A DOG: FOLKLORE OF THE DOG 220 (1985).

39. S. CHAPMAN, POLICE DOGS IN NORTH AMERICA 9-10 (1990) (quoting M. ROSS, THE BOOK OF NOBLE DOGS 34 (1922)).

40. 181 Ky. 218, 204 S.W. 67 (1918).

ιe   mply
ythic im-
l to evil-

tes from
ιving the
ιssing by
e dog in
his new
marched
ence was
onfessed

'fing out
ιnth cen-
*wealth,*40

chard
ιulled
|ι  ·-
·nι·d
and a
vhich
who
both
ιrgets
enefit
ιre of
h his
t you
man
ιis in
com-

e first feast

ɔ start
ιr shot
ighted
oldest
κe this
all the

Ross, The

plexion with drugs and washes, and hide himself amidst a hundred men, I will yet pawn my sceptre that the hound detects him, and expresses his resentment as you have this day beheld.''[41]

The almost mystic qualities with which history and literature long have painted the dog continue to the modern day.[42] Thus, in the stories of Arthur Conan Doyle, the dog was portrayed as possessing an uncanny talent for finding evildoers.[43] And Rin-Tin-Tin, of course, never failed to find the wrongdoer or the wounded, missing child.[44]

The belief in the dog's infallibility arises not only from fictional accounts, but also from real life experiences including the widespread use of dogs in hunting slaves,[45] tracking down fugitives,[46] and hunting game.[47] Dogs also have found dead bodies, victims of crime, and earthquake victims.[48]

Particular examples of these uses of the dog's nose have fortified the dog's image in the American psyche as an unerring best friend of humans. A well-known non-fictional example is the 1977 tracking of James Earl Ray, the convicted killer of Dr. Martin Luther King, Jr.[49] Ray was able to escape from the Brushy Mountain State Penitentiary in Petros, Tennessee, by eluding armed guards and circumventing an electrified fence, but he could not escape the noses of two

41. *Id.* at 220-21, 204 S.W. at 68 (quoting W. Scott, *supra* note 1). Sir Walter Scott's story retains its appeal for the modern audience. *See, e.g.,* People v. McPherson, 85 Mich. App. 341, 346-47, 271 N.W.2d 228, 230-31 (1978) (although finding dog tracking evidence is insufficient alone to support a conviction, the court cited Scott's story for the proposition that dog scent evidence ''has been held in high esteem for centuries''); Buck v. State, 138 P.2d 115, 123 (Okla. Crim. App. 1943) (relying on Sir Walter Scott's story as being equally a tribute to ''Old Boston,'' thus justifying the admission of ''Old Boston's'' tracking efforts at trial).

42. ''Whether it's in real life or in the movies, the escaping con usually has the head start, but just until the law brings in the dogs.'' *20/20: Tracking the Tracker* (ABC television broadcast, Oct. 3, 1985) [hereinafter *Tracking the Tracker*] (voice of Geraldo Rivera).

43. A. Doyle, *The Sign of the Four,* in Sherlock Holmes: The Long Stories 187 (Galley Press 1987) (''I know a dog that would follow that scent to the world's end. If a pack can track a trailed herring across a shire, how far can a specially-trained hound follow so pungent a smell as this?''); B. Lowe, Hunting the Clean Boot: The Working Bloodhound 203 (1981) ('' 'for olfactory scenting the bloodhound is everything that authors, such as Conan Doyle, have implied . . . .' '') (quoting Chief Inspector Wilkinson of the Metropolitan Police Dog Training Establishment at Keston, Kent).

44. ''What do we know about dogs, you know? . . . Lassie, Rin Tin Tin—we think dogs can do everything, and dogs are so friendly and sweet . . . .'' *Tracking the Tracker, supra* note 42 (voice of Geraldo Rivera).

45. An ignominious use for the unwitting canines, but a part of the canine mystique nonetheless. S. Chapman, *supra* note 39, at 4; B. Lowe, *supra* note 43, at 12. Canine slave hunting also is depicted frighteningly in H. Stowe, Uncle Tom's Cabin (1985).

46. S. Chapman, *supra* note 39, at 8-9, 161-64.

47. B. Lowe, *supra* note 43, at 10-12.

48. *Id.* at 12, 63, 65.

49. S. Chapman, *supra* note 39, at 65.

bloodhounds. The hounds led their handlers straight to Ray, who had covered himself with leaves to avoid his pursuers.[50]

The best known modern use of the dog's olfactory talents, however, probably has been in drug trafficking. Dogs are responsible for seizures of drugs worth hundreds of millions of dollars. In Miami from 1973 through 1975, for example, a single golden retriever, Trep, sniffed out sixty-three million dollars worth of drugs, resulting in the conviction of twenty drug dealers.[51] These stories regularly are reinforced in the popular consciousness as they find their way into newspapers across the country.[52]

The use of dogs to locate drugs is a recent phenomenon.[53] The use of dogs' scenting abilities in ferreting out criminal activity, however, is not an entirely new idea. In a use that closely parallels the use of dogs in drug trafficking cases, canines were used during Prohibition to track down moonshiners. One famous team, Pete, a massive bulldog, and his partner, Snake Thompson, captured more moonshiners and destroyed more stills than any other enforcement team. Pete was so successful that a "contract," which luckily failed, once was taken out on the dog's life.[54] Similarly, dog-sniffing abilities have been employed in the detection of explosives. Man-dog explosive detection teams save thousands of police personnel hours and many lives each year.[55] Again, these stories often are recounted in newspapers.[56]

While each of these instances of the dog's scenting prowess has contributed to the canine's mythic stature, the greatest canine mythology has surrounded a single breed: the bloodhound. The hound

---

50. *Id.*

51. *Id.* at 71.

52. *E.g., Use of Drug Sniffing Dogs Challenged,* Wash. Post, May 6, 1990, at D1, col. 2 (drug-detecting dogs used to search cars); *Stepped-Up Drug War to Focus on S.D. Border,* L.A. Times, Jan. 26, 1990, at A18, col. 1 (San Diego County ed.) (Administration plans to assign additional teams of drug-sniffing dogs to protect the U.S.-Mexican border).

53. The U.S. Customs Service did not begin using dogs as drug-detectors until 1970. Note, *Dog Sniff Searches and* United States v. Thomas, 19 LOY. L.A.L. REV. 1097, 1099 n.16 (1986); *see also* United States v. Solis, 536 F.2d 880, 882 (9th Cir. 1976) (the "recent proliferation of crimes involving the transportation of drugs . . . has led naturally to the training and use of dogs . . . to detect the presence of such contraband").

54. S. CHAPMAN, *supra* note 39, at 73-74.

55. *Id.* at 32-33; Crowley, *Putting Some Teeth Into the Law,* POLICE MAG., July 1982, at 61, 63-64. Interestingly, explosives-detection training requires each dog to select the one canister containing explosives from among many, a task that might be characterized as a type of inanimate scent discrimination object lineup. *See id.* at 61, 64.

56. *Wanted: Lost Bomb Used in Airport Security,* Chicago Trib., Apr. 30, 1990, at C9, col. 1 (dog located half-pound package of explosives planted in luggage); *Stalled Talks Delay Airport Detectors,* San Francisco Chron., Mar. 29, 1990, at A4, col. 6 (describing dogs as 95% effective in detecting explosives at airports).

not only has been described as "an almost mystical breed, destined for moments of truth,"[57] but its nose unqualifiedly has been declared "two million times as sensitive as a human's."[58] Many have dubbed the hound "unerring"[59] and tell amazing stories of the hound's successes.[60] This image too has reached the public mind, as one commentator has noted:

> [A]mongst the uninformed he was and is sometimes regarded as a ferocious monster endowed with miraculous scenting attributes; capable of pursuing his victim successfully under any conditions till caught, when he would certainly tear him limb from limb. This may probably be accounted for partly by his name, which is calculated to inspire awe and partly by recollections of slave hunting tales in Uncle Tom's Cabin.[61]

In a 1968 statement, the American Bar Association recognized the risk that a jury will be swayed by a "superstitious faith" in the bloodhound's accuracy.[62] This same faith or "superstitious awe" occasionally has been noted in the cases.[63] The best summary, however,

---

57. Caras, *Bloodhound*, Sci. Dig., Nov. 1977, at 62.

58. *Id.* at 64. The following quote, if somewhat sarcastic, nevertheless captures well the popular image of the bloodhound:

> Over all, the bloodhound boasts superior skill, To scent, to view, to turn and boldly kill—His fellows' vain alarms rejects with scorn, True to his master's voices and learned horn; His nostrils oft, if ancient fame sings true, Traced the sly felon thro' the tainted dew; Once snuff'd, he follows with unaltered aim, Nor odours lure him from his chosen game; Deep mouthed, he thunders and inflamed he views, Springs on relentless and to death pursues.

McWhorter, *The Bloodhound as a Witness*, 54 Am. L. Rev. 109, 117 (1920) (quoting an anonymous poem).

59. *E.g.*, B. Lowe, *supra* note 43, at 11 (quoting Nimrod, Horse and the Hound (1842)) (noting that the bloodhound " 'possessed the property of unerringly tracing the scent he was laid upon, amongst a hundred others' ").

60. Roger Caras, an ABC network correspondent who has hosted "Pets and Wildlife," a radio program, tells one such story:

> I once helped the New York City police run tests in Central Park with a State Police bloodhound. They wanted to see if the dog could be used in the city environment. Following a trail laid down by a detective, the hound ran right through four softball games and across an area known as the Sheep Meadow. The evening before, 55,000 had attended a rock concert in that field. The dog was able to sort out that one trail out of the lingering 55,000 scents and stay with it.

Caras, *supra* note 57, at 63.

61. B. Lowe, *supra* note 43, at 12 (quoting Edwin Brough). Brough discussed the popular *perception* of bloodhounds as slave hunters. The reality is that foxhounds of the country, sometimes crossed with the Cuban mastiff (nicknamed the "Cuban bloodhound")— not true bloodhounds—generally were used in hunting slaves. *Id.*

62. S. Chapman, *supra* note 39, at 67.

63. *E.g.*, People v. Perryman, 89 Mich. App. 516, 524, 280 N.W.2d 579, 582 (1979); *accord*, Cook v. State, 374 A.2d 264, 270 (Del. 1977) (speaking in terms of "the undue prejudice such evidence has upon the jury," a fear that the court recognized but that did not persuade the court to exclude dog tracking evidence from criminal trials).

---

**[Left margin fragments:]**

[Vol. 42

v... had

...s, how-
...ible for
... Miami
...r, Trep,
...g in the
 are re-
 ay into

n.[53] The
...y, how-
...lls the
...ng Pro-
, a mas-
...d more
...rcement
y failed,
 abilities
g ...plo-
 urs and
 nted in

...ess has
...ine my-
 e hound

at D1, col.
*D. Border,*
on plans to
r).
until 1970.
1097, 1099
the "recent
...ally to the

July 1982,
...ect the one
...erized as a

6, ...990, at
...alled Talks
(describing

of the popular view of the dog's nose and of the connection between that view and the law of evidence comes from Wigmore:

> [I]n actual usage, evidence of the conduct of animals is apt to be highly misleading, to the danger of innocent men. Amidst the popular excitement attendant upon a murder and the chase of the suspect, all the facts upon which the trustworthiness of the inference rests are apt to be distorted. . . . Moreover, the very limited nature of the inference possible is apt to be overestimated—a consequence dangerous when the jurors are moved by local prejudice . . . . The hesitation shown in some courts to the use of this evidence is due to the risks of its misuse by the jury, for in some regions of our country the mysteriously accurate operation of the dogs' senses has given rise to a superstitious faith in the dogs' inerrant inspiration, and this gross popular creed might in a jury mislead from giving excessive credit to the evidence of the dogs' itinerary.[64]

Despite Wigmore's well-known views and the occasional citation of this passage in the case law,[65] for the most part the courts either ignore the myth, deny its existence, or uncritically accept its truth. The result has been that courts often have judged, with little justification, the accuracy of dog scenting evidence by unique standards not applied to analogous types of evidence. This unique treatment has led courts to accept arguably unreliable evidence in drug detection, tracking, and scent lineup cases without serious inquiry into the wisdom of doing so. This Article argues that this unique treatment stems from the impact of canine mythic infallibility on the courts, a subject to which this Article now turns.

### C.  How Judges Apply the Myth

#### (1)  The Narcotics Cases

In cases involving dog sniffing for narcotics it is particularly evident that the courts often accept the mythic dog with an almost superstitious faith. The myth so completely has dominated the judicial psyche in those cases that the courts either assume the reliability of the sniff or address the question cursorily; the dog is the clear and consistent winner. The courts' failure is due to more than sloppy reasoning; the mythic underpinnings of the cases are revealed in the grand language chosen to describe the dog's olfactory sensibilities.

In *United States v. Waltzer*,[66] for example, Kane, a federal Department of Enforcement Agency narcotics detector dog, alerted

---

64.  1A J. WIGMORE, EVIDENCE § 177, at 1852 (1983).

65.  State v. Streeper, 113 Idaho 662, 666, 747 P.2d 71, 75 (1987).

66.  682 F.2d 370 (2d Cir. 1982), *cert. denied,* 463 U.S. 1210 (1983).

Case 3:07-cv-05416-JSW    Document 10-2    Filed 06/25/2008    Page 11 of 55

ween

to be
 pop-
e sus-
rence
.ature
uence
. The
s due
f our
es has
ation,
o giv-


tation of
either ig-
uth. The
.fication,
; not ap-
t has led
.  rack-
: wisdom
·ms from
ubject to



rticularly
n almost
d the ju-
the relia-
og is the
iore than
 revealed
tory sen-



deral De-
  alerted

agents to a suspect's luggage at an airport and the alert resulted in
the suspect's arrest. A later search of the suspect's luggage revealed
cocaine. The district court denied the defendant's motion to suppress
the cocaine and the court of appeals affirmed, concluding that canine
identification is a discriminating and, "in cases such as Kane," a
reliable method of identifying packages containing narcotics.[67] But
a dog is not necessarily either discriminating or reliable. The ap-
pellate court briefly addressed Kane's accuracy by simply noting that
he had a "perfect record."[68] Similarly, Judge Oakes in his concurring
opinion described the prosecution's key witness as "the able, canny
canine Kane, with the perfect record—all hits and no misses."[69] Es-
sentially, the sniff itself was sufficient to establish probable cause
for the arrest.

The reference to Kane's "perfect record" was meaningless, how-
ever, because the court failed to ask *any* questions about Kane's re-
liability or skill beyond noting his "perfect record." For example,
what was Kane's earlier scenting experience? Had he previously alerted
to known quantities of cocaine or only to other drugs? Did "perfect"
mean that he had been tested and correct twice, a figure of little
value, or had he been correct on hundreds of occasions? Further-
more, were the circumstances of the search in any way suggestive,[70]
or were there "handler cues"[71] that might have caused Kane to iden-
tify certain persons even though Kane did not himself recognize the
scent of cocaine? The facts of *United States v. Young*[72] illustrate that
asking these kinds of questions is critical to identifying those dog
sniffs that deserve to be relied upon.

In *Young*, Kane broke his "perfect record" when he erroneously
alerted to narcotics at the defendant's apartment. The defendant
sought to suppress evidence of firearms found during the search on
the ground that Kane's unreliable sniff was inadequate to establish
probable cause for the arrest.[73] Specifically, the defendant argued
that dog sniffs of apartments are less reliable than sniffs of luggage;

67.  *Id.* at 372-73.

68.  *Id.* at 371.

69.  *Id.* at 374 (Oakes, J., concurring).

70.  For example, did the luggage contain cheese or meat, scents that might attract the
dog's attention? Was the luggage so different in appearance from the other pieces of luggage
that the dog may have chosen it based on sight, not scent? *See generally infra* notes 471-
548 and accompanying text.

71.  "Handler cues" are the conscious or subconscious handler suggestions to the dog
that the dog should identify a particular person or object. *See infra* notes 205-208 and
accompanying text.

72.  745 F.2d 733 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084 (1985).

73.  *Id.* at 741.

that there are physical differences between a sniff in a small, confined area and a sniff at the entrance of an apartment; and that a search warrant therefore must provide, at the very least, a detailed account of the searching dog's track record with respect to apartments and homes.[74] The investigating agent's search warrant affidavit in *Young* stated only that Kane was successful in two similar incidents but did not state how many times Kane had failed.[75]

In dicta, the appellate court suggested that it might agree with the defendant's argument. The court characterized Kane's sniff as an "arguably unreliable, or at least unsubstantiated, technique."[76] The court skirted the issue, however, by affirming the defendant's conviction on the theory that the search was supported by probable cause even without the dog's erroneous signal.[77]

Other courts have displayed even less sensitivity to the question of accuracy. In *Doe v. Renfrow*,[78] a school system's administrators conducted a mass sniffing expedition to uncover student drug use. The dog alerted to fifty students but only seventeen were found in possession of drugs, an accuracy rate of thirty-four percent. The plaintiff brought suit against school officials for allegedly violating her fourth amendment rights. Although the dog's accuracy rate during the search was very low, the court concluded that the alerts established reasonable cause to believe that the students identified were concealing narcotics. The court praised the nose of the dog: "It is well known that a patrol dog is endowed by nature with qualities of hearing and smell that appear to be superior to those of humans."[79] The court declared that the dog's "keen olfactory sense" had "led naturally" to the training of dogs to detect contraband, a task that the court concluded without explanation was similar to the traditional use of dogs in search and rescue missions.[80] Consequently, the court found that the conduct of a properly trained dog can "standing alone" provide the basis for reasonable, and even probable, cause.[81]

Significantly, the court in *Renfrow* never addressed the dog's accuracy rate *before* the search, a matter clearly relevant to probable cause. Nor did it consider that tracking human scent, as is done in

74. *Id.* at 756.
75. *Id.*
76. *Id.* at 758.
77. *Id.* at 756.
78. 475 F. Supp. 1012 (N.D. Ind. 1979), *rev'd on other grounds,* 631 F.2d 91 (7th Cir. 1980), *cert. denied,* 451 U.S. 1022 (1981).
79. *Id.* at 1025.
80. *Id.* at 1026 (quoting United States v. Solis, 536 F.2d 880, 882 (9th Cir. 1976)).
81. *Id.*

[Vol. 42

co..fined
a search
account
ents and
n *Young*
; but did

;ree with
sniff as
tique.'"[76]
endant's
probable

question
istrators
rug use.
found in
ent. The
violating
r  dur-
alerts es-
ied were
g: "It is
alities of
nans.'"[79]
1ad "led
ask that
1e tradi-
ntly, the
standing
cause.[81]
he dog's
probable
done in

search and rescue missions, may be different from tracking drugs, a difference that potentially requires an independent scientific inquiry whether dogs are better or worse at tracking contraband than tracking humans. Finally, the court failed to address in any depth whether the dog had been "properly trained"[82] and it completely ignored the non-discriminating nature of this particular dog's training. The dog apparently reacted to the plaintiff primarily because that morning she had been playing with one of her dogs who was in heat.[83]

The United States Supreme Court has contributed to the lower courts' willingness to assume that a dog's alert to narcotics is inherently reliable.[84] Although the Court in reality has addressed reliability questions only tangentially or in dicta,[85] lower courts have viewed the Court's comments on the question as authoritative statements on the subject.[86] Three cases in particular have guided the lower courts.

In *United States v. Chadwick,*[87] a marijuana detection dog signaled the presence of marijuana inside a footlocker. Although the Court declared the subsequent opening of the locker and inspection of its interior unlawful because the police had not first obtained a warrant, the Court suggested that had the police asked, a warrant unquestionably would have issued based solely on the dog's alert.[88]

A plurality of the Court made similar assumptions regarding the reliability of canine sniffing in *Florida v. Royer.*[89] *Royer* involved a suspected drug courier who was questioned in an airport concourse and then required to accompany the police forty feet to an office, where he consented to a search of his suitcases. The Court held that the consent was the fruit of an arrest without probable cause. In emphasizing that the police had less intrusive means than searching the suitcases to confirm their suspicions, the Court noted that:

> The courts are not strangers to the use of trained dogs to detect
> the presence of controlled substances in luggage. There is no in-

---

82. While the court found "no fault with the school administrators using . . . the senses of properly trained outside personnel and dogs," *id.* at 1027, the only indirect reference to the dog's training was that the dog's trainer, Ms. Little, had "vast experience" and ran a legitimate enterprise. *Id.* at 1026.

83. *See id.* at 1017.

84. *See infra* notes 87-94 and accompanying text.

85. *See infra* notes 89, 92.

86. *See infra* notes 89, 92.

87. 433 U.S. 1 (1977).

88. *See id.* at 15.

89. 460 U.S. 491 (1983); *see also* United States v. Knox, 839 F.2d 285, 291, 294 n.4 (6th Cir. 1988) ("[U]nder *Royer,* the positive reaction of the Narcotics Unit dog alone would have established probable cause to not only search defendants' luggage, but to arrest them immediately."), *cert. denied,* 109 S. Ct. 1742 (1989).

)  :h Cir.

1976)).

dication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out . . . . A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause.*[90]

Finally, in *United States v. Place,*[91] the Court held that a dog sniff is not a "search" within the meaning of the fourth amendment and does not, therefore, require probable cause. In doing so, the Court assumed that a sniff is a discriminate, accurate method for disclosing the presence or absence of narcotics.[92] The Court, however, reversed Place's conviction on another ground. Two DEA agents had a reasonable, articulable suspicion that when Place deplaned at LaGuardia airport, he carried narcotics. Although that suspicion justified a brief detention that was limited in scope and designed to investigate circumstances surrounding that suspicion, the Court held that the officers went beyond such limited detention by moving Place's luggage to Kennedy airport in order to conduct the dog sniff, thereby delaying the luggage for ninety minutes.[93] In reaching this conclusion, the court relied upon *Royer* and suggested that a better solution would have been to bring the dog to LaGuardia for a brief sniff, thus minimizing the intrusion while enabling the officers to confirm their suspicions.[94] Once again, the Court's implied assumption was that the sniff itself would be highly reliable.

One final point should be noted. The myth has not been completely monolithic and a few cases have challenged the assumption of the dog's infallibility.[95] These cases, however, have done little more than flag the issue, and have offered no serious, coherent method

---

90. *Royer,* 460 U.S. at 505-06 (emphasis added).

91. 462 U.S. 696 (1983).

92. *Id.* at 707; *see also* United States v. Brown, 731 F.2d 1491, 1492 n.1 (11th Cir. 1984) (citing *Place* for the proposition that the "Supreme Court has assumed that dog-sniff tests are highly reliable").

93. *Id.* at 709-10.

94. *Id.* at 709.

95. *See, e.g.,* United States v. Fernandez, 772 F.2d 495, 497-98 & n.2 (9th Cir. 1985) (noting in dicta that, because there was no evidence of "Marc the Narc's" reliability, the court was unable to determine whether the dog's "hit" established probable cause to search luggage for narcotics); Horton v. Goose Creek Indep. School Dist., 693 F.2d 524, 525 (5th Cir. 1982) (remand for trial court to evaluate dog's reliability before determining whether an alert gave rise to reasonable suspicion); *cert. denied,* 463 U.S. 1207 (1983); *cf.* People v. Mayberry, 31 Cal. 3d 335, 342, 644 P.2d 810, 814, 182 Cal. Rptr. 617, 621 (1982) (cautioning that adequate demonstration of a narcotic detector dog's training and experience is necessary before its reaction to an object may be admitted into evidence). *See generally* Annotation, *Use of Trained Dog to Detect Narcotics or Drugs as Unreasonable Search in Violation of Fourth Amendment,* 31 A.L.R. FED. 931 (1986 & Supp. 1989) (collecting cases).

for resolution. The courts have made a more serious, if equally flawed, effort to address the problem in the dog-tracking cases.[96]

*(2)   Tracking the Truth*

a.   The Dog as Sui Generis

In concluding that a dog's sniff is not a search, the United States Supreme Court in *United States v. Place* declared that the canine sniff is "sui generis."[97] This same conclusion—that a dog's sniff is unique—had been reached before by courts deciding a very different question: what foundation is necessary before evidence of canine tracking may be admitted as proof of a defendant's guilt?[98] In answering this question the majority of courts have required a showing:

> (1) [T]hat . . . [the dogs] are of pure blood, and of a stock characterized by acuteness of scent and power of discrimination; (2) that they possess these qualities, and have been accustomed and trained to pursue the human track; (3) that they have been found by experience reliable in such pursuit; (4) and that in the particular case they were put on the trail of the guilty party, which was pursued and followed under such circumstances and in such way as to afford substantial assurance, or permit a reasonable inference, of identification.[99]

Modern statements of the rule sometimes delete the requirement that the dogs be of a particular breed but add requirements that the handler be proven qualified to use the dog and that the trail not be so stale or contaminated as to be beyond the dog's ability to follow.[100]

Whichever variant of the test is used, the courts often require little in the way of foundation to pass it.[101] The courts offer minimal,

---

96.   See *infra* notes 97-132 and accompanying text.

97.   462 U.S. 696, 707 (1983).

98.   See Annotation, *Evidence of Trailing by Dogs in Criminal Cases,* 18 A.L.R.3d 1221 (1968 & Supp. 1989).

99.   State v. McLeod, 196 N.C. 542, 545, 146 S.E. 409, 411 (1929).

100.   See, e.g., Commonwealth v. Michaux, 360 Pa. Super., 452, 457, 520 A.2d 1177, 1179 (1987); Annotation, *supra* note 98, at 1230-37 (surveying foundational requirements). Not all modern cases disregard breeding; some indeed place heavy emphasis on that factor. See, e.g., State v. Maya, 126 N.H. 590, 598, 493 A.2d 1139, 1145 (1985). For a summary and commentary upon the many variations on the majority approach, see Terrell v. State, 3 Md. App. 340, 239 A.2d 128 (1968).

101.   See, e.g., State v. Streeper, 113 Idaho 662, 667, 747 P.2d 71, 76 (1987) (foundational requirements met when two dogs had only 75% and 80% success rates respectively, and the tracking was done three to five hours after the crime with no inquiry into possible changes in the trail during that period or into the general ability of dogs to track after the passage of a significant period of time); State v. Harris, 25 Or. App. 71, 77, 547 P.2d 1394, 1398 (1976) (tracking within 48 hours of crime not "stale").

THE HASTINGS LAW JOURNAL [Vol. 42

if any, discussion of what controlled experimentation should be used to determine the general accuracy of dogs in tracking or to determine the factors that may explain why dogs are sometimes wrong.[102]

Dogs with tracking records far from perfect frequently are deemed reliable.[103] Even these less-than-perfect tracking records are misleading, since they apparently are based on the number of times that a dog who is instructed to track actually finds a "match." The courts do not mention the number of times that a false "match" is made, nor do they describe experiments that would determine the reliability of the particular dog's scenting abilities.[104] Ultimately, reliability questions often turn on the conclusory testimony of the dog's handler, an individual who is not required to have academic training in canine psychology or any other related discipline.[105] Furthermore, discussions regarding trail "staleness" are cursory and fail to address important physics issues, for example, the rate at which human scent may dissipate in hot, dry weather, as opposed to rainy, windy weather.[106] Indeed, many courts reject the notion that tracking should be a scientific process, the accuracy of which can be appreciated only by understanding the nature of scent and the biology and motivation of the dog.[107] Moreover, the courts are not worried about erroneous tracking, because they deem it a danger largely eliminated by the "corroboration requirement."

The "corroboration requirement" is a rule articulated by the courts in most states requiring that dog tracking evidence be corroborated by other evidence before a conviction based on that tracking evidence can be sustained.[108] The meaning of this requirement is

---

102. *See infra* cases cited at notes 103-132. The absence of such a discussion is truly remarkable because scientific research, however skimpy, has been available at least since the 1920s. *See infra* text accompanying notes 363-372.

103. *See, e.g.,* State v. Wilson, 180 Conn. 481, 488, 429 A.2d 931, 934 (1980) (80% success rate in tracking); People v. Perryman, 89 Mich. App. 516, 522, 280 N.W.2d 579, 582 (1979) (only 11 out of 36 successes, a success rate of under 30%).

104. *See supra* cases cited at notes 100-101, 103.

105. *E.g.,* People v. Malgren, 139 Cal. App. 3d 234, 238-39, 188 Cal. Rptr. 569, 572 (1983) (handler/police officer's testimony); *Wilson,* 180 Conn. at 487-88, 429 A.2d at 934 (handler/state trooper's testimony).

106. M. PEARSALL & H. VERBRUGGEN, M.D., *supra* note 3, at 35-44 (summarizing the effects of air temperature and humidity on a dog's ability to follow a track).

107. *See* People v. Craig, 86 Cal. App. 3d 905, 915-16, 150 Cal. Rptr. 676, 682-83 (1978) (rejecting the need to prove the demonstrable scientific reliability of dog tracking); *Wilson,* 180 Conn. at 481, 487-89, 429 A.2d at 934-35 (1980) (effectively ignoring the defendant's claim that no scientific basis had been proved to support a state trooper's testimony as to the accuracy of his tracking dog).

108. *E.g.,* Commonwealth v. Michaux, 360 Pa. Super. 452, 458-59, 520 A.2d 1177, 1180 (1987); Annotation, *supra* note 98, at 1237-40 (collecting cases).

unclear in states where courts declare that tracking evidence is "cumulative only"[109] and must be corroborated by other "direct"[110] evidence of identity. Such language suggests that tracking evidence only will be admitted if there is independent evidence that, standing alone, could support the defendant's conviction.[111] Other cases, however, clearly hold that the "other evidence" required for corroboration may be circumstantial and need not be sufficient to establish a defendant's guilt.[112] In effect, these latter cases hold that tracking evidence is more than merely "cumulative," thus permitting a court to send the question of the wrongdoer's identity to the jury in a case in which otherwise there would be insufficient evidence to do so.[113] In practice, this interpretation of the rule has meant that little "other evidence" is necessary to support a conviction.[114]

---

109. *Michaux,* 360 Pa. Super. at 458, 520 A.2d at 1180 (quoting State v. Loucks, 98 Wash. 2d 563, 567, 656 P.2d 480, 482 (1983)). "Cumulative evidence" is "[a]dditional or corroborative evidence to the same point. That which goes to prove what has *already been established* by other evidence." BLACK'S LAW DICTIONARY 343 (5th ed. 1979) (emphasis added). By describing tracking evidence as "cumulative only," therefore, courts apparently are saying that the guilty party's identity already has been shown. Tracking merely offers additional support to the existing proof of identity.

110. People v. Perryman, 89 Mich. App. 516, 524, 280 N.W.2d 579, 583 (1979); *accord Loucks,* 98 Wash. 2d at 567, 656 P.2d at 482 (1983) (noting that a large majority of jurisdictions permit dog tracking evidence "only after other evidence has been introduced *clearly connecting the accused* with . . . the crime") (emphasis added). *But see* State v. Ellis, 48 Wash. App. 333, 335, 738 P.2d 1085, 1087 (1987) (rejecting the assertion that *Loucks* required that the "other evidence" produced must be sufficient by itself to convict the accused).

111. *See supra* cases cited at note 110; *see also* State v. Cheatham, 458 S.W.2d 336 (Mo. 1970) (tracking evidence was insufficient to support a robbery conviction where circumstantial evidence of the defendant's presence near the crime scene and association with an accomplice did not, standing alone, link defendant with the crime).

112. People v. Malgren, 139 Cal. App. 3d 234, 239, 188 Cal. Rptr. 569, 573 (1983) (corroborating evidence can be circumstantial); *Ellis,* 48 Wash. App. at 335, 738 P.2d at 1087 ("other evidence" need not itself be sufficient to convict).

113. This logic follows from the rationales of these cases despite not being articulated clearly in their text. The evidence, other than tracking, need not be sufficient to convict; but once tracking evidence is admitted, if there is sufficient evidence to take the case to the jury, and the jury convicts (a verdict that is upheld on appeal), the tracking evidence is precisely what tips the scales in favor of guilt. Thus the prosecutor's losing case is turned into a winner. The tracking evidence is, therefore, much more than "merely cumulative" because it serves not as proof of a fact already established, but rather as a necessary step in proving the existence of that fact in the first place. *See supra* note 109.

114. For example, in *Ellis,* the police saw two men running from the scene of a burglary, one wearing a brown leather jacket and darker pants, the other wearing a dark top and lighter colored pants. The police pursued, but lost the men. A dog tracked and located one man fitting the description of the first suspect, who wore a brown leather jacket and darker pants. The same dog later tracked the defendant, who wore a rust-colored jacket and dark gray pants and therefore did not fit the second suspect's description. Despite the defendant's clothing differing from the description given by the officers, and despite the defendant's

Moreover, even when the additional evidence offered is more than minimal, the power of the tracking evidence often is undeniable and actually may be the primary reason for the resulting conviction. *People v. Malgren*[115] illustrates this proposition. In *Malgren,* two teenagers returned home to find the knobs removed from their front door. A crash came from their parents' bedroom, and they saw someone run out of the house. They called the police, who arrived with a dog that spent thirty-five to forty minutes tracking over about seven-tenths of a mile until he located the defendant in some bushes one hour after the crime. The defendant was out of breath and perspiring, with leaves on his jacket, grass stains on his shoes, and wet trouser legs. Later, both a penlight and pliers whose teeth matched the spacing of marks on the doorknobs were found near the burglarized residence.[116] At trial, the defendant testified that he had hitched a ride with a woman, but they had quarreled, and thus he left the car and was walking along the freeway when the dog came after him, forcing him to run into the bushes to escape.[117] A jury convicted the defendant of burglary.

On appeal, the defendant argued that, other than the dog's tracking, there was no direct evidence of his guilt. The court rejected his challenge and concluded that the circumstances of the case afforded sufficient ''corroborating evidence'' including, among other factors, the location where the pliers and penlight had been found and the defendant's sweaty condition.[118] Moreover, the court found an additional circumstance showing consciousness of guilt because the jury may have concluded that the defendant lied about how he got into the bushes.[119]

In his dissent Justice Feinberg took a very different view.[120] He noted that the defendant's location, perspiration, lack of breath, and the leaves on his jacket just as easily could corroborate his alibi as the prosecution's case. After all, if the defendant was fleeing the scene of the crime, why was he only seven-tenths of a mile away one hour after the burglary occurred? Moreover, assuming that the jury

attempted alibi, he was convicted. *Ellis,* 48 Wash. App. at 333-36, 738 P.2d at 1086-87. On appeal, the court held that there was sufficient evidence to support the conviction. *Id.* at 336, 738 P.2d at 1087. The dissent sharply disagreed with the majority, concluding that ''besides the tracking dog evidence, there is little to support an identification of Ellis as the perpetrator.'' *Id.* at 340, 738 P.2d at 1089 (Ringold, J., dissenting.)

115.   139 Cal. App. 3d 234, 188 Cal. Rptr. 569 (1983).

116.   *Id.* at 237, 188 Cal. Rptr. at 571.

117.   *Id.*

118.   *Id.* at 240, 188 Cal. Rptr. at 573.

119.   *Id.*

120.   *Id.* at 242-47, 188 Cal. Rptr. at 575-78 (Feinberg, J., dissenting).

believed that the defendant lied about how he got in the bushes, did that fact show a consciousness of guilt about a burglary committed an hour earlier at a residence almost a mile away? Furthermore, why did the dog take a full forty minutes to track the seven-tenths of a mile?[121] The prosecution explained that the delay in tracking resulted because the wind had blown the scent around, causing the dog to lose it and forcing the dog to nose around before picking it up again. Justice Feinberg, however, noted that if true this circumstance merely lessened the already questionable reliability of the dog. He cautioned that although the scientific validity of dog tracking evidence has not been demonstrated "even as well as voice-printers,"[122] the jury likely would give undue weight to tracking because "evidence gleaned from the efforts of dogs has been part of our folklore for centuries."[123]

Despite his criticisms, Justice Feinberg did not recommend a total ban on admission of tracking evidence. Instead, he agreed with the rest of the court that the tracking evidence had established a reasonable suspicion of the defendant's involvement in the burglary and therefore was relevant in determining the legality of police conduct.[124] Furthermore, although he believed that the case before the court should not have gone to the jury, Justice Feinberg indicated that he would permit a jury to receive tracking evidence if the jury were instructed to view such evidence with caution and there was far greater corroboration than in *Malgren*.[125]

Indeed, many courts have followed an approach that is similar to Justice Feinberg's proposal.[126] This approach, however, makes two assumptions that may be seriously flawed.[127] Not only does it assume that the "superstitious awe" with which juries view the dog can be overcome merely by an instruction, but also that juries will be supplied with sufficient information to evaluate tracking accuracy fairly.

The view espoused by the *Malgren* majority—that minimal corroborating evidence is necessary where the traditional five-part track-

---

121. *Id.* at 237, 188 Cal. Rptr. at 571.

122. *Id.* at 246, 188 Cal. Rptr. at 577. The California Supreme Court has rejected the use of voiceprint evidence because of its lack of acceptance in the relevant scientific field. People v. Kelly, 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976).

123. *Malgren,* 139 Cal. App. 3d at 246, 188 Cal. Rptr. at 577.

124. *Id.* at 245-246, 188 Cal. Rptr. at 577. Other cases have held that under certain circumstances, tracking evidence may be admitted as a factor tending to establish probable cause even where the evidence is too unreliable to be admitted as proof of guilt at trial. *See, e.g.,* State v. Maya, 126 N.H. 590, 598-99, 493 A.2d 1139, 1145-46 (1985).

125. 139 Cal. App. 3d at 242-47, 188 Cal. Rptr. at 575-78.

126. *See infra* text accompanying notes 639-642, 675-684; cases collected at Annotation, *supra* note 98.

127. *See infra* text accompanying notes 575-627, 664-685.

ing test is met—is the view of the majority of courts that have considered the question.[128] This standard must be credited with offering at least some test of a dog's accuracy, an accomplishment that generally has eluded the courts in the narcotics cases.[129] Moreover, the majority test is not wholly without teeth; there are indeed cases in which the evidence failed to satisfy the test for admissibility[130] or was found insufficient to support the verdict.[131] These cases, however, tend to be extreme with only the barest evidence of reliability or corroboration.[132] Most importantly, the majority view still lacks a scientific basis for determining when tracking is accurate and it fails to address convincingly the concerns raised by Justice Feinberg and by the courts adopting the minority position.

### b.   Debunking the Dog

The minority view excludes all dog tracking evidence for reasons similar to those expressed by Justice Feinberg. The seminal case is *Brott v. State*,[133] in which the court expressed concern over the scientific basis for admitting evidence of a bloodhound's tracking of a trail to a defendant's home more than twelve hours after a burglary.[134] The sun had been shining steadily on the trail for that time, and "perhaps hundreds" had walked over or paralleled the course of the trail.[135] These circumstances led the court to ponder whether

---

128.  See cases collected at Annotation, *supra* note 98.

129.  As noted earlier, a few narcotics cases have demanded some showing of reliability but they have not offered clear guidelines on how to make this showing. *See* cases cited *supra* note 95. The *People v. Malgren* five-part test at least offers minimal guidance on how to determine scenting accuracy in the context of tracking. *See supra* notes 115-127 and accompanying text (discussing the *Malgren* five-part test). As discussed throughout the remainder of this Article, however, that guidance is inadequate and surely is ineffective in screening unreliable evidence from the jury.

130.  *E.g.*, McDonald v. State, 145 Ark. 581, 583, 224 S.W. 976 (1920) (witness admitted that he did not know much about bloodhounds and could not say whether they followed the trail correctly); O'Quinn v. State, 153 Ga. App. 467, 470, 265 S.E.2d 824, 825 (1980) (error to admit sheriff's testimony where he had not trained dogs, was not their handler, and the dogs had not been put on the tracks at the scene of the crime nor followed the tracks to the defendant); Pedigo v. Commonwealth, 103 Ky. 41, 51, 44 S.W. 143, 146 (1898) (dog not shown to be trained and tested in tracking humans).

131.  *See, e.g.*, People v. McPherson, 85 Mich. App. 341, 271 N.W.2d 228 (1978) (no evidence corroborating the tracking, and the fingerprints found at the scene of the crime were not the defendant's); State v. Loucks, 98 Wash. 2d 563, 656 P.2d 480 (1983) (conviction reversed where fingerprint and blood type evidence at the scene of the crime tended to exculpate the defendant instead of corroborating the tracking of a dog).

132.  *See supra* cases cited at notes 130-131.

133.  70 Neb. 395, 97 N.W. 593 (1903).

134.  *Id.* at 397, 97 N.W. at 594.

135.  *Id.*

the scent had largely dissipated or been contaminated by other persons' scents. The court feared that difficulties in tracking would not deter a hound, who would track as best he could and always follow some scent, even if not the right one. Although the court conceded that the bloodhound frequently may be right, it also concluded that he is frequently wrong.[136] As a consequence of these concerns the court reversed the defendant's conviction. In doing so, the court recognized the power, but challenged the logic, of the mythic dog:

> It is a commonly accepted notion that he will start from the place where a crime has been committed, follow for miles the track upon which he has been set, find the culprit, confront him, and mirabile dictu, by accusing bay and mien declare, "Thou art the man." This strange misbelief is with some people apparently incorrigible. It is a delusion which abundant actual experience has failed to dissipate. It lives on from generation to generation. It has still the attractiveness of a fresh creation. "Time writes no wrinkles on its brow." But it is nevertheless a delusion—an evident and obvious delusion. The sleuthhound of fiction is a marvelous dog, but we find nothing quite like him in real life.[137]

Few jurisdictions have followed *Brott,* and no modern case has done so.[138] Nevertheless, *Brott* often is cited by majority courts to show recognition of the problems in using tracking evidence[139] that the majority believes to be less serious and more easily rectified than the court did in *Brott.*[140] Of special significance for this Article, however, is the Iowa Supreme Court's adoption in 1923 of the minority view in *State v. Grba.*[141] *Grba* is the first reported case involving both tracking and what was in effect a dog scent lineup, although the actual term "lineup" was not used.[142] In *Grba,* a sheriff asked seven

---

136. *Id.* at 398, 97 N.W. at 594.

137. *Id.* at 396, 97 N.W. at 593-94. *Brott*'s rationale was sharply challenged in Terrell v. State, 3 Md. App. 340, 239 A.2d 128 (1968). The *Terrell* court's lengthy defense of the majority position may be summarized as follows: The foundational and corroboration requirements prevent the jury from acting out of ignorance and superstitious awe; the jury need not know how a dog tracks so long as the jury knows that the animal does so accurately; the dog's trainer can answer any questions regarding the accuracy and meaning of the dog's behavior; and the danger of error is minimized by the corroboration requirement and is no greater than the similar danger with human eyewitness testimony. Each of these aspects of the *Terrell* defense is addressed in Parts III.G. and IV. of this Article.

138. Only five jurisdictions have adopted the minority view. People v. Pfanschmidt, 262 Ill. 411, 104 N.E. 804 (1914); Ruse v. State, 186 Ind. 237, 115 N.E. 778 (1917); State v. Grba, 196 Iowa 241, 194 N.W. 250 (1923); State v. Storm, 125 Mont. 346, 238 P.2d 1161 (1951); Brott v. State, 70 Neb. 395, 97 N.W. 593 (1903).

139. *E.g.,* State v. Loucks, 98 Wash. 2d 563, 567, 656 P.2d 480, 482 (1983).

140. *See, e.g.,* Terrell v. State, 3 Md. App. 340, 239 A.2d 128 (1968); *supra* note 137 (discussion of *Terrell*).

141. 196 Iowa 241, 194 N.W. 250 (1923).

142. *Id.*

or eight men to walk by two bloodhounds who had been tracking the suspected bomber of a home. The handler did not know whom the sheriff believed to be the "right man." The hounds alerted to the defendant, and he subsequently was convicted of the crime. Although there was other evidence linking the defendant to the crime, the appellate court reversed because "the bloodhound may be right in what he does, and he may be wholly wrong. How is it possible to know in any particular case whether he is right or wrong?"[143]

No other dog scent lineup cases were reported until the 1980s.[144] Subsequent cases largely have ignored *Grba,* and mainly have engrafted the majority tracking test onto the analysis of lineups.

The flaws in the majority approach to tracking are most evident in the dog scent lineup cases. These cases, for the most part, have applied the majority foundational requirements for tracking to the arguably very different circumstances of the dog scent lineup.[145] This approach exposes the substantial deference that the majority tracking view gives to dog scenting, because lineups rarely fail the majority test despite the courts' repeated claims that they recognize the dog's fallibility.[146] Applying the majority tracking test to scent lineups sometimes causes extreme results that raise serious doubts about the ability of the tracking test to adequately screen unreliable evidence, protect against juror misuse of questionable evidence, or ensure the full disclosure of information necessary for the jury to evaluate such evidence.[147]

These extreme results, which include convictions based on potentially suggestive lineups[148] and lineups conducted years after the crimes,[149] show a judicial unwillingness to examine the biological and psychological reasons for misidentification. By doing so, the courts flatly reject the notion that lineups should be treated like scientific evidence.[150] This rejection perpetuates the image of the dog as sui

---

143. *Id.* at 263, 194 N.W. at 259.

144. *See infra* notes 145-151 and accompanying text; Annotation, *supra* note 4.

145. *E.g.,* United States v. Gates, 680 F.2d 1117, 1119 (6th Cir. 1982); United States v. McNiece, 558 F. Supp. 612, 616 n.5 (E.D.N.Y. 1983); State v. Roscoe, 145 Ariz. 212, 220-21, 700 P.2d 1312, 1320-21 (1984), *cert. denied,* 471 U.S. 1094 (1985).

146. *See supra* cases cited at note 145.

147. *See infra* notes 469-567, 652-685 and accompanying text.

148. *See infra* text accompanying notes 471-523 for a discussion of suggestive lineups.

149. These lineups are conducted after so long a period of time that common sense suggests the danger of the scent's dissipation and contamination. *See, e.g., Gates,* 680 F.2d 1117 (lineup eight months after crime); *McNiece,* 558 F. Supp. 612 (E.D.N.Y. 1983) (lineup 21 months after crime).

150. *Roscoe,* 145 Ariz. at 219, 700 P.2d at 1319 (scent lineups are "not bottomed on any scientific theory").

generis. The result is judicial approval of canine identifications that border on the miraculous and that in effect endorse the dog's mythic infallibility. This endorsement brings the tracking and lineup cases closely in line with the unarticulated assumptions of the narcotics cases.[151]

The impact of those unarticulated assumptions on both courts and juries is the subject of much of the remainder of this Article.

One interesting wrinkle is worth noting here. Many of the reported cases that raise issues regarding scent lineups involve lineups conducted by a particular handler, John Preston. Since at least 1984, it has been alleged that Preston's testimony is fraudulent because neither he nor his dogs have the training or experience that he claims they possess. Geraldo Rivera presented a supposed exposé of Preston on ABC's 20/20 television program. Although he conceded that dogs have an "extraordinary sense of smell" that has been invaluable in law enforcement,[152] Rivera challenged whether Preston had the formal training that he claimed to have, noted that other dog handlers were of the opinion that Preston's dogs clearly were not "working" and that Preston's claims regarding dogs' scenting prowess were beyond the abilities of any dog, and offered stories of the absurd lengths to which Preston maintained his dog's noses could go (for example, pond-sniffing to uncover evidence hidden beneath the water).[153] The allegations of fraud are not in themselves significant because there is a danger of fraud in every trial, Preston denies the fraud charge,[154]

---

151. *But see* Ramos v. State, 496 So. 2d 121 (Fla. 1986) (the only modern case challenging the assumption of the dog's infallibility in a lineup).

152. *Tracking the Tracker, supra* note 42.

153. *Id.* Rivera's allegations soon are to be tested in a case involving what apparently is one of Preston's most impressive achievements. In *Roscoe,* 145 Ariz. at 218, 700 P.2d at 1318, Preston described the following series of tests during his testimony. First, his dog (Harass II) scented the victim's clothing and then selected the defendant's car from a line of five cars. Second, the dog scented the defendant's clothing and then selected the victim's clothing (thus indicating that the defendant's scent was on that clothing) from a line of five items of clothing. Third, after being put on the defendant's scent, the dog alerted to the victim's bicycle in a line of five bicycles. Each of these tests was, according to Preston, run blind: Preston was not told in advance which article or location was connected with the crime. *Id.* Either Preston's dog, at least on this one occasion, demonstrated an impressive talent for scent discrimination, or Preston was in cahoots with local officers who told him in advance which items to select. Defendant Roscoe will soon have an opportunity to prove that the latter version is closer to the truth, since the Arizona Supreme Court, in a collateral attack on the conviction, has remanded the case for a hearing on whether Preston was a "fraud and liar" who was "actually dishonest in the manner in which he investigated the case." State v. Roscoe, No. CR-89-0160-PC, slip op. at 4 (Ariz. Oct. 19, 1989). That hearing is scheduled for late October 1990. Telephone interview with Shari Altendorf, a paralegal on the defense team representing Roscoe (Sept. 10, 1990).

154. *Tracking the Tracker, supra* note 42.

---

racking
' whom
:rted to
me. Al-
: crime,
be right
possible
;?"[143]
980s.[144]
ave en-
ps.
evident
rt, have
; to the
.[145] This
racking
najority
ie dog's
lineups
; .t the
vidence,
sure the
ate such

on po-
ifter the
.ical and
e courts
cientific
g as sui

4.
:d States v.
:. 212, 220-

e lineups.
imon sense
80 F.2d
bs) (lineup

ottomed on

and he still has strong supporters in both law enforcement and the appellate courts.[155] What is significant, however, is that Preston's credibility, and therefore the prosecution's willingness to use him as a witness, was substantially damaged when in a later unreported case the court ordered, and Preston's dogs failed, a test designed to determine the accuracy of his dogs.[156] That failure serves to underscore the value of employing traditional rules of evidence to evaluate the reliability of dog scent identifications and of actively involving the trial judge in screening out possibly unreliable scientific evidence.

It is important to clarify, however, that neither the alleged failure of dogs in scent lineup cases nor the weaknesses in the courts' analyses necessarily require wholesale rejection of scent lineup evidence. To the contrary, some European researchers maintain that they have designed training and testing procedures that avoid the kinds of errors allegedly made by Preston (for example, using inadequately trained dogs and suggestive lineup procedures), thus bringing strong scientific support to the lineup procedure.[157] An understanding of the research and of many of the legal issues raised by the lineup cases, however, first requires a basic understanding of the biology and psychology of scenting and tracking.

## II.    The Science of Scenting

Even the briefest review of the scientific principles underlying dog scenting reveals that, contrary to the conclusions of many courts, there are significant scientific differences among the various uses of scenting: tracking, narcotics detection, and scent lineups. These differences make it dangerous to rely upon judicial precedent regarding the reliability of one form of dog scenting when addressing the reliability of another form. Examination of the science of scenting also highlights the courts' failure to adopt a rational approach to any

---

155.  Judge Dean Moxley of Brevard County said of Preston:

   I think dogs can do a lot of things that people at the outset say they can't do and they don't try. For instance, pick an arbitrary time figure—just, dog [sic] can't track after 24 hours, or dogs can't track on pavement, or dogs can't track a person on a bicycle. But they never tried it, and Mr. Preston has tried it, and he is relating things that he observed.

*Tracking the Tracker, supra* note 42. More recently, the Supreme Court of Virginia declared that Preston "demonstrated the reliability of his dog's talents." Epperly v. Booker, 235 Va. 35, 41 n.1, 366 S.E.2d 62, 65 n.1 (1988).

156.  *Tracking the Tracker, supra* note 42.

157.  De Bruin, *The Detection Dog and Science* (Mar. 15, 1988) (unpublished manuscript on file with the author of this Article); Frawley, *Police Service Dog Work in Holland,* DOG SPORTS, Apr. 1989, at 10.

form of dog scenting—"rational" meaning an approach that maximizes the likelihood of admitting only reliable scent evidence that is useful to the jury. Finally, examination of the science of scenting suggests tentative guidelines for the design of fair dog scent lineups. Before addressing any of these matters, however, it is important first to consider the threshold question: How sensitive is the dog's nose?

## A.  The Dog's Nose

The dog's nose maximizes the area available for exposure of chemical receptor cells to the air.[158] Large supports called turbinate bones form scroll-like passages that permit the air to come into contact with millions more cells than would be the case were the nasal passages simply straight tubes.[159]

The total number of olfactory cells varies with the dog's size but in all breeds the number is far greater than in man.[160] Thus, the German Sheep Dog has 220 million such cells compared to man's five million.[161] Laid out, these cells cover an area in the dog's head that is about the size of the skin on his body, compared to humans, whose equivalent area of exposure of olfactory cells to air is the size of a postage stamp.[162] Moreover, almost one-eighth of the canine brain is devoted to olfaction while the human olfactory lobes comprise a much smaller percentage of total brain size.[163]

The effect of the vast number of canine olfactory cells is open to dispute. Some researchers claim that the result is a canine olfactory acuity—the ability to detect extremely small concentrations of odorous material—between one-hundred thousand and one-hundred million times greater than man's.[164] Others claim that there is little difference in acuity but a great difference in the ability to discriminate among odors.[165] Whichever view is accurate—and recent data

---

158.  L. WHITNEY, DOG PSYCHOLOGY: THE BASIS FOR DOG TRAINING 57 (1973).

159.  *Id.*

160.  W. SYROTUCK, SCENT AND THE SCENTING DOG 13 (1972).

161.  *Id.*

162.  W. SYROTUCK, *supra* note 160, at 11; L. WHITNEY, *supra* note 158, at 57.

163.  W. SYROTUCK, *supra* note 160, at 11.

164.  *Id.* at 13. An example illustrates the magnitude of this conclusion. If a gram of butyric acid evaporated evenly throughout a ten-story building, a man standing in one of the rooms would barely be able to perceive the acid. However, if a gram of butyric were diluted to fill the air above the entire city of Hamburg, the dog described by these researchers still could perceive the acid at an altitude of three hundred feet. *Id.; see also* M. PEARSALL & H. VERBRUGGEN, M.D., *supra* note 3, at 5.

165.  W. SYROTUCK, *supra* note 160, at 13; Moulton, Ashton & Eayrs, *Studies in Olfactory Acuity: Relative Detectability of n-Aliphatic Acids by the Dog,* 8 ANIMAL BEHAV. No. 3-4,

suggest that the truth is somewhere between the two extremes[166]—there is little doubt that the dog can detect minute traces of certain odors and has olfactory sensibilities far superior to humans.[167] The accuracy of those sensibilities depends to a great extent, however, on the concept of "scent complexes" or "scent groups."

## B. Scent Groups

Dogs distinguish among human scents by recognizing the group of odors specific to each individual.[168] Thus, a person's scent is a composite odor in which no single odor necessarily predominates.[169] The dog's olfactory sensitivity is such that minute quantities of a substance may contribute to this scent group even if, standing alone, the trace substance could not be detected by the dog.[170]

An experiment by Neuhaus, a well-known researcher on canine scenting whose experiments during the 1950s included the first precise measurements of canine acuity,[171] illustrates this concept. Neuhaus found that a dog could distinguish between a base mixture of four aliphatic acids and a second identical mixture in which only one aspect was changed—a fifth aliphatic acid, caproic acid, was added, but in a concentration too small for the dog to detect were he smelling the caproic acid alone. Neuhaus then repeated the experiment with a base of four completely different chemicals but again added

117 (1960). The theory is that each olfactory cilia responds to one specific odor so that more cilia means more sensory information and thus a greater ability to distinguish differences among odors. See M. PEARSALL & H. VERBRUGGEN, M.D., *supra* note 3, at 11.

166. Specifically, this data suggests lower levels of the dog's sensitivity between ten and one hundred times greater than man's. W. SYROTUCK, *supra* note 160, at 13-15.

167. *Id.* at 15.

168. *See infra* notes 169-173 and accompanying text.

169. *See* S. BRYSON, *supra* note 3, at 94. *See generally,* W. MCCARTNEY, OLFACTION AND ODOURS: AN OSPHRESIOLOGICAL ESSAY (1968) (which contains detailed summaries of many of the classic experiments on dog scenting acuity and ability to discriminate among odors). It is important to note that this "composite odor" theory and, indeed all the other theories described in Part II of this Article reflect the prevailing descriptions in the literature of what it is that dogs scent and how they do so. Some critics maintain, however, that scientific research on canine olfaction is so primitive that we do not have any idea what it is that dogs scent, in sharp contrast, for example, to the unquestioned understanding that what dogs see is varying wavelengths of electromagnetic radiation ("light"). *E.g.,* R. LUBOW, WAR ANIMALS 143 (1977) (research has not approached a "comprehensive theory of odor perception"). If these critics are right, of course, that simply strengthens the ultimate conclusion of this Article: dog scent lineups should not be admitted as evidence of guilt at criminal trials because science has yet to develop a clear understanding of what it is that dogs scent, much less how accurate they are at doing so.

170. *See* S. BRYSON, *supra* note 3, at 94.

171. W. MCCARTNEY, *supra* note 169, at 28.

caproic acid to this new base to create a second mixture. This time, the dog could distinguish the new base from the base plus caproic acid only when the caproic acid was added in a concentration *higher* than that necessary for the dog to detect the caproic acid standing alone.[172]

Researchers also have applied the concept of scent groups when analyzing potential sources of suggestiveness in dog scent lineups.[173] The concept of scent groups also must be kept in mind in order fully to understand what it is that a dog follows when he traces "ground scent" and how that differs from what a dog follows when he traces "air scent."

## C.  Ground, Air, and Track Scents

Ground scent results from a person walking through a vegetated area.[174] Each footstep physically disturbs the soil, releasing moisture and the vapors of soil ingredients.[175] Plant life also is killed, releasing odorous vegetative fluids.[176] Moreover, the soil contains hundreds of species of bacteria that decompose the dead plant cells and vegetative fluids released by the footstep.[177] The decomposition creates additional odorous by-products.[178] Thus, each footstep creates an odorous vapor more intense than that of the ground surrounding the footstep.[179] This vapor can last for a substantial period of time depending on the life span of the bacteria, which in turn varies according to air temperature, humidity, type of soil surface, and other factors.[180]

Air or "airborne" scent is windborne human body odor.[181] Body odor comes from a variety of sources: sweat and sebaceous gland secretions, cells shed by the respiratory and genito-urinary tracts,

172.  S. Bryson, *supra* note 3, at 94; W. McCartney, *supra* note 169, at 29.

173.  *See, e.g.,* F. Buytendijk, The Mind of the Dog 99-100 (1973).

174.  *See* B. Lowe, *supra* note 43 at 66, 149, 209; W. Syrotuck, *supra* note 160, at 53-70. Some writers refer to "ground scent" as "track scent." G. Johnson, Tracking Dog Theory and Method 23 (1977). The term "ground" scent is clearer because a dog often "tracks" scents that include more than just the odors of crushed vegetation. *See infra* text accompanying notes 181-204.

175.  W. Syrotuck, *supra* note 160, at 53.

176.  *Id.* at 53, 58.

177.  *Id.*

178.  *Id.* at 53-54, 58-59.

179.  *Id.* at 54. The relative strengths of vegetative and human scents will, of course, vary with the passage of time. *Id.* at 55-69.

180.  *Id.* at 57-69.

181.  G. Johnson, *supra* note 174, at 25; B. Lowe, *supra* note 43, at 209. Vegetative ground scent also may be carried by the wind. G. Johnson, *supra* note 174, at 23-25.

gaseous secretions such as the odor of garlic on an individual's breath, toiletries, clothes, shoes, and bacteria.[182]

The bacterial source of airborne scent is the most important[183] because bacterial action on dead human skin cells in the environment of skin secretions creates odorous by-products that increase the individuality of each person's odor.[184] Moreover, the survival time of the scent created by the bacteria depends, like the survival time of ground scent, upon a variety of conditions, including air temperature and humidity.[185] Air temperature and humidity also affect the length of time during which the bacteria-created scent is released by altering the life-span of the bacteria and, therefore, the time period during which a dog can track a person based on that person's body odor.[186]

The bacteria-created and other components of human body odor are transmitted by skin "rafts," cornflake-shaped skin flakes approximately fourteen microns in size.[187] On average, each flake carries four microbes and may consist of one or more cells.[188] Forty thousand such cells are shed by the body each minute.[189] Each raft is surrounded by a vapor cloud and leaves the body in an upward movement of rapid hot body air currents.[190] The raft's vapor or scent cloud will last as long as the active microbes on the raft last.[191] The airborne rafts constitute "air scent."[192] But many such rafts eventually fall to the ground, some close to or on the vegetative footstep path created by the tracklayer.[193] The odor of these rafts combines with the ground scent to create what, for purposes of this Article, we will call "track scent."[194]

---

182. *Compare* W. SYROTUCK, *supra* note 160, at 23-36 (human scent comes from a basic odor that is typical of each individual and that can be varied somewhat by emotions, toiletries, clothing, and diet) *with* M. PEARSALL & H. VERBRUGGEN, M.D., *supra* note 3, at 13-19 (human scent is made up of particulate components, including skin oils and particles, perspiration, and a gaseous component).

183. W. SYROTUCK, *supra* note 160, at 32-34.

184. *Id.* at 31-34, 36.

185. *See id.* at 32-43, 59.

186. *See id.* at 32-35, 48, 59-69.

187. *Id.* at 37; *see also* M. PEARSALL & H. VERBRUGGEN, M.D., *supra* note 3, at 14-15 (using the surgical term "scurf" to describe human body rafts).

188. W. SYROTUCK, *supra* note 160, at 37.

189. *Id.*

190. *Id.* at 37-41.

191. *Id.* at 38-39.

192. *Id.* at 48-54.

193. *Id.* at 54-56, 71-74.

194. *See id.* at 67-68 (discussing the "combined vapors" of vegetative and raft scents). The term "track scent" is used here as a shorthand reference to distinguish the combining of human and vegetative scents from any discussion of those scents individually.

ɪ˅ ̤ch,

·tant[183]
nment
the in-
ime of
ime of
ːrature
length
ˌltering
during
ˌdor.[186]
ˌy odor
ˌes ap-
ke car-
· Forty
ch raft
ˌpward
ˌr scent
The
s even-
ɔotstep
mbines
Article,

m a basic
emotions,
note 3, at
particles,

, at 14-15

ɪft scents).
combining

### D.  Time and Psychology: Two Factors Affecting Scenting Accuracy

When raft and ground scents combine to form track scent, there is a brief period during which the human raft scent is stronger than the ground scent.[195] Raft scent, however, falls off rapidly while ground scent persists for a much longer period of time.[196] Consequently, a dog searching across vegetation cannot follow a particular human's scent for a long period of time.[197] There is substantial agreement that while the human scent is fresh, a properly trained dog can discriminate among the odors of different humans,[198] but that once the human odor fades the dog can no longer so discriminate.[199] Nevertheless, the dog still can distinguish one human trail from another because of differences in the intensity of each track.[200] Varying levels of intensity arise when the tracks are laid at different times as well as when the weights and foot sizes of the tracklayers differ.[201]

Glen R. Johnson's experiments illustrate these concepts. He found that dogs easily were able to distinguish between two tracklayers laying track in an ''X'' pattern when the track was only thirty minutes old.[202] This was true even when the weights of the tracklayers were substantially identical.[203] The dogs also were successful in distinguishing between tracklayers of different weights where the track was three hours old. The dogs were unsuccessful, however, on the older track when the weights of the tracklayers were substantially identical. Essentially, the experiment illustrates that the dogs were following the older track based solely on differences in ground scent intensity, not differences in human body odor.[204]

The accuracy of a dog's scent work also may be affected by a broad range of psychological factors, some of which are unique to

195.  G. JOHNSON, *supra* note 174, at 51; W. SYROTUCK, *supra* note 160, at 61.

196.  *Id.*

197.  *See* G. JOHNSON, *supra* note 174, at 39-55.; W. SYROTUCK, *supra* note 160, at 68-82.

198.  *See, e.g.,* G. JOHNSON, *supra* note 174, at 46-47. *But see* I. Brisbin, Jr. & S. Austad, *Testing the Individual Odor Theory of Canine Olfaction* (1989) (unpublished manuscript on file with the author of this Article). Brisbin and Austad challenge the ''prevailing'' theory of scent, which assumes that rafts embody a unique scent for each human. They argue instead that each person may have a unique scent for each portion of the body (for example a unique ''elbow'' scent) but that there is no single, unique scent characteristic of each person regardless of where on the person's body the scent is emitted.

199.  G. JOHNSON, *supra* note 174, at 39-55; W. SYROTUCK, *supra* note 160, at 78.

200.  G. JOHNSON, *supra* note 174, at 39-55; W. SYROTUCK, *supra* note 160, at 93-94.

201.  *See* W. SYROTUCK, *supra* note 160, at 53-54 and *infra* notes 202-204 and accompanying text.

202.  G. JOHNSON, *supra* note 174, at 43-44.

203.  *Id.* at 46-47.

204.  *Id.* at 47-48.

particular types of scent work.[205] One factor common to all scent work, however, is the existence of "minimal cues."[206] These are sub-conscious muscular twitches by the handler that suggest whom or what the handler wants the dog to identify or muscular twitches by the tracklayer or the suspect that attract the dog's attention to a particular person in a lineup.[207] The cues cannot be consciously controlled.[208]

### E.  The Types of Scenting Dogs

Each scenting dog can be classified, based on the dog's orientation toward ground scent, air scent, or a combination thereof, as fitting into one of three types: the tracking dog, the trailing dog, or the air scent or "point source" dog.[209]

A tracking dog is oriented toward vegetative vapors.[210] Although such a dog often can and will discriminate among human raft odors, that ability is short-lived and weak because of the dog's focus on vegetation.[211] Tracking dogs will not vary from the tracklayer's footsteps.[212] Moreover, the vegetative vapor upon which the dogs rely is often so similar to surrounding scents that the dog may be working hard yet end up following the wrong trail.[213] Nevertheless, these dogs are preferred for tracking competitions because the relatively longer life of vegetative scent enables the dogs to follow fairly old tracks.[214]

Trailing dogs have a stronger orientation to the rafts that have fallen to the ground on or near the tracklayer's route.[215] Because of wind and other conditions, the rafts may fall near, but not precisely on, the tracklayer's path so that the trailing dog will vary somewhat from the tracklayer's footsteps.[216] Moreover, because trailing dogs

---

205.  *See infra* text accompanying notes 519-549 (surveying the unique psychological factors present in dog scent lineups); *see also* Craig, *The Dog as a Detective*, Sci. Monthly January 1924, at 45 (discussing psychological factors in both tracking and scent lineups).

206.  F. Buytendijk, *supra* note 173, at 90 ("'[A] well-trained dog very readily responds to any signs unconsciously given by its master.'"); Craig, *supra* note 205, at 43-47 ("minimal movements," such as subconscious jerks of a leash by a handler or fearful reactions by a suspect).

207.  Craig, *supra* note 205, at 44-47; *see* F. Buytendijk, *supra* note 173, at 81, 86, 99.

208.  F. Buytendijk, *supra* note 173, at 81.

209.  W. Syrotuck, *supra* note 160, at 71-75.

210.  *Id.* at 71, 75-76, 78.

211.  *Id.* at 78.

212.  G. Johnson, *supra* note 174, at 26; W. Syrotuck, *supra* note 160, at 71-72.

213.  W. Syrotuck, *supra* note 160, at 76.

214.  G. Johnson, *supra* note 174, at 21, 23, 26.

215.  W. Syrotuck, *supra* note 160, at 71.

216.  G. Johnson, *supra* note 174, at 26-29; W. Syrotuck, *supra* note 160, at 71, 73, 76-77.

focus on both human and vegetative scents, such dogs sometimes
inadvertently focus on the often predominant vegetative scent.[217]
Careful training by a highly skilled handler, however, often can pre-
vent this problem.[218]

Air-scenting dogs are oriented primarily to airborne rafts, often
ignoring ground scent entirely.[219] They may draw on the human raft
portion of ground scent if that portion is compatible with the air
scent.[220] Air-scenting dogs follow increasing levels of human odor
intensity until reaching the source of the odor and, therefore, often
are called "point source" dogs.[221]

Point source dogs can be used either for "detection" or "dis-
crimination."[222] "Detection" merely requires a dog to react when a
particular substance is present but does not require the dog to dis-
tinguish that substance from other similar substances.[223] "Discrim-
ination" by contrast requires a dog to tell apart similar substances.[224]
As applied to the tracking of human scent, a point source *detector*
dog is trained to react to the presence of any human.[225] An avalanche
victim locator dog is an example.[226] A point source *discriminator* dog,
on the other hand, is trained to react only to the scent of the par-
ticular human being tracked.[227]

The difference is important because, for example, searching for
plane crash survivors requires a dog who will react to *any* person's
presence (a "point source detector dog"), but tracking humans flee-
ing from the scene of a crime requires a dog who only will react to
a scent matching one at the crime scene (a "point source discrimi-
nator dog"); a dog who reacts to the scent of humans not present
at the crime scene (a "detector") may incorrectly "identify" a person
as the wrongdoer.[228]

"Detection" and "discrimination" also are important concepts
when dealing with dogs trained to locate substances instead of peo-
ple. For example, narcotics detector dogs often are trained to react
to a broad range of illegal substances but not to distinguish between

217. W. Syrotuck, *supra* note 160, at 76.
218. *Id.*
219. *Id.* at 75-77.
220. *Id.* at 76.
221. *Id.* at 79-81.
222. *Id.*
223. *See id.* at 81-82.
224. *See id.* at 80-82.
225. *See id.*
226. *Id.* at 80.
227. *Id.*
228. *See id.* at 81-83.

marijuana and morphine.[229] This training for "detection" instead of discrimination is critical because police generally seek a dog who will react to *all* illegal substances, not one who finds heroin but ignores crack.[230]

These distinctions among the types of dogs are important because using a dog trained for one purpose to accomplish another may lead to misidentification.[231]

**F.  Recognizing the Science Behind Scent Lineups: A Tool for Crafting Fair Lineup Procedures**

This brief review of the science of scenting permits certain tentative distinctions to be drawn among tracking, narcotics detection, and scent lineups. These distinctions in turn suggest certain minimal requirements for a fair scent lineup.

First, scent lineups require discrimination, not merely detection. The discrimination must be among scents within the particular class of human body odors. Consequently, dogs trained only in detection will not offer trustworthy identifications in lineups.[232] Furthermore, dogs trained to discriminate among non-human scents also may not be reliable for lineups. Accordingly, the worst type of dog to use in a lineup would be an animal trained to detect non-human scents, the most obvious example being the narcotics detector dog. Similarly, tracking dogs, because of their focus on non-human scents, should not be used in lineups. Trailing dogs, while somewhat better than trackers, are also unreliable because they may mistakenly follow the vegetative rather than the human scent. Human discriminating point source dogs offer the most reliable results, although for reasons noted below even point source dogs are not ideal for lineup identifications.

Second, lineups often take place after a much greater lapse in time between the crime and the scenting than is the case with a track-

---

229. *Id.* at 81.

230. *Id.* at 81-82. It is also useful to remember that the distinctions among "tracking," "trailing," and "air scenting" dogs are not relevant in narcotics detection because neither vegetative scent nor human scent is being sought but rather only the scent of the illegal substance. *See id.* at 79-83. Because narcotics detector dogs are trained to locate narcotics odor and to follow increasing levels of that odor's intensity until reaching the source of the odor, however, such dogs often are called "single element" point source dogs. *See id.* at 79-80. The phrase "single element" apparently is intended to emphasize that the dogs are trained to detect only narcotics (not necessarily only one type of narcotic) but not other substances, such as natural gas or explosives. *Id.*

231. *See id.* at 82 ("The dog must distinguish between the criminal and non-criminal . . . . This must be treated with caution as vegetative vapour trained dogs may point out the wrong person.").

232. *See supra* text accompanying notes 229-231; *infra* text accompanying note 540.

Case 3:07-cv-05416-JSW    Document 10-2    Filed 06/25/2008    Page 33 of 55

ing.[233] Special care, therefore, must be taken only to conduct lineups within the time limits that controlled experiments have indicated a particular scenting dog can still successfully differentiate the wrong-doer's scent from those of others.[234]

Third, a dog's ability to track someone despite "crossed lines" should not be taken as proof that the dog can select matching scents in a lineup. "Crossed lines" result when numerous persons walk across the tracklayer's earlier laid path.[235] The dog's ability to select the correct path after a significant lapse in time, such as three hours, shows only that he can distinguish among differing intensities of scents, not that he can distinguish accurately among different human scents of similar intensity.[236]

Fourth, even a tracking or trailing dog who has demonstrated an apparent ability, at least under certain conditions, to distinguish among human scents of the same intensity cannot necessarily be trusted to perform accurately in a lineup. Because dogs generally react to odor groups rather than individual odors, elimination of key odors from a scent group creates a whole new challenge for the dog.[237] Thus a dog who has proven his ability to distinguish among different combinations of ground and human scent will not necessarily be accurate in distinguishing among human scent groups alone. Use of air scenting dogs, therefore, is preferable because they focus on human scent only. Ultimately, however, dogs are most trustworthy when they are trained for a single specific scenting task.[238] This is particularly true in the case of dogs used in scent lineups because unique scenting problems face a dog employed in a lineup circumstance.[239] Consequently, the best candidate for performing lineups is a dog

233. *Compare* S. BRYSON, *supra* note 3, at 226-27 (suggesting, depending upon the conditions, upper time limits for successful tracking from a few hours to 30 hours) *with* United States v. Gates, 680 F.2d 1117 (6th Cir. 1982) (eight-month delay between crime and scent lineup).

234. See *infra* text accompanying notes 383-390 for a discussion of the maximum permissible time lag between the crime and the scent lineup.

235. B. LOWE, *supra* note 43, at 67 ("crossed lines"); *accord* G. JOHNSON, *supra* note 174, at 44-49 ("crosstracks").

236. *See* G. JOHNSON, *supra* note 174, at 39-48.

237. *See supra* text accompanying notes 168-173.

238. *See* W. SYROTUCK, *supra* note 160, at 81-82 (emphasizing the importance of using dogs with different types of training to perform different scenting tasks); Hepper, *The Discrimination of Human Odour by the Dog*, 17 PERCEPTION 549, 550 (1988) (dogs were specifically trained for the task that they were called upon to perform in an experiment); Letter from Brigadier Jan de Bruin to Andrew E. Taslitz (June 26, 1989) [hereinafter Letter II] (on file at the *Hastings Law Journal* office) (recommending the use in scent lineups of only dogs specially trained for that task).

239. *See infra* text accompanying notes 514-544.

specially trained for lineup identifications and shown to have a proven track record of reliably identifying defendants in lineups. Although a dog specially trained for lineups but also trained in other scenting tasks is not nearly as ideal as an exclusive lineup specialist, such a dog is by far preferable to a dog trained for tracking or trailing but not for lineups.

Fifth, lineups must be "blind," that is, conducted by a handler who not only has no idea whom the police suspect, but also has insufficient information regarding the case to form his own opinion as to who is the probable wrongdoer. Without such "blindness," even a highly skilled and unquestionably honest handler will convey "minimal cues" that will reduce the likelihood of an accurate identification.[240]

Sixth, lineup participants themselves may convey "minimal cues" that may affect the dog's performance.[241] Consequently, either object lineups should be used or human lineups must be designed to block the dog from seeing lineup participants.

Finally, unique psychological factors—which will be discussed in a later section of this Article—may affect a dog's performance in a lineup.[242] Special controls therefore must be designed to minimize or eliminate the effects of these factors.[243]

## III. Evidentiary Objections to Dog Scent Lineups

The answers to two questions guide much of the law of evidence, particularly the law governing scientific evidence. First, what impact will this evidence have on the jury? Second, how trustworthy is this evidence?[244] The first question requires the court to consider such

---

240.  *See supra* notes 206-208 and accompanying text.

241.  Craig, *supra* note 205, at 46.

242.  *See infra* text accompanying notes 514-544.

243.  Several of these seven suggestions already have been adopted in the Netherlands. *See infra* text accompanying notes 522-548.

244.  *See, e.g.,* Doyle, *Applying Lawyers' Expertise to Scientific Experts: Some Thoughts About Trial Court Analysis of the Prejudicial Effects of Admitting and Excluding Expert Scientific Testimony,* 25 WM. & MARY L. REV. 619, 620-22 (1984) (noting that the fears of jury misuse of science, particularly "bad science," guide the law of scientific evidence); Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness,* 1986 U. ILL. L. REV. 43, 44 (1986) ("Trustworthiness of expert witness opinion testimony today is a critical question in much if not most litigation . . . ."); Imwinkelried, *The Standard for Admitting Scientific Evidence: A Critique from the Perspective of Jury Psychology,* 28 VILL. L. REV. 554, 564 (1983) [hereinafter Imwinkelried, *Critique*] ("The combined effect of these criticisms—the level of error in forensic analysis and the jury's supposed inability to critically evaluate the evidence—is a powerful argument for caution in the admission of scientific proof.").

matters as whether the evidence will inflame the jurors' passions so that they will decide the case based on their emotions, not based on reason; whether jurors can and will give the evidence its appropriate weight; and whether, if given appropriate instructions, they can and will use the evidence only for its proper purposes.[245] The second question is related to the first, in the sense that courts are less afraid that juries will misuse evidence when that evidence is known to be highly trustworthy.[246]

This Article began by examining the myth of canine infallibility because that myth offers guidance in determining what impact scent lineup evidence will have on juries. The Article next examined the scientific understanding of what it is that dogs scent and how they do so because science sheds light on the trustworthiness of scent lineups. The question of trustworthiness—and ways to improve trustworthiness—is addressed in greater detail below, detail that cannot be understood without the scientific background summarized in Part II of this Article.

Myth and science thus provide a framework for examining the host of potential evidentiary and constitutional objections to scent lineups that are addressed below.

## A.  The *Frye* Rule

### (1)  Are Scent Lineups "Scientific" Evidence?

The classic test for the admissibility of scientific evidence was articulated in *Frye v. United States*:[247]

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.[248]

---

245.  *E.g.*, M. GRAHAM, EVIDENCE: TEXT, RULES, ILLUSTRATIONS AND PROBLEMS: THE COMMENTARY METHOD 20, 22 (1983) (noting concerns that a jury may decide based on "sympathy, hatred, contempt, retribution, or horror" or may overvalue the probative worth of particular evidence); *infra* notes 675-684 and accompanying text (discussing using jury instructions to control the weight jurors give evidence).

246.  *See infra* notes 247-283, 409-450 and accompanying text.

247.  293 F. 1013 (D.C. Cir. 1923).

248.  *Id.* at 1014.

Recently, there has been much dispute over whether the *Frye* test makes sense.[249] The test has been attacked as too vague and difficult to apply, as too conservative, and as too liberal.[250] Whatever the merits of the test, it remains an obstacle to admissibility of evidence in many jurisdictions,[251] and in many other jurisdictions the *Frye* general acceptance requirement is still a factor that guides the court's admissibility decision.[252]

*Frye* only applies, however, to "scientific" evidence.[253] The courts' failure to address adequately or, for that matter, to address at all the threshold question of what constitutes scientific evidence has led the courts to apply *Frye* in some cases but not in others, without a reasoned basis for distinguishing among them.[254] The courts have found it particularly difficult to address the application of *Frye* to two types of dog scenting evidence: tracking and lineups.

a.   The Tracking Analogy

In *People v. Craig,*[255] the court at least implicitly confronted the threshold question of whether tracking is "scientific" evidence within the meaning of *Frye.* Defendant Craig appealed his robbery conviction on the ground that dog tracking evidence was improperly admitted at trial, in violation of the *Frye* standard. The court of appeals rejected Craig's challenge and concluded that *Frye* governs inanimate scientific techniques but not the ability of a properly trained animal to utilize a "subjective, innate capability."[256] The court reasoned that, with inanimate scientific techniques, one piece of testing apparatus is essentially the same as another. Since each dog has different abilities, however, those special abilities must be demonstrated on an individual basis.[257] The court found such a showing based on the testimony of Robert Outman, a dog trainer who had trained both

249. *See, e.g., Rules for Admissibility of Scientific Evidence,* 115 F.R.D. 79 (1986) [hereinafter *Rules for Admissibility*]; *Symposium on Science and Rules of Evidence,* 99 F.R.D. 187 (1983).

250. *E.g.,* Giannelli, *The Admissibility of Novel Scientific Evidence:* Frye v. United States, *a Half-Century Later,* 80 Colum. L. Rev. 1197, 1208-28 (1980) (summarizing criticisms of *Frye*).

251. Black, *A Unified Theory of Scientific Evidence,* 56 Fordham L. Rev. 595, 601 (1988) (noting that *Frye* still is followed in most jurisdictions).

252. *E.g.,* United States v. Downing, 753 F.2d 1224, 1238 (3d Cir. 1985).

253. Giannelli, *supra* note 250, at 1219; McCord, *supra* note 30, at 1181, 1189.

254. *See, e.g.,* McCord, *supra* note 30, at 1181-89.

255. 86 Cal. App. 3d 905, 150 Cal. Rptr. 676 (1978).

256. *Id.* at 916, 150 Cal. Rptr. at 682.

257. *Id.* at 915, 150 Cal. Rptr. at 682.

Bobby, the dog involved in the case, and Bobby's handler. Because Outman testified that Bobby had a one hundred percent accuracy record in training and in four actual cases, the court held that there was ample proof of reliability to justify admitting the results of Bobby's tracking.[258]

The *Craig* court's conclusion that the *Frye* test does not apply to expert testimony when the testimony's value depends in part on the proper training of a subjective, innate ability directly contradicts earlier California case law. Thus, for example, the California courts have applied *Frye* to testimony by voice identification experts, who often partly base their opinion that two voices are identical on an aural comparison; each expert listens to two voices and concludes, with his trained ear, that the voices sound alike.[259] Obviously, the value of the expert's opinion turns both on his subjective, innate ability to distinguish among similar voices and on the proper training of that ability. There is no conceptual difference between the voice identification and tracking cases, even though one depends upon the training of a human ability and the other upon that of a canine.

Examining the purposes behind the *Frye* standard makes this point clearer. *Frye* is designed to screen out expert evidence that the jury cannot properly evaluate. The jury's inability to evaluate certain evidence usually is a result of its tendency to be "overawed" by certain types of experts.[260] Such evidence will be admitted under *Frye*

---

258.  *Id.* at 916-17, 150 Cal. Rptr. 682-83.

259.  People v. Kelly, 17 Cal. 3d 24, 29, 549 P.2d 1240, 1243, 130 Cal. Rptr. 144, 147 (1976); *accord* R. LEMPERT & S. SALTZBURG, A MODERN APPROACH TO EVIDENCE: TEXT, PROBLEMS, TRANSCRIPTS AND CASES 969 (2d ed. 1983). A voice identification expert also bases his opinion on a visual examination of a "spectrogram," which is a graphic representation of each human voice plotted by time, frequency, and intensity. *Kelly,* 17 Cal. 3d at 29, 549 P.2d at 1243, 130 Cal. Rptr. at 147. Although the expert's opinion thus turns in part on purportedly objective data (the spectrogram), he offers his opinion to a specified level of certainty because of the combination of this data with his subjective belief that, to his "trained ear," the two voices sound alike. Consequently, if his trained ear is not effective in matching voices, the expressed level of certainty of his opinion is subject to attack, and indeed, if the spectrogram itself is inconclusive, the exercise of his trained ear may be *the* factor that raises his opinion from uncertainty whether two voices match to a clear declaration that they are from the same person. Additionally, the spectrogram is not as "objective" as it may first appear because no scale governs the examiner's determination that the graphic representations of the voices look alike. *See* Lewis, *The Element of Subjectivity in Interpretation of Test Results,* in SCIENTIFIC AND EXPERT EVIDENCE 429 (E. Imwinkelried 2d ed. 1981) ("The nadir of unstructured subjectivity may be the recently developed technology popularly known as voiceprint . . . . The interpretation [of the voiceprint] is an individual reaction on the examiner's part, which borders on the intuitive and is not susceptible to objective verification.")

260.  *See Ex Parte Hinton,* 548 So. 2d 562, 569 (Ala. 1989) (polygraph results inadmissible because of danger that jury will be "overawed"), *cert. denied,* 110 S. Ct. 419 (1989); State

only if there is an independent guarantee of trustworthiness. *Frye* provides that guarantee by ensuring review of the evidence's accuracy by a "minimal reserve" of unbiased experts.[261] The need for such a review exists whenever the jury is likely to be overawed by the expert and does not depend on whether the expert's opinion relates to the use of inanimate instruments that are substantially identical in every case or animate instruments such as dogs, the reliability of which may vary with the particular instrument being used.

A hypothetical situation illustrates this point. If, as was the case in *Craig,* jurors with preconceived notions of canine infallibility listen to a dog trainer testify that his particular dog is one hundred percent accurate, the jury likely will give that testimony tremendous weight. This result, however, is only acceptable if the testimony is supported by scientific research showing that at least some dogs are capable of nearly perfect discrimination among human scents. If scientific experimentation in fact reveals that dogs are inaccurate at scent discrimination, and some researchers indeed have made this claim,[262] a jury verdict based largely on the dog trainer's testimony would be based on misleading evidence. Applying *Frye* in such circumstances would minimize this danger because the trainer's testimony would be admitted only after proof that a substantial segment of the scientific community accepts the reliability of the dog's ability to discriminate among human scents.

Looked at from yet another perspective, *Craig* makes a different logical error in concluding that the fact that the law requires each dog's abilities to be demonstrated on an individual basis renders dog-scenting evidence "non-scientific." To the contrary, this individualized inquiry into whether a scientific instrument is in proper working order is common to, and an essential part of, the legal concepts governing admissibility of "scientific" evidence. The accuracy of any scientific test depends on the validity of both the underlying scientific principles and the instrument applying those principles, as well as on the calibration and testing of the instrument to ensure that it is in proper working order.[263] Thus, the accuracy of dog scent discrimi-

v. Rimmasch, 775 P.2d 388 (Utah 1989) (whether jury will be "overawed" was critical factor in determining whether to admit expert testimony regarding child abuse); *see also* Starrs, Frye v. United States *Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702,* 26 JURIMETRICS J. 249, 250 (1986) (noting that "juries give overweening deference to scientific evidence, regardless of its validity within the scientific community.").

261. United States v. Addison, 498 F.2d 741, 744 (D.C. Cir. 1974); Giannelli, *supra* note 250, at 1208, 1215-16 (noting that an impartiality requirement better serves *Frye's* purposes).

262. *See infra* text accompanying notes 363-372, 382 and accompanying text.

263. *See infra* text accompanying notes 451-456.

nation depends upon the accuracy of the underlying scientific principle that human scents are unique.[264] Moreover, dogs, as the instruments, must be shown to be capable of discriminating among these scents. In each case the particular dog must be proven to be properly trained, that is, "calibrated," and his individual ability to discriminate accurately among human scents must have been tested on the occasion in question.[265] A "calibration" requirement, therefore, helps to ensure that application of a scientific technique on a particular occasion is accurate. It does not, however, alter the essential nature of that technique as scientific or remove the necessity for an initial inquiry into whether the technique and the principles on which it is based are valid.

b.   The Lineup Cases

*Craig*'s logic—that *Frye* does not govern techniques that rely on the subjective, innate capabilities of animals—would, if accepted, bar *Frye*'s application to all dog scenting feats, including dog scent lineups. Indeed, some lineup cases have rejected *Frye*'s application although they have done so based on a very different theory than that articulated in *Craig*.

*State v. Roscoe*[266] is one such case. In *Roscoe,* the appellate court affirmed the trial court's admission of scent lineup evidence over the defendant's objection that the evidence was not generally accepted among members of the scientific community.[267] Surprisingly, the appellate court reasoned that, since it did not consider scent lineup evidence to be scientifically based, proof of its acceptance by the scientific community was not necessary in order for the evidence to be admitted. The court noted that "it was not the theories of Newton, Einstein or Freud which gave the evidence weight"[268] because no one knows how or why the dog did what it did. The court concluded that the jury's verdict need not be based on scientific principles, but instead could be based on the credentials and integrity of the dog's handler, John Preston, and the "simple idea" that, when

264.   *See infra* text accompanying notes 328-338.

265.   *See infra* text accompanying notes 451-456.

266.   145 Ariz. 212, 700 P.2d 1312 (1984), *cert. denied,* 471 U.S. 1094 (1985).

267.   More specifically, the defendant argued that two claims were not generally accepted: (1) the claim that trained dogs can perform scent identification lineups in addition to tracking; and (2) the claim that such dogs can either track or identify after a long hiatus between the time the scent is laid down on the scene and the time at which the dog is put on the scent. *Id.* at 218-19, 700 P.2d at 1318-19.

268.   *Id.* at 220, 700 P.2d at 1320.

properly trained and handled, dogs can discriminate among human odors.[269] Moreover, the court suggested that because the handler's credentials and integrity were effectively probed and tested, his testimony did not so overawe the jurors as to render them incapable of evaluating the testimony effectively from their own knowledge.[270]

The *Roscoe* court's conclusion that the jury's verdict was not based on what commonly are understood as scientific principles is plainly wrong. Even if the scientific basis was not explicitly articulated in the testimony, without the unspoken scientific assumption that the biology of his dog's nose somehow enabled it to discriminate among human scents, the dog handler's testimony would be completely irrelevant.[271] This assumption was given an air of pseudo-scientific validity when Preston claimed that his own observations in hundreds of cases demonstrated his dog's reliability. Further, the implication of scientific infallibility crept in when Preston was allowed to explain to the jury the need for "blind lineups." Because the phrase "blind lineups" *sounds* scientific, it was likely to lead the jury to perceive Preston as not simply a dog handler but rather an individual versed in the science of devising carefully planned, accurate, and fair lineups. His testimony about his observations in other cases thus may have seemed to the jury to be a description of the results of hundreds of carefully designed individual experiments. In effect Preston's testimony derived its weight from science, thereby creating an unquestionable need for the application of *Frye*.

The *Roscoe* court also incorrectly concluded that dog scenting evidence does not derive its weight from "scientific" theory and that *Frye* therefore does not apply because "no one knows exactly how or why some dogs are able to track or scent, or the degree to which they are able to do so."[272] The court failed to recognize that ig-

269.  *Id.*

270.  *See id.* at 219-20, 700 P.2d at 1319-20.

271.  Indeed, the *Roscoe* court acknowledged that the scent lineup evidence was offered at trial on the theory that it is "common knowledge that some dogs, when properly trained and handled, can discriminate between human odors." *Roscoe,* 145 Ariz. at 219-20, 700 P.2d at 1319-20. The court concluded that there was "some support for this in the scientific literature." *Id.* at 220 n.2, 700 P.2d at 1320 n.2. Curiously, however, the court viewed the existence or non-existence of scientific support for this "common knowledge" as irrelevant because the scientific data was not the basis for the presentation of the evidence to the jury. *Id.* Even more curiously, the court, in the context of a collateral attack by Roscoe on his conviction, recently has reaffirmed its general approach to scent lineup evidence as "non-scientific," *see* State v. Roscoe, No. CR-89-0160-PC, slip op. at 5 (Ariz. Oct. 19, 1989), but, in doing so, has conceded that "there was and is not demonstrable scientific acceptance in the relevant scientific community for Preston's techniques." *Id.*

272.  *Id.* at 219, 700 P.2d at 1319.

norance of scientific principles and lack of sufficient scientific and experimental proof is precisely what *Frye* seeks to guard against. In fact, as two well-known commentators on the law of evidence have noted, this particular concern of *Frye* is especially important in criminal cases. According to Andre A. Moenssens and Fred E. Inbau:

> In criminal cases, where an individual's freedom is at stake, courts certainly ought to be very cautious in admitting evidence based upon insufficiently tested or verified premises, especially when the evidence seeks to establish the ultimate issue in the case—the identification of the accused as the perpetrator of the offense. It would appear that when this is the issue, there may be occasions when the more exacting general acceptance test of *Frye,* despite its deficiencies, should be followed.[273]

This comment is directly relevant to scent lineups, which often are the only direct evidence of the perpetrator's identity. The courts therefore must be "very cautious" in admitting such evidence, a caution well served by the application of *Frye.*

c.   Juror Inability to Evaluate Lineup Evidence Fairly

Even if it is conceded that scent lineups are not based on any scientific theory as that term is commonly understood, *Frye* should apply whenever jurors are likely to be in awe of expert evidence.

It is highly likely that jurors will be overawed by dog scenting evidence. Psychology, however, offers little to support or refute this conclusion, since the existing psychological studies regarding the effect of expert testimony on juries are scant, confusing, and conflicting.[274] Nor should the court's own sense of what will overawe the jury be the guidepost, since such a measure would be subjective and offer little in the way of reasoned guidance to the analysis. Resort to mythology, however, provides an objective standard for resolving the problem of jury overawe.

As discussed throughout this Article, there is no question that the myth of the dog's infallible scenting abilities exists and survives across generations, despite repeated, reasoned attacks. The *Roscoe*

---

273.  A. MOENSSENS, F. INBAU & J. STARRS, SCIENTIFIC EVIDENCE IN CRIMINAL CASES 12 (3d ed. 1986).

274.  *E.g.,* R. HASTIE, S. PENROD & N. PENNINGTON, INSIDE THE JURY 8 (noting that judicial reluctance to use social science research results regarding juries "derives from the lack of extensive empirical research on some of the legally significant aspects of jury performance"). *Compare* Massaro, *supra* note 27, at 444 (noting lack of empirical evidence that jurors are overawed by mental health experts) *with* Imwinkelried, *Critique, supra* note 244, at 570 (conceding that there is "meager data" regarding the ability of juries to evaluate expert testimony but summarizing several studies which suggest that sometimes juries can indeed evaluate such evidence properly).

court itself, while rejecting application of the *Frye* standard, nevertheless recognized the existence of the myth and even noted that some states prohibit dog scenting evidence because of a fear that jurors will be misled by "folklore superstitions that attach to bloodhounds and their ability to track."[275] The *Roscoe* court further conceded that there is "some likelihood that jurors may give such evidence considerable weight."[276] Indeed, to counteract this possibility, the court suggested that demonstrations in the courtroom or on film would be advisable.[277] The court further declared that it "would have been better if the trial court had required some independent verification of the dog's abilities."[278] Nevertheless, despite the absence of both verification and the recommended demonstrations, the court upheld the admissibility of the lineups in the case before it. It refused to reach the logical conclusion that its own analysis suggested: jurors will view scent lineups as possessing precisely the kind of mythic infallibility that calls for the application of *Frye*.

Furthermore, factors other than the probability that the jury will be overawed suggest that juries are incapable of fairly evaluating dog scent evidence and, consequently, that *Frye* should apply.[279]

First, only minimal literature currently is available for defense lawyers to use in developing effective cross-examinations. Second, few qualified scientific experts are available to testify on dog scenting and to assist in trial preparation.[280]

Third, the dog's scenting record often is offered as being perfect or nearly so (for example, the "100% accuracy" rate attributed to the dog in *Craig*)[281] while the jury has little information available to challenge that image. Such descriptions reinforce the myth that already has taken hold in the jurors' minds. Fourth, although dog scenting evidence has been used for centuries,[282] experimental research, particularly with regard to the accuracy of dog scent lineups,[283] still is in its infancy. It therefore may be advisable to keep

275.  145 Ariz. at 220, 700 P.2d at 1320.
276.  *Id*. at 221, 700 P.2d at 1321.
277.  *Id*.
278.  *Id*.
279.  The four factors considered below are based on analyses of *Frye*-related questions suggested by Professors Saltzburg and McCord. *See* McCord, *supra* note 30, at 1188.
280.  Professor I. Lehr Brisbin, Jr., a well-known specialist in dog-scenting and research professor at the University of Georgia, has suggested that only a handful of truly qualified experts are available. Professor Brisbin also has bemoaned the dearth of scientific literature and the need for further research. Telephone interview with I. Lehr Brisbin, Jr. (June 1, 1989).
281.  People v. Craig, 86 Cal. App. 3d 905, 917, 150 Cal. Rptr. 676, 683 (1978).
282.  *See supra* text accompanying notes 34-64.
283.  *See supra* note 280; *infra* text accompanying notes 328-356.

u nev-
ted that
ear that
o blood-
her con-
evidence
ility, the
on film
uld have
ent veri-
absence
he court
t refused
d: jurors
ythic in-

jury will
ting dog
79

· fense
Second,
scenting

g perfect
buted to
ilable to
that al-
ugh dog
ental re-
ent line-
 to keep

this incomplete and inconclusive scientific picture from the jury.

In short, reliable jury decision-making can be served best, in those jurisdictions still using the *Frye* test, by *Frye*'s application to scent lineup evidence.

### d.  The Novelty Question

Once it is understood that dog scent evidence is or should at least be treated as "scientific" evidence, one potential question regarding *Frye*'s application still remains: is such evidence generally, and lineup evidence in particular, sufficiently "novel" that *Frye* should apply?[284] The simple answer is that "novelty" should be irrelevant. The rule that *Frye* governs the admissibility of "novel" scientific evidence apparently has its roots in Professor Giannelli's comprehensive article on *Frye*.[285] The novelty requirement is best understood, however, as a simple statement that once a scientific technique is generally accepted, the question is no longer "novel" and need not be relitigated. Thus, if the question has never been litigated, the "novelty" requirement should be no bar to raising *Frye*. Similarly, even where general acceptance has been demonstrated once in litigation, the "novelty" requirement should not bar relitigation if the scientific community changes its mind when further research reveals that a previously trusted technique no longer is valid.

Although dog scenting evidence has been used in one form or another for centuries, the general acceptance of such evidence rarely

---

284.  Starrs, *supra* note 260, at 252-53 (noting *Frye*'s "novelty" requirement).

285.  *Id.* at 252-53 (attributing the novelty requirement to Professor Giannelli). Professor Starrs' article provides an excellent critique of the "novelty" requirement. The requirement, he notes, is ill-defined and often presents pointless and time-consuming foundational problems for trial courts. *Id.* He asks whether "novel" means historically "new" to the scientific world. If so, will historically "old" techniques not be subject to *Frye* even where scientific research has resulted in rejection of those techniques by most of the scientific community? *Id.* at 253. Clearly, it would be illogical to answer "yes" to this last question. Similarly, what can guide a court in determining whether a new technique that offers but a "twist" on an old principle is truly "novel"? Moreover, science might accept one use of an old technique but not a new and "novel" use. Surely the courts should not approve an application of the technique where that new application is not yet accepted by the scientific community. Additionally, if *Frye* does not apply to old techniques, the courts will have to ignore scientific developments revealing that a once valued technique is indeed not trustworthy. *Id.* at 253. In short, the "novelty" requirement defeats the very purposes of *Frye* unless the requirement is but a judicial time-saving device; that is, a kind of "judicial notice." Professor Starrs cautions against even this role for the "novelty" rule, rejecting the rule altogether. Accordingly, the only logical meaning for the novelty requirement is that assigned in the text of this Article: to bar relitigation of scientific reliability questions unless new evidence sheds a different light on the inquiry.

ed questions
1188.
ind research
ily qualified
fic literature
Jr (June 1,

978).

has been tested.[286] Consequently, the "novelty" requirement does not bar application of *Frye.* This conclusion is even stronger, however, regarding scent lineups since such lineups apparently did not enter widespread use until the 1980s.[287] Lineup evidence thus truly is "novel" and therefore at a minimum must survive *Frye* before being presented to the jury.[288]

### (2)  Is the Frye Test Met?

Only three cases have addressed, even indirectly, whether scent lineups pass the *Frye* test. In one such case, *United States v. McNiece,*[289] the defendant objected to the use of scent lineups because the relevant scientific community generally had not accepted the principle that each person has a unique scent.[290] The court, however, applied a relevancy test in which the *Frye* general acceptance rule was but one factor, and concluded that the lack of general acceptance was unimportant.[291] The court noted that the jury was likely to perceive the actions of an animate, nonmechanical instrument such as the dog as subject to error.[292] Ignoring the implications of the dog's mythic infallibility, the court concluded that evidence of an object lineup conducted fully twenty-one months after the crime was admissible.[293]

In a second case, *United States v. Gates,*[294] the court upheld the admission of lineup evidence because the five-factor test for the admissibility of *tracking* evidence had been passed. The majority never considered *Frye.* Circuit Judge Kennedy, in a concurring opinion, concluded that the lineup evidence should not have been admitted because no foundation was laid to establish either that scent lineups were reliable or that they were generally accepted as such in the relevant scientific community. Nevertheless, Judge Kennedy concurred in the result, finding that the error was harmless "in light of the overwhelming evidence of appellant's guilt."[295]

*Ramos v. State,*[296] is the only case involving a scent lineup in which a conviction was reversed by an appellate court and remanded

---

286.  *See supra* text accompanying notes 255-272.
287.  *See supra* notes 141-144 and accompanying text.
288.  *See infra* text accompanying notes 289-353.
289.  558 F. Supp. 612 (E.D.N.Y. 1983).
290.  *Id.* at 615.
291.  *Id.* at 615-16.
292.  *Id.* at 615.
293.  *Id.* at 617.
294.  680 F.2d 1117 (6th Cir. 1982).
295.  *Id.* at 1120 (Kennedy, J., concurring).
296.  496 So. 2d 121 (Fla. 1986).

[Vol. 42

for a new trial because of the prosection's failure to establish the reliability of the lineup evidence. The *Ramos* court rejected the prosecution's argument that testimony of a police officer and of the dog's handler was sufficient to establish such reliability.[297] Although the court acknowledged that the United States Supreme Court previously had approved the use of drug sniffer dogs, and that the Supreme Court of Florida itself previously had approved the use of tracker dogs,[298] the court held that tracking and narcotics detection were "not the same" as scent lineups.[299] The court found that the issue of reliability of dog scent lineups was a question of first impression, and therefore, absent adequate proof of the reliability of scent lineups at trial, the defendant's conviction for first degree murder and his subsequent death sentence could not stand.[300] The court, however, did not frame its analysis in terms of the *Frye* general acceptance requirement, but instead focused on evidence of "reliability."[301]

These cases illustrate that the case law offers little guidance in determining *Frye*'s application to scent lineups. Because analogy to the facts of similar cases is unavailing, whether dog scent lineups meet the *Frye* test can be determined only by examining the basic definitions of the terms comprising the *Frye* rule, the methods for proving "general acceptance," and the policies to be served by applying *Frye*.

First, the "relevant scientific field" must be defined.[302] Many scientific techniques do not fall within any one academic discipline.[303] For example, voiceprint analysis, which seeks to match a known and an unknown voice as coming from the same person "requires knowledge of anatomy, physiology, physics, psychology, and linguistics."[304] Similarly, scent lineup analysis requires knowledge of canine and human anatomy, physiology, physics, psychology, chemistry, and osphresiology.[305] Defining what constitutes the relevant field often pre-determines whether *Frye* is met. Thus, if the field of voice-

297. *Id.* at 123.

298. *Id.*

299. *Id.*

300. *Id.*

301. *Id.*

302. Giannelli, *supra* note 250, at 1208-10.

303. *Id.* at 1208.

304. People v. Kelly, 17 Cal. 3d 24, 34, 549 P.2d 1240, 1246, 130 Cal. Rptr. 144, 150 (1976).

305. *See, e.g.,* W. McCartney, *supra* note 169, at 1-15. "Osphresiology," the study of the sense of smell, is a word no longer found in the dictionary, but the use of which McCartney, in his classic work on the subject, has revived. *See id.* at 10.

THE HASTINGS LAW JOURNAL [Vol. 42

print analysis is defined to consist of the technicians who administer voice spectrograms, such technicians unquestionably will declare voiceprint analysis "generally accepted."[306] On the other hand, if the field is defined more broadly to include research scientists in many of the fields noted above, the opposite declaration will result.[307]

The best approach is to define the relevant field to include scientists who either have conducted research regarding the relevant principles and techniques or are familiar with and capable of critiquing such research.[308] Testimony regarding general acceptance among such scientists should be offered only by one of their number who does not make his living from application of the technique in question.[309] This approach has several advantages. *Frye*'s purpose is to ensure some minimal guarantee that evidence is trustworthy.[310] The general acceptance requirement achieves that purpose by assuring that "those most qualified to assess the general validity of a scientific method will have the determinative voice."[311] Clearly, scientists are most qualified to assess the validity of a scientific method. This assertion is better understood when it is emphasized that the *Frye* requirement only makes sense if "general acceptance" refers to acceptance of the results of, and the inferences drawn from, scientific experimentation. After all, it is experimentation that demonstrates the value of a scientific technique.[312] Only a scientist is

---

306. *See Kelly,* 17 Cal. 3d at 39-40, 549 P.2d at 1249-50, 130 Cal. Rptr. at 153-54.

307. *See* J. TARANTINO, STRATEGIC USE OF SCIENTIFIC EVIDENCE 132-33, 135 (1988).

308. *See* People v. Kelly, 17 Cal. 3d at 38, 549 P.2d at 1249, 130 Cal. Rptr. at 153; Moenssens, *Admissibility of Scientific Evidence—An Alternative to the Frye Rule,* 25 WM. & MARY L. REV. 545, 548-51 (1984).

309. Giannelli, *supra* note 250, at 1215-16; *see Kelly,* 17 Cal. 3d at 38, 549 P.2d at 1249, 130 Cal. Rptr. at 153.

310. Giannelli, *supra* note 250, at 1206-08.

311. United States v. Addison, 498 F.2d 741, 743-44 (D.C. Cir. 1974).

312. Moenssens, *supra* note 308, at 556-57. Professor Moenssens points out that a technique should pass through six stages before it may be admitted at trial:

    Stage 1: A theory is postulated.

    Stage 2: Experiments are designed to verify the validity of the theory.

    Stage 3: If the theory's validity is not disproved after a searching inquiry and empirical testing, it is "proven" valid and a court then appropriately may take judicial notice of the theory. This result is unlikely to occur at this stage, however, because no vehicle exists for translating the theory into relevant evidence in a law suit.

    Stage 4: A technique is devised, or an instrument is designed and built, that will permit the theory to be applied practically in a forensic setting.

    Stage 5: After devising a methodology, further tests must demonstrate a positive correlation between the results and the underlying theory. This stage is necessary to prove that the effects observed are not the result of some unidentified cause.

    Stage 6: After the test has been shown to yield reliable results that are relevant

[Vol. 42

dininister
l declare
nd, if the
in many
sult.[307]

) include
e relevant
le of cri-
:ceptance
r number
hnique in
; purpose
vorthy.[310]

se by as-
alidity of
Clearly,
scientific
iphasized
entance"
\ from,
that dem-
cientist is

t 153-54.
5 (1988).
Rptr. at 153;
*ule,* 25 Wм.

549 P.2d at

s out that a

uiry and
nay take
iowever,
in a law

that will

positive
iecessary
l cause.
relevant

likely to be familiar with the experimental data and their meaning.[313]

Moreover, only a scientist will be familiar with the nature and extent of dissenting views and their significance.[314] Specifically, a scientist will know whether experimentation is in such an early stage that no clear conclusions can be drawn, particularly where there are conflicting points of view.[315] Alternatively, the scientist will know whether, despite some dissent, experimentation has advanced to the point that there are indeed "generally accepted" conclusions.[316] Finally, a scientist who does not make his living from application of the technique will have no "axe to grind" and can be better trusted to offer an unbiased opinion.[317]

This technique has been applied successfully to voiceprint analysis, the result being that the *Frye* test was failed when the only testimony regarding general acceptance was that of a technician and law enforcement officer. In *People v. Kelly,*[318] the California Supreme Court held that a voiceprint analysis was inadmissible since it failed to meet the *Frye* test. The only testimony regarding general acceptance was that of a technician and law enforcement officer who had been trained by the leading pioneer in voiceprint analysis, headed the

---

to disputed issues in a law suit, a court then may admit these results properly into evidence, and a qualified expert may interpret the results before the jury.

*Id.* at 556 (footnote omitted). Professor Moenssens notes that the courts' failure to examine these six stages of development of a scientific technique has led to the acceptance of some techniques under *Frye* that have not reached the final stage of experimental verification. This failure is one of many reasons that have led Professor Moenssens to argue for replacing *Frye* with a more flexible alternative. Whether or not such a course is wise, *Frye* is much more likely to achieve its purposes when courts apply the test with the six stages of scientific development in mind.

313. As Professor Giannelli states:
    Even if empirical validation is recognized, a technician's testimony should never suffice to establish the validity of a new technique: "[T]he technician merely follows prescribed routines, and is not expected to understand their underlying fundamentals. He knows how, but not why." Because it is critical to know the "why," or, as in the case of empirical validation, the implications of not knowing the "why," the views of scientists are essential. Moreover, a technician would not be qualified to testify about the general acceptability of a technique because presumably only a scientist would be sufficiently conversant with the views held by those in the relevant field.

Giannelli, *supra* note 250, at 1214-15 (footnotes omitted) (quoting Kirk, *The Interrelationship of Law and Science,* 13 Buffalo L. Rev. 393, 394 (1964)).

314. *Id.*

315. *See supra* notes 312-313.

316. *See* Giannelli, *supra* note 250, at 1210-11; Giannelli, *General Acceptance of Scientific Tests—Pure and Beyond,* in Scientific and Expert Evidence, *supra* note 259, at 24.

317. *See* E. Imwinkelried, Methods of Attacking Scientific Evidence § 4-6(b), at 137-41 (1982) [hereinafter E. Imwinkelried, Methods of Attacking]; J. Tarantino, *supra* note 307, at 12-14; Giannelli, *supra* note 250, at 1215-16.

318. 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976).

Michigan State Police Voiceprint Identification Unit, frequently tes-
tified as a voiceprint expert, and, in short, had "virtually built his
career on the reliability of the [voiceprint] technique."[319] The court
declared that such a technician could not "assess fairly and impar-
tially the nature and extent of any opposing scientific views."[320]

Applying this approach to scent lineups results in defining the
"relevant scientific field" as consisting of those scientists, whether
biologists, anatomy specialists, or dog psychologists, who are fa-
miliar with the experimental data regarding the trustworthiness of
canine scent discrimination generally and scent lineups in particu-
lar.[321] Furthermore, any witness testifying about general acceptance
must not make his living by using dogs for scent discrimination tasks.
It is this definition of the relevant field, and this restriction on the
persons whose opinions are being considered, that leads to the con-
clusions stated below.

Second, both validity and reliability must be shown.[322] "Valid-
ity" addresses whether a test is accurate and whether it measures
what it is supposed to measure.[323] "Reliability" refers to the con-
sistency with which repeated tests yield the same results.[324] The pur-
poses of *Frye* suggest that both validity and reliability are necessary
since a single test suggesting high accuracy is meaningless if later tests
reach contrary conclusions.[325] Such later tests may reveal flaws in the
methods used in, or limits to the inferences that may be drawn from,
the early tests.

---

319.  *Id.* at 38, 549 P.2d at 1249, 130 Cal. Rptr. at 153-54.

320.  *Id.*

321.  This definition of those who make up the relevant field does not mean that only
experiments conducted by scientists in that field are relevant in determining general accep-
tance. For example, a technician lacking the technical credentials of a research scientist but
who gains a strong familiarity with the scientific method might, *in consultation with scientists,*
conduct scent lineup experiments under controlled conditions. If research scientists review
the nature of the experiments and approve of the methods and the likely trustworthiness of
the results, and if the results are replicable in similar controlled experiments, then the
technician's work will be relevant in deciding the question of general acceptance. Indeed,
at least one "scientific technician," Brigadier Jan de Bruin of the Rotterdam Municipal
Police, has conducted controlled experiments concerning scent lineups, doing so in consul-
tation with Professor E.P. Koster, an olfaction expert at the University of Utrecht, Holland.
*See infra* text accompanying notes 379-381. However, whether this technician's experiments,
in conjunction with the work of others, establish general acceptance of the validity and
reliability of scent lineups is a question to be resolved by the views of research scientists,
not the "scientific technician."

322.  Giannelli, *supra* note 250, at 1201 & n.20; Moenssens, *supra* note 308, at 548.

323.  J. TARANTINO, *supra* note 307, at 3-4; Giannelli, *supra* note 250, at 1201 & n.20.

324.  *See supra* note 323.

325.  *See* McCord, *supra* note 30, at 1190.

:ly res-
iilt his
: court
impar-
''320

ng the
·hether
are fa-
iess of
articu-
·ptance
i tasks.
on the
ie con-

'Valid-
·easures
ie con-
ie pur-
t ,ary
er tests
s in the
i from,

Third, the validity and reliability of both the underlying sci-
entific principles and the scientific technique must be shown.[326] A
technique that appears consistent and accurate may not justify reach-
ing the conclusions that the technique suggests if the underlying prin-
ciples are in error. For example, if a victim receives a threatening
phone call and records that call, numerous voiceprint experts might
agree that the recorded voice and the defendant's voice "match."
That match is meaningless, however, unless the underlying principle
that each person has a unique voice is correct. Conversely, if the
underlying principle is correct but the voice spectrogram cannot be
trusted accurately to match one voice to another, the results of a
spectrographic comparison will be meaningless.[327]

There are five relevant questions that the scientific community
must answer affirmatively if dog scent lineups are to pass the *Frye*
test:[328] (1) Does each person have a unique scent? (2) If yes, is there
a "core scent" that stays the same over time, despite changes in in-
dividual mood, diet, clothes, cologne, and similar factors? (3) If yes,
are at least some dogs biologically capable of discriminating among
the unique human body scents? (4) If so, can those dogs be trained
to use their capability accurately whenever so commanded by their
handlers? (5) If those dogs can be so trained, how much time can
elapse between the application of scent to the object and the holding
of the lineup after which the dogs still can discriminate successfully
among scents? The first two questions are concerned with the validity
of the underlying scientific principles, and the latter three questions
inquire as to the validity and reliability of the technique.

To the first question many might answer "yes," each person
does indeed have a unique scent. Although both the principle of scent
uniqueness and its general acceptance often are articulated clearly,[329]
the basis for such acceptance is less clear. Many widely varying ex-
periments have demonstrated that a dog can, under certain circum-

that only
ral accep-
entist but
*scientists,*
sts review
thiness of
then the
:. Indeed,
Municipal
in consul-
. Holland.
periments,
lidity and
scientists,

· '8.
n.20.

---

326. Giannelli, *supra* note 250, at 1211-14. The "validity" of a scientific principle, as
opposed to the technique applying that principle, might be better understood as meaning
that the theory reflects sound scientific reasoning, *see* Black, *supra* note 251, at 599-600,
and that it is supported by empirical verification, *see* Giannelli, *supra* note 250, at 1212-14.

327. *See, e.g.,* A. MOENSSENS, F. INBAU, & J. STARRS, *supra* note 273, at 663-64; Bessner,
*The Admissibility of Novel Scientific Techniques in Criminal Trials: Voice Spectroscopy,* 30
CRIM. L.Q. 294, 297-99 (1988).

328. These questions are suggested by the research results summarized in W. MCCARTNEY,
*supra* note 169, at 58-59, and by an analogy to the case law regarding the admissibility of
voice spectrograms. *See supra* note 327.

329. "It is generally accepted that humans have a scent and that it differs from one
individual to another." W. SYROTUCK, *supra* note 160, at xiii.

THE HASTINGS LAW JOURNAL [Vol. 42

stances, accurately distinguish among human odors (although the dispute continues as to what these particular circumstances are).[330] That fact, however, does not necessarily establish that human odors are *unique*. A wide enough sample might show that dogs cannot distinguish among the scents of certain persons, thus suggesting that these persons indeed have similar or identical scents.[331] Moreover, a dog's choosing among several persons might be the result of badly designed experiments, not necessarily perceived differences in human odors.[332] Nevertheless, some authors at least implicitly accept the view that research has proceeded far enough to justify the conclusion that the uniqueness of each human's scent is "generally accepted."[333] This uniqueness has been explained as follows. Heredity gives rise to individual DNA and its resulting individual characteristics. Thus, each person's sweat should have a unique composition.[334] The action of each individual set of skin bacteria on individual skin components and secretions (such as sweat) further differentiates each person's scent.[335] Varying combinations of clothing, shoes, toiletries, and diet, among other factors, therefore should particularize each person's scent.[336]

Dissenters from the theory of scent uniqueness, however, now have new evidence. Drs. I. Lehr Brisbin, Jr. and Steven N. Austad have completed research that challenges the theory of scent uniqueness.[337] Brisbin and Austad conducted numerous trials in which three dogs were required to choose between two scented articles, one treated with scent from a portion of the handler's body and one with scent from a portion of a stranger's body. They concluded that dogs could distinguish between handler and stranger scents both taken from human hands or both taken from human elbows but could not consistently distinguish between handler and stranger scents taken from different body parts; for example, from the handler's elbow but the

---

330. See the experiments summarized in W. McCARTNEY, *supra* note 169, at 18-58; *infra* text accompanying notes 337-390, 514-548.

331. *Cf. infra* notes 376-377 and accompanying text (summarizing experiment that suggests that dogs cannot distinguish between identical twins living in the same environment).

332. *See infra* notes 522-548 and accompanying text (suggesting ways to design fair scent lineup experiment).

333. *See infra* notes 334-336, 340-341 and accompanying text.

334. W. McCARTNEY, *supra* note 169, at 28-29; W. SYROTUCK, *supra* note 160, at 21.

335. W. SYROTUCK, *supra* note 160, at 21-44. *But see* Telephone interview with Dr. L.J. Myers, Director, Institute for Biological Detection Systems, Auburn University (Oct. 3, 1989) (challenging the notion that the bacterial action theory of human scent has been experimentally proven correct).

336. W. SYROTUCK, *supra* note 160, at 21-44.

337. I. Brisbin, Jr. & S. Austad, *supra* note 198, at 13-15.

stranger's hand. The authors suggested two possible conclusions from their study. Individual odors may exist for specific human body parts, but there is no unique individual odor characteristic of a particular human and detectable by the dog regardless of the anatomical source of the odor. Alternatively, there may be an individual unique human body scent, but present training methods are inadequate to teach the dog to make the necessary discrimination accurately.[338] Brisbin and Austad's research is important because it draws into question the theory of scent uniqueness, and if human scents are *not* unique, then scent lineups unquestionably fail the *Frye* test. At the very least, Brisbin and Austad's work suggests the need for further research on whether human scents are unique, and if so, on how dogs can better be trained to discriminate among those scents.

The second question—whether there is a "core scent" that remains the same despite changes in mood, diet, clothes, and the like—is even harder to answer. Limited experimentation, discussed in Part III(B)(1)(a) of this Article, suggests that properly trained dogs of certain types can, at least under certain circumstances, discriminate between the scents of identical twins based solely on differences in the twins' diet or environment.[339] But whether a dog can match the scent of an individual taken at one point in time to the scent of that same individual at a later time when his diet, clothes, and environment have been varied in the interim has been little tested.

A suggested experiment would have a subject handle a porous object, then eat a different diet, wear different clothes, live in an environment where different odors were present, and finally, change his cologne for one week. A non-suggestive, properly designed object lineup would then be held at the end of that week. If the dog chose the correct object in the lineup, and if other experimenters working with other dogs reached similar results, that would strongly suggest that there is indeed a "core" scent that remains constant over time. To the author's knowledge, as of the writing of this Article, no such series of experiments has been conducted.

Nevertheless, respected authors in the field have concluded, with some caution, that "[t]here is probably a basic odor which is typical of each individual in good health and normal circumstances. This, in turn, can likely be varied somewhat by emotions, toiletries, clothing, and diet."[340] This "basic odor" is thought to "retain its characteristic feature just as a human face does whether angry, or

---

338. *Id.* at 1, 3-4, 9-12, 14-15.
339. *See infra* text accompanying notes 373-377.
340. W. SYROTUCK, *supra* note 160, at 36.

laughing, or weeping."[341] The basis of this conclusion is unclear, but it is probably founded on the success of a significant number of dogs in correctly discriminating among persons and objects after the passage of a fairly long period of time. Yet ultimately, the lack of controlled experimentation specifically designed to test that conclusion calls into question whether the conclusion should be considered "generally accepted" within the meaning of *Frye*. Moreover, the experiments of Brisbin and Austad outlined above suggest that there may be many "core" scents if indeed there are any "core" scents at all, because there may be a different "core" for each part of the human anatomy.[342]

It is important to emphasize that even if the "basic odor" theory were discarded, that only would call into question the trustworthiness of lineups conducted after such time as to permit significant changes in the subject's diet and environment. If the lineup is conducted within hours of the crime, the individual's scent is less likely to have significantly changed.

The third question should be answered "yes": numerous experiments demonstrate that, at least under some conditions, properly trained dogs are biologically capable of discriminating among human odors.[343]

The fourth question, however, should be answered "no": it is not generally accepted that a dog can be trained to use his biological capacity for scent discrimination accurately upon command. Factors that raise the chances of correct canine scent discrimination include: the dog's breed; careful selection of a highly motivated animal; close bonding between dog and handler; lengthy, tedious, and precise training for a single type of scent discrimination task; and the elimination of suggestive circumstances.[344] When these factors are present, it is unquestionably true that under certain circumstances some dogs have been trained to discriminate correctly upon command.[345] There has been too little experimentation, however, to determine precisely what training and which other circumstances are necessary to ensure accuracy on any given occasion.

Indeed, Brisbin and Austad's recent research efforts suggest that our present knowledge of dog training is insufficient to justify the use of dog scent lineups. Thus these authors conclude:

---

341. W. MCCARTNEY, *supra* note 169, at 59.

342. *See supra* text accompanying notes 337-338.

343. *See* W. MCCARTNEY, *supra* note 169, at 73, and the numerous experiments summarized throughout McCartney's text.

344. *See id.* at 17, 27-28, 57-58, 60-61, 74-75.

345. *See id.; infra* text accompanying notes 362-390.

> [I]dentification of individuals on the basis of information that the dog obtains from scent articles is an important component of the use of dogs in law enforcement . . . . Although it may indeed be possible to train individual dogs to perform such [scent discrimination] tasks . . . we feel that the results presented here make it clearly incumbent upon the individual dog trainer or handler to demonstrate with data collected under conditions of controlled scientific observation, that the dog under consideration can indeed perform the required scent identification tasks with an acceptable degree of statistical reliability, before evidence based on the performance of such a dog should be accepted in a court of law.[346]

Dr. Brisbin also found much research on the training of dogs to perform scent lineups to be flawed, because the dogs were not asked to perform "blank" lineups in which the true match to the scent did not appear at all. Such tests are necessary in order to control against the dog's choosing someone because it wants to please its master, and not because it truly recognized the scent.[347]

European research technician Jan de Bruin meanwhile insists that he indeed has learned how to train dogs to avoid such false identifications and that he has performed controlled experiments confirming that dogs can be trained accurately to discriminate scents in lineups upon command.[348] Although the results of his experiments are available in English, de Bruin has yet to publish any explanation of the number, manner, and circumstances of the experiments conducted.[349] Moreover, replication of his experiments has not yet been attempted in the United States or elsewhere.

Finally, as to the fifth question, it is unclear how much time may elapse between the laying of a scent and the holding of a lineup before the accuracy of a dog's discrimination is affected. Assuming that there is a unique core scent that remains constant over time, over how long a period can a dog still detect that scent? Some experiments suggest an upper limit of between three to six weeks,[350] while others

---

346. I. Brisbin & S. Austad, *supra* note 198, at 14-15; *see also* Telephone interview with Dr. L. J. Myers, Director, Institute for Biological Detection Systems, Auburn University (Oct. 3, 1989) (expressing the opinion that further experimental research is necessary to determine whether scent lineups are reliable).

347. Telephone interview with I. Brisbin (June 1, 1989).

348. de Bruin, *supra* note 157, at 8-9, 11; *see also* Frawley, *supra* note 157, at 10-12. As noted earlier, de Bruin is in charge of the Rotterdam, Holland, Police Canine Unit. He has conducted all the experiments discussed in this Article himself, but he designed the experiments (and his program for training dogs and handlers) by consulting with a scientist, Dr. E.P. Koster of the University of Utrecht, Holland. *See supra* note 321; *infra* note 379 and text accompanying both notes; *see also* Letter from Dr. E.P. Koster to Andrew E. Taslitz (June 16, 1989) (on file with the author of this Article).

349. de Bruin, however, is working on a book that will explain his experiments in detail. *See* Letter I, *supra* note 9.

350. *See infra* text accompanying notes 383-386.

suggest that, under the right circumstances, the limit may be as high as six months.[351] Some European researchers claim an upper limit of three years if certain standardized procedures are followed.[352] These few limited experiments, only one of which dealt with a true scent lineup,[353] are insufficient to establish the general acceptance of a time limit within which scent lineup discrimination may still be considered trustworthy.

Moreover, the European claim of accurate results after three years is implausible. One of the critical components of human scent is the vapor produced by bacterial action on human skin cells and skin secretions.[354] It is difficult to imagine conditions under which this bacterial action could be maintained for such a long period of time. Moreover, it seems that a bacterial action lasting that long would break down all the skin cells and skin secretions involved. If "food" other than skin cells and skin secretions were given to the bacteria, the nature of the vapor released by the bacteria and thus the scent on the object likely would change. Absent rebuttal of these observations, it is impossible to understand the significance of the little research done or to reconcile the apparently conflicting results.

Accordingly, scent lineups, whether conducted promptly or long after a crime, do not pass the *Frye* test. This does not mean, however, that such lineups should never be admissible in a *Frye* jurisdiction; rather, it means that scent lineups should be inadmissible until and unless research establishes their reliability.[355]

In the many jurisdictions that do not follow *Frye* at all or that consider general acceptance as only one factor in a broader analysis of relevancy and weight,[356] the lack of general acceptance will not automatically condemn scent lineups to exclusion at trial.

---

351.  *See infra* text accompanying notes 387-388.

352.  *See* Frawley, *supra* note 157, at 12.

353.  *See* de Bruin, *supra* note 157, at 8-11.

354.  *See supra* notes 182-185 and accompanying text.

355.  Professor Samuel G. Chapman, a political scientist who has written extensively on the use of police dogs, has reached a similar, if slightly more optimistic, conclusion (albeit without reviewing for his readers the scientific research supporting that conclusion):

> It will take many years of research and experimentation, but it is possible that law enforcement will enter the age of scent identifications. This suggests that trained dogs, under the supervision of handlers, could be used to conduct scent lineups with the results eventually carrying the weight of a fingerprint identification. Farfetched, perhaps, but efforts to rise above problems in this area could lead to an impressive achievement.

S. CHAPMAN, *supra* note 39, at 220-21.

356.  United States v. Downing, 753 F.2d 1224, 1238 (3d Cir. 1985) (acceptance among the scientific community as but one factor); Giannelli, *supra* note 250, at 1203, 1232-35 (alternatives to *Frye*).

# EXHIBIT: E

1). the Lastest of Petitioners Mental Health disorder conditions while incarcerated. They date back to 2002. before trial. ✓ (I.E still waiting to obtain mental health discovery from Contra Costa County Jail ( 19-pages)

ATTACHED TO EXHIB
( 19 PAGES ),

( pg 80 )